IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MC ASSET RECOVERY, LLC, | |
| Plaintiff, | CIVIL ACTION FILE |
| v. | NO. 1:06-CV-0417-BBM |
| THE SOUTHERN COMPANY, | |
| Defendant. | |

## O R D E R

This matter is before the court on Defendant The Southern Company's ("Southern") Motion to Establish the Governing Law [Doc. No. 309].

## I.   Factual and Procedural Background

The court will give a brief overview of the facts, which have been set out more thoroughly in previous Orders filed in this case. Plaintiff MC Asset Recovery, LLC ("MCAR") has filed this action to recover transfers of money and other value from Mirant Corporation and its various affiliates (collectively, "Mirant") to Southern between 1999 and 2001. The suit asserts that Southern caused Mirant, its subsidiary, to transfer approximately $2 billion to Southern, which left Mirant unable to pay its debts and ultimately forced it into bankruptcy in 2003.

According to MCAR, Mirant served as a holding company for Southern's energy business investments. Mirant acquired interests in multiple international and domestic energy assets and power companies. The acquisitions were funded

through a combination of Southern funds advanced to Mirant and financing from third party lenders. Mirant used some of the third party funding to repay Southern, but any difference between the amount received from third party lenders and the purchase price of the acquisition was allegedly treated as an equity contribution by Southern to Mirant. Later, Southern required Mirant to repay all of the funds it had advanced to Mirant with interest, despite MCAR's allegation that the funds were properly characterized as equity contributions.

In July 1999, Mirant transferred $289.5 million to Southern. In October 1999, Mirant transferred $744.8 million to Southern. These amounts allegedly represented repayment for Southern's prior advances to Mirant, plus interest. In December 1999, it is alleged that Southern caused Mirant to pay it a dividend of $165 million, for which Mirant received no value. MCAR alleges that Mirant was insolvent at the time of these transfers or, alternatively, was rendered insolvent by the transfers. (See Fourth Am. Compl. ¶¶ 22-41, 52-55, 60-72.)

In May and July 2000, during the run-up to the Mirant initial public offering and spin-off, Mirant paid Southern additional dividends in the amounts of $450 million and $53 million. (Id. ¶¶ 77-85.) Again, Mirant allegedly received no value in exchange for these transfers, and was either insolvent at the time or rendered insolvent by the transfers.

To effect the spin-off of Mirant from Southern, the two entities entered into a series of separation agreements. Under these agreements, Mirant agreed to indemnify Southern against various liabilities, including tax obligations and other contractual obligations Southern may have had to subsidiaries of Mirant. Mirant also transferred its interest in valuable subsidiaries to Southern, and agreed to pay fees for the continued use of Southern's business infrastructure and outstanding Southern guarantees in support of Mirant's business. (Id. ¶¶ 88-91, 102-05.) MCAR alleges that the separation agreements amounted to another transfer of value from Mirant to Southern, for which Mirant received nothing in exchange.

This litigation seeks to avoid these transfers as fraudulent. Mirant assigned MCAR its rights under the Bankruptcy Code to avoid the allegedly fraudulent transfers or related transactions that took place on or before April 2, 2001, the date the spin-off was complete. (See Am. and Restated Second Am. Joint Chapter 11 Plan of Reorganization for Mirant Corporation and its Affiliated Debtors, Ex. A, ¶ 206.) MCAR alleges the following claims: avoidance of certain transfers made by Mirant to Southern, under 11 U.S.C. § 544(b); aiding and abetting a breach of fiduciary duty;[1] unjust enrichment; and alter ego liability.

---

[1] MCAR also alleged a breach of fiduciary duty claim, but this court ruled that the claim failed as a matter of law. (Ct. Order, Dec. 11, 2006, at 21.)

The Complaint was originally filed in the Northern District of Texas as part of Mirant's Chapter 11 reorganization in Bankruptcy Court.[2] The District Court for the Northern District of Texas withdrew the reference and then transferred the case to the Northern District of Georgia pursuant to Southern's motion under 28 U.S.C. § 1404(a). Discovery has not yet concluded. Despite this, Southern filed the instant Motion seeking the court's ruling on choice of law questions. Specifically, Southern asks the court to rule that the Georgia fraudulent conveyance statute, Ga. St. Ann. 18-2-22 (1991) ("Section 18-2-22"), which was in force at the time the actions in question occurred, is the applicable state law. Southern and MCAR in its Response Brief also present the question of the applicability of the Federal Debt Collection Procedure Act ("FDCPA").[3]

## II.     Law Governing the Allegedly Fraudulent Transfers

### A.     Texas Choice of Law

---

[2] Mirant's reorganization plan under Chapter 11 was confirmed on December 9, 2005.

[3] Though this Motion is not filed according to any schedule provided for by the Local Rules, and Southern did not seek leave to file it, the court will decide it now in the interest of narrowing the issues for any motions for summary judgment and the trial. The court understands that most of the facts relevant to the choice of law decision are not disputed by the parties, and are unlikely to change over the course of the remaining discovery period.

The case was originally filed in Texas and then transferred to Georgia. This court, as the transferee forum, must apply the law of Texas, the transferor forum. Ferens v. John Deere Co., 494 U.S. 516, 523 (1990). That means that this court must apply the choice of law rules that a Texas court would apply in determining the applicable substantive law.[4] Under Texas law, a claim for fraudulent transfer arises in tort. ASARCO LLC v. Americas Mining Corp., 382 B.R. 49, 62 (S.D. Tex. 2007). Texas has adopted the "most significant relationship" test, as described in Sections 6 and 145 of the Restatement (Second) of Conflict of Laws, to govern conflicts of law that sound in tort. Gutierrez v. Collins, 583 S.W.2d 312, 318 (Tex. 1979).

Southern seeks to have the law of Georgia apply to this case because Georgia has the most significant relationship to the action. If Texas's choice of law rules do point to Georgia as the source of the substantive law, the Georgia statute that was in effect at the time of the transfers would apply. See, e.g., Laddin v. Edwards, No. 1:02-CV-3327-TWT, 2006 WL 1097491, at *7 n.3 (N.D. Ga. Apr. 21, 2006) (Thrash, J.); In re McLain, No. 01-12342-WHD, 2004 WL 5309101, at *5 (Bankr. N.D. Ga. Sept. 30, 2004); Gerschick v. Pounds, 281 Ga. App. 531, 532 n.8, 636 S.E.2d 663, 665 n.8 (2006).

---

[4] When a federal court has jurisdiction pursuant to federal question jurisdiction, it applies federal choice of law rules. See, e.g., Sec. & Exch. Comm'n v. Infinity Group, 27 F. Supp. 2d 559, 564 (E.D. Pa. 1998). Neither party has argued that federal choice of law rules should apply to this case. In any event, the federal "independent judgment" test is identical to the most significant relationship test under Texas choice of law rules. In re Consol. Capital Equities Corp., 143 B.R. 80, 85 (Bankr. N.D. Tex. 1992).

That statute is Section 18-2-22 of the Georgia Code. Section 18-2-22 was repealed in part on July 1, 2002, when Georgia adopted the Uniform Fraudulent Transfers Act ("UFTA"), codified at Section 18-2-70 et seq. <u>Chepstow Ltd. v. Hunt</u>, 381 F.3d 1077, 1081 (11th Cir. 2004).

MCAR believes that Texas law should apply. The Texas law that was in effect at the time the transfers were made was the Texas UFTA, Tex. Bus. & Comm. Code § 24.001 et seq. It contends that Texas's contacts, aggregated with the contacts of other UFTA states that have an interest in the matter, have the most significant relationship to the conflict,[5] and therefore Texas's UFTA should be applied. Alternately, MCAR argues that there is no conflict between Georgia law and Texas law, in which case the law of Texas would apply because it is the forum state.

1.    Is there a conflict between the Georgia and Texas laws?

There must be a true conflict between the laws in question before a court will conduct a choice of law analysis. <u>Vandeventer v. All Am. Life & Cas. Co.</u>, 101 S.W.3d 703, 712 (Tex. App. 2003). In the absence of such a conflict, the law of the other state is presumed to be the same as the law of the forum. <u>Starlek, L.L.C. v. Arnold</u>, No. 05-99-01169-CV, 2000 WL 330186, at *2 (Tex. App. Mar. 30, 2000).

---

[5] As will be discussed, "[w]hen certain contacts involving a tort are located in two or more states with identical local law rules on the issue in question, the case will be treated for choice-of-law purposes as if these contacts were grouped in a single state." Restatement (Second) of Conflict of Laws § 145 cmt. i.

Southern seeks to have Georgia law apply to the fraudulent transfer claims, and bears the burden of showing that it differs from Texas law.  Id. ("Under Texas law, the burden is on the party asserting the application of foreign law to first show the existence of a true conflict of laws and then to demonstrate which law should apply based on state contacts to the asserted claims.").

Georgia's old law, Section 18-2-22, reads in its entirety:

> The following acts by debtors shall be fraudulent in law against creditors and others and as to them shall be null and void:
> (1) Every assignment or transfer by a debtor, insolvent at the time, of real or personal property or choses in action of any description to any person, either in trust or for the benefit of or on behalf of creditors, where any trust or benefit is reserved to the assignor or any person for him;
> (2) Every conveyance of real or personal estate, by writing or otherwise, and every bond, suit, judgment and execution, or contract of any description had or made with intention to delay or defraud creditors, where such intention is known to the taking party; a bona fide transaction on a valuable consideration, where the taking party is without notice or ground for reasonable suspicion of said intent of the debtor, shall be valid; and
> (3) Every voluntary deed or conveyance, not for a valuable consideration, made by a debtor who is insolvent at the time of the conveyance.

Ga. St. Ann. 18-2-22 (2001).

In order for MCAR to prevail under subsection (3), "it must be proven that: (1) the deed or conveyance was voluntary; (2) there was no valuable consideration exchanged for the transfer; and (3) the debtor was insolvent at the time of the

transfer."[6] In re Stewart Fin. Co., No. 05-3085, 2007 WL 1704423, at *4 (Bankr. M.D. Ga. June 8, 2007). The party bearing the burden of proof at trial, in this case MCAR, bears the burden on all three elements. Id. at *5; Fed. Deposit Ins. Corp. v. United States, 654 F. Supp. 794, 808 (N.D. Ga. 1986) (Murphy, J.); see In re Greenberg, No. 01-42188, 2003 WL 21919441, at *4 (Bankr. S.D. Ga. May 13, 2003). By contrast, the Texas statute provides that once indicia of fraud are shown and the presumption of fraud arises, the burden shifts to the defendant, here, Southern, to establish that the transfer was not fraudulent. In re Klutts, 216 B.R. 558, 562 (Bankr. W.D. Tex. 1997). Because the respective statutes place differing burdens on the parties, there is a true conflict between the laws. See In re Terry Mfg. Co., No. 04-3135-WRS, 2007 WL 1560087, at *5 (Bankr. M.D. Ala. May 29, 2007).

   2. The "most significant relationship" test.

---

  [6] The court assumes that MCAR would proceed under subsection (3). An action under subsection (1) involves "an insolvent debtor who retains an interest or benefit from the property transferred," which the court does not believe to apply to the facts of this case. Trust Co. Bank of Nw. Ga., N.A. v. Manning, No. 4:90-cv-278-HLM, 1993 WL 294184, at *6 (N.D. Ga. May 21, 1993) (Murphy, J.) As for subsection (2), "the trustee must prove that each payment [made] prior to bankruptcy was: (1) made with the intent to delay or defraud creditors; and (2) the Defendants knew that payments were made for such purpose." Laddin, 2006 WL 1097491, at *7; In re Smith, No. 07-50410-JDW, 2007 WL 3238717, at *2 (Bankr. M.D. Ga. Oct. 30, 2007); compare 11 U.S.C. § 548(a)(1)(A) with id. § 548(a)(1)(B). The court is not aware of any allegations that Southern caused the transfers in question to be made with the actual intent to delay or defraud Mirant's creditors.

"The starting point for any conflict-of-laws decision is the <u>Restatement (Second) of Conflicts [sic] of Laws Section 6</u>." <u>Greenberg Traurig of N.Y., P.C. v. Moody</u>, 161 S.W.3d 56, 70 (Tex. App. 2004); <u>see</u> <u>Vanderbilt Mortgage & Fin., Inc. v. Posey</u>, 146 S.W.3d 302, 314-15 (Tex. App. 2004). Section 6 lists seven factors that are relevant to the choice of the applicable rule of law:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2).

In a tort action, the rights and liabilities of the parties "are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in [Section] 6." <u>Id.</u> § 145(1). The contacts to be taken into account when applying those principles are:

> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.

Id. § 145(2).  In sum, "Section 145 directs that the law of the state with the most significant relationship to the particular issue in tort should govern that issue. Section 6 requires us to consider the relative interests of the respective states in having their laws applied to this case."  Cates v. Creamer, 431 F.3d 456, 464 (5th Cir. 2005) (citation omitted).

i. Aggregation of Texas and New York contacts

In evaluating the contacts with various states, the Restatement treats contacts located in two or more states that have identical state law as contacts from a single state, for purposes of choice of law decisions.  Restatement (Second) of Conflict of Laws § 145 cmt. i; see also In re Morse Tool, Inc., 108 B.R. 384, 388 (Bankr. D. Mass. 1989).  New York, in addition to Georgia and Texas, has important contacts with the case, namely, that the majority of Mirant's creditors and also the overwhelming percentage of the dollar value of claims are located in New York.  (See MCAR's Resp. to Southern's Mot. to Establish Governing Law 6, 17-19.)

New York has adopted the Uniform Fraudulent Conveyance Act ("UFCA"), the predecessor statute to UFTA.  MCAR argues that UFTA and UFCA are virtually identical and have no significant differences for the purposes of this case.  Thus, according to MCAR, the place of the injury, New York, under Section 145 and the

interest of Texas as the forum under Section 6 should be grouped together to favor the application of UFTA.

There are relevant differences between UFCA and UFTA. In re Nirvana Rest. Inc., 337 B.R. 495, 509 & n.11 (Bankr. S.D.N.Y. 2006) (observing that UFTA requires that the debtor objectively intended, believed, or reasonably should have believed that he would incur debts beyond his ability to pay as they became due, while UFCA uses a subjective standard); see also id. at 508 & n.9; Drenis v. Haligiannis, 452 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2006). Moreover, most states that adopted first UFCA and then later UFTA treat the statutes as substantively different. See, e.g., Hickman v. Turitto, No. 1:06-CV-151, 2007 WL 2892788, at *5 (E.D. Tenn. Sept. 28, 2007); In re Lowenstein, 361 B.R. 326, 329 n.2 (Bankr. D. Mass. 2007); Drolett v. Boltach, No. 266607, 2007 WL 1374861, at *1 (Mich. App. May 10, 2007). "UFCA and its successor, the UFTA, are similar, [but] they are not identical and vary from state to state." In re Exide Tech., Inc., 299 B.R. 732, 749 (Bankr. D. Del. 2003); see also, e.g., In re Consol. Capital Equities Corp., 143 B.R. 80, 84 (Bankr. N.D. Tex. 1992) (noting that, though both New York and California had adopted UFCA, they imposed different burdens of proceeding on the substantive elements); 5 Collier on Bankruptcy, ¶ 548.01[3] (15th ed. rev. 2007). But see In re Pajaro Dunes Rental Agency, Inc., 174 B.R. 557, 572 (Bankr. N.D. Cal. 1994) ("Unless otherwise specified,

common-law authorities and case-law dealing with the UFCA, UFTA, Bankruptcy Act of 1898 or the Bankruptcy Code may be cross-referenced whatever the statutory basis of the action at bar.").

Therefore, the court does not find it appropriate to group contacts with New York and contacts with Texas for purposes of the choice of law analysis. Though similar policies underlie both uniform statutes, and their structure and organization are generally the same, see In re Canyon Sys. Corp., 343 B.R. 615, 634 n.15 (Bankr. S.D. Ohio 2006); Cheswell, Inc. v. Premier Homes & Land Corp., 319 F. Supp. 2d 135, 138-39 (D. Mass. 2004), they are no more the same law than Georgia's Section 18-2-22 is the same as UFTA.

ii.    Restatement Section 145

The court will first identify the significant contacts under Section 145. The relevant parties are Southern and Mirant, both of which had their principal place of business in Georgia.[7] More specifically, Mirant's corporate finance department and energy trading operations were located in Atlanta. The relationship between the parties was centered in Georgia. Many, if not all, of the transfers in question were implemented by executives of Southern and Mirant located in Georgia. "There is no

_____

[7] Southern and Mirant were also both incorporated in Delaware, but for most issues, "a corporation's principal place of business is a more important contact than the place of incorporation." Restatement (Second) of Conflict of Laws § 145 cmt. e.

doubt that the activities of which complaint is made in this action were centered in Atlanta . . . ." (Judge McBryde's Mem. Op. and Order, N.D. Tex., Feb. 15, 2006, at 7.) Thus, three of the four Section 145 contacts favor Georgia.

The fourth contact, the place where the injury occurred, favors New York and other states. One of the basic aims of the Bankruptcy Code is to allow a trustee to represent the interests of all creditors in avoiding fraudulent transfers and thus maximizing the value of the debtor's estate. See, e.g., In re Davis, 785 F.2d 926, 927 (11th Cir. 1986); In re Vogel Van & Storage, Inc., 210 B.R. 27, 33 (N.D.N.Y. 1997). It follows that an injury to the estate by way of a fraudulent transfer is an injury to the creditors, who stand to lose out when the estate is diminished. Mirant's unsecured creditors are spread over a number of states, with the bulk of the value and the most creditors in New York. (MCAR's Resp. to Southern's Mot. to Establish Governing Law 11 n.25; see Fourth Am. Compl. ¶ 129.)

The substantive issue in this case is whether the transfers made by Southern of Mirant's assets to itself were fraudulent, such that MCAR can now avoid them on behalf of Mirant's creditors. New York has a strong connection to the facts and circumstances that relate to the fraudulent transfer issue. It is home to the creditors, and the purpose of fraudulent transfer law is to protect creditors. However, the other three contacts obviously favor Georgia, as it was the principal place of

business of both Southern and Mirant and the center of their relationship, and was the location of the transfers themselves. Georgia is thus both the place of business and the location of the defendant's conduct, which suggests that Georgia law will apply. <u>See</u> Restatement (Second) of Conflict of Laws § 145 cmt. e.

MCAR argues that the state of the applicable law in fraudulent transfer cases tends to be the state where the creditors are located. In fact, a review of the cases MCAR cites indicates that they better support the proposition that all factors are relevant and to be weighed against one another. <u>See</u> <u>In re Integra Realty Res., Inc.</u>, 198 B.R. 352, 362 (Bankr. D. Colo. 1996) (applying the law of the state where the transfer originated and from where it was approved, where the debtor's principal place of business was, where a significant number of creditors were, and where a significant number of those receiving the transfer were located); <u>In re Consol. Capital</u>, 143 B.R. at 85 (selecting the law of the state in which the debtor's headquarters, principal place of business, majority of assets, majority of employees, board of directors, and greatest concentration of creditors were located); <u>In re O'Day Corp.</u>, 126 B.R. 370, 391 (Bankr. D. Mass. 1991) (applying the law of the state that was home to the assets transferred, home to the debtor's business operations and employees, and where the greatest concentration of creditors were located); <u>In re O.P.M. Leasing Servs., Inc.</u>, 40 B.R. 380, 395 (Bankr. S.D.N.Y. 1984) (choosing the law

of the state where the vast number of creditors were located, where the debtor was incorporated, and from where it did the major portion of its business).[8]  The cases certainly do not support the proposition that the location of the creditors is a decisive or otherwise more important factor.

iii.     Restatement Section 6

The first factor under Section 6 is the needs of the interstate system.  The purpose of this factor is to harmonize relations and facilitate commercial activities between states.  Restatement (Second) of Conflict of Laws § 6 cmt. d.  In this case, both Texas and Georgia have statutes allowing creditors to avoid fraudulent transfers.  It seems unlikely that the application of one statute over the other would cause any harm to relations or commercial transactions between the states.  See Baird v. Bell Helicopter Textron, 491 F. Supp. 1129, 1144 (N.D. Tex. 1980).

The second factor is the relevant policies of the forum state.  Texas is the forum state in this litigation.  Texas has laws allowing fraudulent transfers to be avoided, but the parties and issues in this case have little connection to Texas.  Aside from the fact that Mirant filed its bankruptcy petition in Texas, the court can discern no reason that Texas would have an interest in seeing its law applied.  (Cf. Judge

---

[8] The court notes that New York does not apply the same choice of law rules as Texas.  See In re O.P.M. Leasing, 40 B.R. at 392.  Also, the analysis in the case ultimately proved the conflict to be a false conflict.  Id. at 395.

McBryde's Mem. Op. and Order, N.D. Tex., Feb. 15, 2006, at 4-5, 7.) Texas was merely the place where the action was filed, and now that the action has been moved, it has even less of an interest. <u>See</u> Restatement (Second) of Conflict of Laws § 6 cmt. e.

Other interested states in this matter include Georgia and New York under the third factor. In selecting the applicable law, the court should attempt to accommodate the relevant policies of all the interested states. Both Georgia and New York provide paths to avoid fraudulent transfers with the purpose of protecting creditors. <u>See, e.g.</u>, <u>Brown Transport Corp. v. Street</u>, 194 Ga. App. 717, 719, 391 S.E.2d 699, 702 (1990); <u>In re O.P.M. Leasing</u>, 40 B.R. at 392. In general, "the state whose interests are most deeply affected should have its local law applied." Restatement (Second) of Conflict of Laws § 6 cmt. f. As discussed above, Georgia and New York both have important interests at stake based on their relevant contacts, but Georgia's contacts are slightly weightier. Thus, this factor slightly favors Georgia's substantive law.

MCAR argues that Georgia has no interest in applying its old law, now that it has adopted UFTA. While this argument has some logical appeal, the court rejects it. Georgia has an interest in this matter because it was home to the parties, their business, and the transactions that gave rise to this lawsuit. Section 18-2-22 governs

fraudulent transfers with the purpose of protecting creditors, and Georgia courts

have continued to apply it to transfers made before July 1, 2002. <u>See, e.g.</u>, <u>Laddin</u>,

2006 WL 1097491, at *7 n.3; <u>In re Smith</u>, No. 07-50410-JDW, 2007 WL 3238717, at *2

n.1 (Bankr. M.D. Ga. Oct. 30, 2007); <u>In re McLain</u>, 2004 WL 5309101, at *5; <u>Gerschick</u>,

281 Ga. App. at 532 n.8, 636 S.E.2d at 665 n.8 (2006). Georgia's interest does not

diminish simply because the applicable law is an older version of its current statute.[9]

The fourth factor is the protection of justified expectations. Southern and

Mirant, both Georgia-based businesses, can reasonably be said to have expected

Georgia law to apply to the transfers. The court notes that protection of the justified

---

[9] MCAR's citation to <u>Berghammer v. Smith</u>, 185 N.W.2d 226 (Iowa 1971), does not change that conclusion. There, an Iowa court applied Minnesota law in personal injury litigation between a Minnesota resident and an Illinois resident. Minnesota did not permit recovery by a wife for loss of consortium at the time the accident in question occurred, but subsequently the law was changed to allow such a claim. The new Minnesota law was specifically made prospective in its application and would not have permitted the wife in <u>Berghammer</u> to recover. However, the Iowa court decided that enforcing the abandoned Minnesota rule would not advance Minnesota's interests. The Iowa court surmised that the new Minnesota rule had been made applicable prospectively to allow those relying on the old rule to secure more insurance against a potential increase in liability. Because the defendant in <u>Berghammer</u> lived in Illinois, which allowed wives to recover for loss of consortium, the court presumed that he was already adequately insured for loss of consortium claims. Thus, the court found that neither Minnesota's nor Iowa's policy interests would be served by applying the old Minnesota rule. <u>Id.</u> at 232-33. In this case, Georgia cannot be said to have abandoned its old law. Section 18-2-22 was modified and updated by Georgia's UFTA statute, and Georgia courts continue to apply the old statute as appropriate. Also, Southern is a Georgia business. To the extent that it tailored its allegedly fraudulent activities to fit within the requirements of any law, it was likely the law of Georgia in place at the time, Section 18-2-22. Georgia retains an interest in applying its law that existed at the time of the transfers.

expectations of the parties is less important in the field of torts. Restatement (Second) of Conflict of Laws § 145 cmt. b. Most of Mirant's creditors are in New York and extended credit either from New York or pursuant to documents governed by New York law. (Fourth Am. Compl. ¶ 129.) New York law "demonstrates a policy generally geared toward protecting New York creditors." In re O.P.M. Leasing, 40 B.R. at 392. However, the creditors chose to conduct business with entities based in Georgia, so they should have had some expectation that Georgia law could apply. See Sacks v. Four Seasons Hotel Ltd., No. 5:04CV73, 2006 WL 783441, at *19 (E.D. Tex. Mar. 24, 2006).

Fifth, the court should consider the basic policies underlying the particular field of law. The primary policy of fraudulent transfer law is the protection of creditors. MCAR acknowledges that Georgia's Section 18-2-22 also serves to protect creditors, but then simply asserts that this factor favors UFTA because UFTA accomplishes creditor protection. (See MCAR's Resp. to Southern's Mot. to Establish Governing Law 8.) The court notes that New York law and Texas law both employ a burden shifting mechanism that requires the transferee to prove that the transfer was not fraudulent after the presumption of fraud has been raised. In re O.P.M. Leasing, 40 B.R. at 393; In re Klutts, 216 B.R. at 562. By allowing a creditor to raise a presumption of insolvency and then placing the burden of going forward on the

transferee, the New York and Texas laws may protect creditors better than the Georgia law, which keeps the burden on the creditor at all times. See In re O.P.M. Leasing, 40 B.R. at 393; compare id. with United States v. Reid, 127 F. Supp. 2d 1361, 1369 (S.D. Ga. 2000) (requiring plaintiff seeking to avoid the transfer to prove debtor's insolvency).

The sixth factor, certainty, predictability, and uniformity of result, appears to favor Texas's UFTA law simply because so many other states have also adopted UFTA, including Georgia. However, the court notes that this factor is of most importance in areas in which the parties may give advance thought to the legal consequences of their actions, such as contractual relationships and interests in land. Restatement (Second) of Conflict of Laws § 6 cmt. i. The court does not give this factor great weight in the instant fraudulent transfer action.

Finally, the last factor is ease of determination and application of the law. This case has been transferred to a federal court in Georgia, which is more familiar with Georgia law than with Texas law. Though the court could educate itself on Texas law, this factor favors Georgia law. See Sacks, 2006 WL 783441, at *20. Georgia's Section 18-2-22 was extensively litigated prior to its repeal, and the court does not anticipate problems in applying it.

In sum, the Section 6 factors do not alter the court's above conclusion that Georgia has the more significant relationship to this case. Some of the overarching factors that guide a choice of law inquiry favor Texas or New York law, but at least an equal number favor Georgia law. That, combined with Georgia's predominance over the Section 145 factors, indicates to the court that application of Georgia law to this case is appropriate.

## B.     FDCPA

MCAR asserts an argument based on the FDCPA, 28 U.S.C. §§ 3001 et seq. The FDCPA provides "the exclusive civil procedures" for the United States to collect debts that are owed to it and to avoid fraudulent transfers as to its own debts.  Id. § 3001(a); see id. § 3304.   Because the United States is a Mirant creditor and, according to MCAR,[10] could use the FDCPA to avoid transfers, MCAR asserts that it can use the same statute to avoid transfers on behalf of the United States — essentially that  the FDCPA is "applicable law" within the meaning of 11 U.S.C. § 544.  In addition, the FDCPA preempts any state law that conflicts with its provisions, 28 U.S.C. § 3003(d), so MCAR argues that it can rely on FDCPA if state law prejudicially conflicts with it.

---

[10] The United States has not filed a claim under the FDCPA to the court's knowledge. (Reply Br. in Supp. of the Southern Company's Mot. to Establish the Governing Law, Ex. A, at 5-6.)

The court notes at the outset that it has found no case in which a court approved such a use of the FDCPA by an estate representative. Though government entities, including the Federal Energy Regulatory Commission and the Treasury Department, have filed proofs of claims, no United States agency has asserted the FDCPA in this action. In fact, the United States may not stand to gain from relying on the provisions of the FDCPA, as the statute instructs that it is not to be construed to supersede or modify the terms of the Bankruptcy Code. 28 U.S.C. § 3003(c)(1). The court is skeptical of an argument that would allow a private estate representative to appropriate for its own use a federal statute that creates rights exercisable only by the United States, when the United States has not asserted those rights in the first place.

Under the FDCPA, "debt" is defined as an amount that is owed to the United States, and does not include any amount that is owed "under the terms of a contract originally entered into by only persons other than the United States." <u>Id.</u> § 3002(3)(B). The legislative history demonstrates that debt was given a deliberately limited definition:

> The definition of 'debt' was carefully written to make clear that the act will not apply to obligations which began as purely private loan or contract obligations. For example, if one of our constituents goes to his neighborhood bank or thrift and takes out a business or personal loan, that transaction is between him and the bank or thrift. . . . This is true even if the bank or thrift later fails and is taken over by Federal

regulators.  If the Federal Government seeks to recover these loan or contract obligations . . . it is not eligible to use the new procedures in this act.

United States v. Bongiorno, 106 F.3d 1027, 1036 (1st Cir. 1997) (quoting 136 Cong. Rec. H13288 (daily ed. Oct. 27, 1990) (statement of Rep. Brooks)).  A debt for purposes of the FDCPA is one which "if collected, will inure directly to the government's benefit (in contrast to benefitting a third party)."  Id.  MCAR's argument assumes that the amounts allegedly owed to the United States meet this narrow definition.  Based on this assumption, MCAR argues that it can assert the FDCPA because it can assert a claim that any unsecured creditor could have brought.

The cases that have considered this issue are very few, although there is some limited support for MCAR's position.  See In re Pajaro Dunes, 174 B.R. at 572 n.42 (suggesting the possibility that "applicable law" could include the FDCPA).  One court observed that the United States was among the creditors and then quoted the FDCPA (which was very similar to the relevant state statute) for the elements of constructive fraud.  See Freeland v. Enodis Corp., ch. 7 Case No. 98-40533, Adv. No. 99-04022, slip op. at 9-10 & 12 n.10 (Bankr. N.D. Ind. July 28, 2004).  However,

MCAR identified no case in which the court allowed a non-government entity to actually rely on the provisions of the FDCPA.[11]

The closest case factually to the instant matter rejected a trustee's claim under the FDCPA because an attempt by a non-government entity to utilize the avoidance powers of the FDCPA "seems far afield from the intent of the FDCPA." <u>In re Bonham</u>, 224 B.R. 435, 437-38 (Bankr. D. Alaska 1998). The issue in <u>Bonham</u> was whether a court order, secured by the Securities & Exchange Commission ("SEC"), mandating that the debtor disgorge profits was a debt under the FDCPA. Believing that it was a debt, the bankruptcy trustee initiated an avoidance action on the basis of the FDCPA. As the court put it, a "threshold question is whether a disgorgement claim of the SEC against the debtors is a 'debt' under the FDCPA, allowing the trustee to enforce the SEC's rights in bankruptcy." <u>Id.</u> at 436. Framing the issue as such indicates that the trustee could assert the SEC's claim under the FDCPA if the amount was a "debt." The court then concluded that the disgorgement was not a debt owing to the United States but rather an equitable remedy designed to deter violations of securities law. Therefore, "neither the trustee nor the SEC [were] within the ambit of the FDCPA." <u>Id.</u> at 437. Reading <u>Bonham</u> in full suggests that

_____

[11] MCAR has not fully set forth how it would use the FDCPA, or on which provisions it would rely.

the court believed the trustee would be able to assert the FDCPA if a debt of the United States was involved.

At the same time, the SEC had filed a proof of claim against the estate in <u>Bonham</u>. <u>Id.</u> at 436. The mere existence of a government agency as a creditor was not enough for the <u>Bonham</u> court to allow a private entity to assert the FDCPA in an avoidance action. <u>See also</u> <u>In re Bendetti</u>, 131 Fed. Appx. 224, 226 (11th Cir. 2005). In the present case, the United States is a creditor of Mirant, but it has not asserted a claim under the FDCPA. (Reply Br. in Supp. of the Southern Company's Mot. to Establish the Governing Law, Ex. A, at 5-6; MCAR's Resp. to Southern's Mot. to Establish Governing Law 17-19.) The court cannot conclude on the basis of the facts before it that MCAR should be able to utilize the FDCPA. There is only limited information in the record now before the court about the amounts owed to the United States.[12] Neither is there anything presently before the court to indicate whether the United States could properly proceed under the FDCPA.

MCAR also cites cases in which courts have permitted bankruptcy trustees to benefit from the ability of the United States to avoid state statutes of limitations. <u>United States v. Gleneagles Inv. Co.</u>, 565 F. Supp. 556, 583 (M.D. Pa. 1983); <u>In re Hunt</u>, 136 B.R. 437, 451 (Bankr. N.D. Tex. 1991), <u>abrogated on other grounds by In</u>

---

[12] MCAR alleges that various agencies of the United States were owed between $200 million and $1 billion as of the dates of the transfers.

re CompuAdd Corp., 137 F.3d 880, 882-83 (5th Cir. 1998). The United States was a significant presence as a creditor in both of those cases. In fact, in Gleneagles, the United States actually commenced the avoidance action to recover several millions of dollars in unpaid taxes. In Hunt, the Internal Revenue Service ("IRS") was the largest creditor of the debtor.

Furthermore, in these cases, the United States had the right to recover based on applicable law other than the FDCPA. In In re Greater Southeast Community Hospital Corp. I, 365 B.R. 293 (Bankr. D.D.C. 2006), the court allowed the trustee to assert the government's statute of limitations because the IRS and the Department of Health and Human Services were creditors of the estate. Id. at 299-300, 304-05. The Internal Revenue Code and the common law right of the government to recover funds paid in error gave the respective government agencies the bases for their claims. Here, as already noted, the United States has not asserted the FDCPA. Indeed, the court is uncertain whether the United States could properly do so, given the narrow definition of "debt" in the statute. A private estate representative may not benefit from the FDCPA "just because an arguable debt is owed to the United States." In re Bendetti, 131 Fed. Appx. at 226. The court is mindful of this proposition, which accords with the narrow definition of "debt" intended by the drafters of the FDCPA.

Southern also argues that MCAR cannot use the FDCPA because the debt recoverable by the United States under that statute would not inure to all creditors equally. The Bankruptcy Code only permits a trustee to assert claims on behalf of the estate and not individual creditors. In re Colonial Realty Co., 168 B.R. 506, 511 (Bankr. D. Conn. 1994) ("[A] a bankruptcy trustee lacks standing to bring causes of action on behalf of certain unsecured creditors when the damages recoverable under the action would be distributed only to the specific group of creditors on whose behalf the trustee was asserting the action.") (citing Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416 (1972)), disagreed with by Ryan v. Sullivan, Hill, Lewin, Rez, Engel and LaBazzo, 316 B.R. 101, 106-07 (D. Conn. 2004). In In re Colonial Realty, the court refused to allow the bankruptcy trustee to assert a claim based on the Federal Deposit Insurance Corporation's ("FDIC") avoidance power under 12 U.S.C. § 1821(d)(17). The court reasoned that the trustee had standing to assert the claims of other creditors under the Bankruptcy Code only if the benefits of the action inured to all creditors ratably. In re Colonial Realty, 168 B.R. at 511. The FDIC's claim, according to the court, was more of a "personal" claim that was not on behalf of all interested creditors. Id. (citing Koch Refining v. Farmers Union Credit Cent. Exch., Inc., 831 F.2d 1339, 1347 n.11 (7th Cir. 1987)). Accordingly, the trustee could not assert the FDIC statute one behalf of the FDIC.

Southern argues that the FDCPA is analogous because its terms permit only the United States to recover. Therefore, recovery accrues to the government and not to all creditors, and the trustee has no standing to bring the government's "personal" claim. The difference, though, is that the FDIC statute expressly states that the rights it grants are superior to the rights of a trustee under the Bankruptcy Code. 12 U.S.C. § 1821(d)(17)(D). The FDIC's claim did not inure to all creditors ratably because its claim had priority over those of the other unsecured creditors. See In re Sahni, 227 B.R. 748, 751 (D. Kan. 1998); In re Colonial Realty Co., 980 F.2d 125, 134 (2d Cir. 1992). By contrast, the FDCPA explicitly did not alter the Bankruptcy Code. 28 U.S.C. § 3003(c)(1). A claim of the United States as creditor would receive the same priority as the rest of the unsecured creditors, and would increase the pro rata distribution each creditor receives, so it cannot be said to be a "personal" claim in the same way as the FDIC's claim in In re Colonial Realty. Cf. In re Greater Se. Cmty. Hosp., 365 B.R. at 301. The court is not convinced that In re Colonial Realty precludes a trustee from asserting a claim under FDCPA.

## C.      Conclusion

To summarize, the court finds that Georgia's old law, Section 18-2-22, is the applicable state law under Texas choice of law principles. Georgia has the most significant relationship to the issues raised in this lawsuit. As for the FDCPA, the

court is quite skeptical of MCAR's ability to assert the federal statute on behalf of the United States as creditor under 11 U.S.C. § 544(b), but because the issue has not been fully briefed, the court will not foreclose further argument on the issue, if such arguments can properly be made.

### III.    Law Governing MCAR's Other Claims

In its Order dated December 11, 2006, the court applied Delaware law to MCAR's claims for breach of fiduciary duty,[13] aiding and abetting a breach of fiduciary duty, and alter ego liability, and Georgia law to the claim for unjust enrichment. (Ct. Order, Dec. 11, 2006, at 20, 26-27.) Southern asks that the court rule now that Georgia law applies to the claim for aiding and abetting a breach of fiduciary duty. Southern provides almost no argument in support of its position, and certainly no argument to persuade the court to rule again on an issue it has already resolved to the best of its ability. (See Mem. of Law in Supp. of the Southern Company's Mot. to Establish Governing Law 14-15.) Delaware law applies to the claims for breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and alter ego liability, and Georgia law applies to the claim for unjust enrichment.

### IV.    Summary

For the foregoing reasons, the Motion to Establish the Governing Law [Doc.

---

[13] The court granted summary judgment in favor of Southern on the claim of breach of fiduciary duty. (Ct. Order, Dec. 11, 2006, at 21.)

No. 309] is GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED, this 1st day of April, 2008.

s/Beverly B. Martin
BEVERLY B. MARTIN
UNITED STATES DISTRICT JUDGE