IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MC Asset Recovery, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CIVIL ACTION NO. |
| | ) 1:06-CV-0417-BBM |
| The Southern Company, | ) |
| | ) __JURY TRIAL DEMANDED__ |
| Defendant. | ) |
| | ) |
| | ) |

## __BRIEF OF MC ASSET RECOVERY, LLC IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT__

# TABLE OF CONTENTS

**Page**

I.    The Fraudulent Transfers Under O.C.G.A. § 18-2-22(3) .........................2

*The '99 Returns*.....................................................................................2
*The 2000 Dividends* ...........................................................................6
*Transfers Integral to the IPO/Spin-off* ........................................11

II.   The Fraudulent Transfers Under O.C.G.A. § 18-2-22(2) ......................13

*Evidence of SEI's Fraudulent Intent* .............................................14
*Evidence of Southern's Knowledge of SEI's Intent*......................18
*There Is No Element of Harm Required Under § 18-2-22(2)* .......20

III.  Unsecured Creditors Exist to Void the Transfers ....................................22

IV.  Summary Judgment Is Not Appropriate on the Illegal
     Dividend Claims.......................................................................................24

*Direct Right of Action*....................................................................24
*The '99 Returns and Separation Transfers Were Illegal Dividends* .............27
*The "Delcared" Dividends Were Illegal*........................................28
*Bad Faith* ........................................................................................31

V.   Summary Judgment Is Not Appropriate on the Aiding and
     Abetting Claims .......................................................................................32

*Insolvency and Zone of Insolvency Under Delaware Law*............33
*The Business Judgment Rule Offers No Protection in This Case* ...............35
*The Exculpation Clause Is Irrelevant to the  Aiding and Abetting Claims*...39
*Knowing Participation* ....................................................................39
*Damages* ..........................................................................................40
*No In Pari Delicto Defense for Southern* ......................................40
*Limitations* ......................................................................................41

VI.  Summary Judgment Is Not Appropriate on the Unjust
     Enrichment Claims...................................................................................42

HOU:2861969.1

*Limitations* ..................................................................................42

*Expectation of Compensation Is Not an Element of Unjust
   Enrichment*..............................................................................45

*The Existence of a Genuine Contractual Obligation Is a Material
   Fact Issue*................................................................................46

*Damage* ......................................................................................47

**VII.   The Self-Dealt Release Provides No Defense.............................................48**

HOU:2861969.1

# TABLE OF AUTHORITIES

**Page**

## Cases

*7547 Partners v. Beck,*
    682 A.2d 160 (Del. 1996)...............................................................42

*In re Adelphia Commc'ns Corp.,*
    323 B.R. 345 (Bankr. S.D.N.Y. 2005) ...........................................7

*Allied Capital Corp. v. GC-Sun Holdings, L.P.,*
    910 A.2d 1020 (Del. Ch. 2006) ....................................................39

*Anderson Oil Co. v. Benton Oil Co.,*
    271 S.E.2d 207 (Ga. 1980) ...........................................................19

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)........................................................................6

*Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.,*
    829 A.2d 143 (Del. Ch. 2003) ......................................................40

*Aronson v. Lewis,*
    473 A.2d 805 (Del. 1984).......................................................20, 36

*ASARCO LLC v. Americas Mining Corp.,*
    No. 1:07-CV-0018, 2008 WL 4009927 (S.D. Tex. Aug. 30, 2008)........37, 38

*Associated Wholesale Grocers, Inc. v. United States,*
    927 F.2d 1517 (10th Cir. 1991) ......................................................7

*AT&T Corp. v. Walker,*
    No. C04-5709FDB, 2006 WL 2927659 (W.D. Wash. Oct. 12, 2006)..........26

*Banyan Licensing, L.C. v. Orthosupport Int'l, Inc.,*
    296 F. Supp. 2d 885 (N.D. Ohio 2003) ........................................43

HOU:2861969.1

*In re Biscayne Inv. Group, Ltd.,*
    264 B.R. 765 (Bankr. S.D. Fla. 2001) ............................................................4

*Brown v. Citizens & S. Nat'l Bank,*
    317 S.E.2d 180 (Ga. 1984) ..................................................................2, 3, 21

*Brown v. Cooper,*
    514 S.E.2d 857 (Ga. Ct. App. 1999) ........................................................3, 20

*Brown v. Gen. Elec. Capital Corp. (In re Foxmeyer Corp.),*
    286 B.R. 546 (Bankr. D. Del. 2002) ............................................................7

*Brown v. Penland Construction Co.,*
    641 S.E.2d 522 (Ga. 2007) ........................................................................46

*Carlson v. Hallinan,*
    925 A.2d 506 (Del. Ch. 2006) ....................................................................19

*Celtic Life Ins. Co. v. Coats*,
    885 S.W.2d 95, 100 (Tex. 1994) ................................................................41

*Chuidian v. Philippine Nat'l Bank,*
    976 F.2d 561 (9th Cir. 1992) ......................................................................43

*Claybrook v. Morris (In re Scott Acquisition Corp.),*
    344 B.R. 283 (Bankr. D. Del. 2006) ..........................................................34

*Cochran v. Ogletree,*
    536 S.E.2d 194 (Ga. Ct. App. 2000) ..........................................................46

*Cohen v. KB Mezzanine Fund II, LP (In re SunMicron Sys. Corp.),*
    432 F.3d 448 (3rd Cir. 2006) ........................................................................4

*Comer & Co. v. Allen,*
    72 Ga. 1, 1883 WL 2813 (Ga. 1883) ..........................................................3

iv

*Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.,*
Civ. A. No. 12150, 1991 WL 277613 (Del. Ch. Dec. 30, 1991)............34, 35

*Crowthers McCall Pattern, Inc. v. Lewis,*
129 B.R. 992 (S.D.N.Y. 1991) ......................................................28

*Dev. Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.),*
250 B.R. 776 (Bankr. S.D. Fla. 2000) ...........................................6

*Dill v. Hamilton,*
44 S.E. 989 (Ga. 1903) ...............................................................22

*Eberhardt v. Bennett,*
137 S.E. 64 (Ga. 1927) .................................................................3

*EBS Litig. LLC v. Barclays Global Investors, N.A.,*
304 F.2d 302, 305 (3rd Cir. 2002).................................................31

*Elledge v. Friberg-Cooper Water Supply Corp.,*
240 S.W.3d 869, 871 (Tex. 2007) ..................................................43

*Ellinger v. United States,*
470 F.3d 1325 (11th Cir. 2006) .......................................................4

*Emerald Partners v. Berlin,*
787 A.2d 85 (Del. 2001)....................................................35, 37, 38

*Engram v. Engram,*
463 S.E.2d 124 (Ga. 1995) .....................................................43, 45

*F.D.I.C. v. Dawson,*
4 F.3d 1303 (5th Cir. 1993) ...........................................................42

*In re Firstline Corp.,*
No. 06-70145, 2007 WL 2460766 (Bankr. M.D. Ga., Aug. 23, 2007)...........4

HOU:2861969.1

*First Nat'l Bank v. Bayliss,*
 23 S.E. 851 (Ga. 1895) ............................................................................14

*Floyd v. Hefner,*
 556 F. Supp. 2d 617 (S.D. Tex. 2008)......................................................41

*Ford v. Blackshear Mfg. Co.,*
 79 S.E. 576 (Ga. 1913) ........................................................................ 21-22

*Gatz v. Ponsoldt,*
 925 A.2d 1265 (Del. 2007)......................................................................40

*Geyer v. Ingersoll Publ'ns Co.,*
 621 A.2d 784 (Del. Ch. 1992) ..................................................................33

*Glassberg v. Boyd,*
 116 A.2d 711 (Del. Ch. 1955) ..................................................................42

*Growe v. Bedard,*
 No. 03-198-B-S, 2004 WL 2677216 (D. Me. Nov. 23, 2004) ....................27

*Harris v. Huff (In re Huff),*
 160 B.R. 256 (Bankr. M.D. Ga. 1993) ......................................................24

*In re Healthsouth Corp. S'holders Litig.,*
 845 A.2d 1096 (Del. Ch. 2003) ................................................................41

*In re Hillsborough Holdings Corp.,*
 176 B.R. 223 (Bankr. M.D. Fla. 1994).........................................................4

*Howard v. Everex Sys., Inc.,*
 228 F.3d 1057 (9th Cir. 2000) ..................................................................20

*Hunstein v. Fiksman,*
 615 S.E.2d 526 (Ga. 2005) .......................................................................24

*IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.),*
 408 F.3d 689 (11th Cir. 2005) ....................................................................6

*Jaurequi v. John Deere Co.*,
    986 F.2d 170 (7th Cir. 1993) ........................................................45

*Jobin v. McKay (In re M & L Bus. Mach. Co.)*,
    84 F.3d 1330 (10th Cir. 1996) ........................................................6

*Johnston v. Wolf*,
    487 A.2d 1132 (Del. 1985) ..........................................................26

*Jones v. Blume*,
    196 S.W.3d 440 (Tex. App.—Dallas 2006, pet. denied) ..............................42

*Kahn v. Lynch Commc'n Sys., Inc.*,
    638 A.2d 1110 (Del. 1994) ..........................................................35

*Lane v. United States (In re Lane)*,
    742 F.2d 1311 (11th Cir. 1984) ....................................................3, 4

*Laventhol, Krekstein, Horwath, & Horwath v. Tuckman*,
    372 A.2d 168 (Del. 1976) ...........................................................42

*Lionheart Legend, Inc. v. Norwest Bank Minn. Nat'l Ass'n*,
    560 S.E.2d 120 (Ga. Ct. App. 2002) ................................................13

*Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group*
    327 B.R. 537 (D. Del. 2005) ......................................................34, 40

*Lowenberg v. City of Dallas*,
    168 S.W.3d 800 (Tex. 2005) .........................................................41

*Mahsa, Inc. v. Al-Madinah Petro. Inc.*,
    625 S.E. 2d 37 (Ga. Ct. App. 2005) ................................................24

*Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Co.*,
    477 F.3d 583 (8th Cir. 2007) .....................................................33, 34

HOU:2861969.1

*Mercantile Nat'l Bank v. Aldridge,*
    210 S.E.2d 791 (Ga. 1974) ...........................................................................19

*Metzger v. Farris, (In re e2 Commc'ns, Inc.),*
    320 B.R. 849 (Bankr. N.D. Tex 2004) .........................................................50

*Miller v. McCown de Leeuw & Co. (In re Brown Sch.),*
    386 B.R. 37 (Bankr. D. Del. 2008) ...............................................................35

*Mills Acquisition Co. v. MacMillan, Inc.,*
    559 A.2d 1261 (Del. 1989) ............................................................................35

*Moore v. Bay,*
    284 U.S. 4 (1931)...........................................................................................23

*Morris v. Standard Gas & Elec. Co.,*
    63 A.2d 577 (Del. Ch. 1949) ...................................................................29, 30

*Morrison v. Exxon Mobil Corp.,*
    No. 1:03-CV-140, 2007 WL 988862 (M.D. Ga. Mar. 29, 2007) .................47

*Nagy v. Bistricer,*
    770 A.2d 43 (Del. Ch. 2000) ........................................................................19

*In re Nat'l Forge Co.,*
    344 B.R. 340 (W.D. Pa. 2006).......................................................................10

*Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.,*
    636 A.2d 892 (Del. 1994) ..............................................................................25

*Official Comm. of Unsecured Creditors of Buckhead Am.*
    *Corp. v. Reliance Capital Group, Inc. (In re Buckhead Am. Corp.),*
    178 B.R. 956 (D. Del. 1994).........................................................................28

*Official Comm. of Unsecured Creditors of Cybergenics*
    *Corp. v. Chinery (In re Cybergenics Corp.),*
    226 F.3d 237 (3rd Cir. 2000), *cert. dismissed*, 124 S. Ct. 530 (2003) ..........23

HOU:2861969.1

*Orman v. Cullman,*
    794 A.2d 5 (Del. Ch. 2002) .......................................................................37

*In re Phar-Mor Inc.,*
    185 B.R. 497 (W.D. Pa. 1995)...................................................................10

*PHP Liquidating, LLC v. Robbins,*
    291 B.R. 592 (D. Del. 2003) ................................................................26, 31

*Protocomm Corp. v. Novell Advanced Servs., Inc.,*
    171 F. Supp. 2d 319 (E.D. Pa. 1999)..........................................................26

*Redding v. Comm'r,*
    630 F.2d 1169 (7th Cir. 1980) .....................................................................7

*Rolleston v. Cherry,*
    521 S.E. 2d 1 (Ga. Ct. App. 1999)..............................................................23

*Roselink Investors, LLC v. Shenkman,*
    386 F. Supp. 2d 209 (S.D.N.Y. 2004) ...................................................36, 37

*Safecard Servs., Inc. v. Halmos,*
    912 P.2d 1132 (Wyo. 1996).......................................................................42

*Sec. & Exch. Comm'n v. Infinity Group Co.,*
    27 F. Supp. 2d 559 (E.D. Pa. 1998)............................................................43

*Sheffield Steel Corp. v. HMK Enters., Inc.,*
    320 B.R. 405 (Bankr. N.D. Okla. 2004)....................................26, 29, 30, 31

*St. Paul Mercury Ins. Co. v. Meeks,*
    508 S.E.2d 646 (Ga. 1988) .......................................................................47

*Stanley v. Brock (In re Kettle Fried Chicken of Am., Inc.),*
    513 F.2d 807 (6th Cir. 1975) .....................................................................26

*State Housecraft v. Jones,*
    99 S.E.2d 701 (Ga. Ct. App. 1957) ..............................................................3

HOU:2861969.1

*Stinnett's Pontiac Serv., Inc. v. Comm'r,*
    730 F.2d 634 (11th Cir. 1984) ...................................................................3

*Stoker v. Bellemeade, LLC,*
    615 S.E.2d 1 (Ga. Ct. App. 2005), *rev'd on other grounds,*
    631 S.E.2d 693 (Ga. 2006) ................................................................ 45-46

*Stokes v. McRae,*
    278 S.E.2d 393 (Ga. 1981) .................................................................13

*Strickland v. Jones,*
    62 S.E. 322 (Ga. 1908) .......................................................................3

*Tectonic Network Inc. v. Wolford,*
    554 F. Supp. 2d 538 (D. Del. 2008) ...................................................38

*Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.),*
    493 F.3d 345 (3rd Cir. 2007) ..........................................................34

*U.S. Anchor Mfg. v. Rule Indus.,*
    443 S.E.2d 833, 835-36 (Ga. 1994) ...................................................49

*U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Falls, L.L.C.,*
    864 A.2d 930 (Del. Ch. 2004), *rev'd on other grounds,*
    875 A.2d 632 (Del. 2005) .............................................................34, 35

*United States v. McMahan,*
    392 F. Supp. 1159 (N.D. Ga. 1975), *aff'd,*
    556 F.2d 362 (5th Cir. 1977), *rev'd on other grounds,*
    569 F.2d 889 (5th Cir. 1978) ...........................................................13

*United States v. Reid,*
    127 F. Supp. 2d 1361 (S.D. Ga. 2000) ......................................... 12-13

*United States Virgin Islands v. Goldman, Sachs & Co,*
    937 A.2d 760 (Del . Ch. 2007) .........................................................46

HOU:2861969.1

*Village of Burnsville v. Westwood Co.*,
    189 N.W.2d 392, 397 (Minn. 1971) ............................................................49

*Von Kamp v. Gary*,
    52 S.E.2d 591 (Ga. 1949) ............................................................21

*Wallace v. Wallace*,
    5 S.E. 2d 580 (Ga. 1939) ............................................................20, 21

*Wal-Mart Stores, Inc. v. Coughlin*,
    235 S.W.3d 424, 429 (Ark. 2007) ............................................................49

*In re The Walt Disney Co. Derivative Litig.*,
    907 A.2d 693 (Del. Ch. 2005) ............................................................39

*Weinberger v. UOP, Inc.*,
    457 A.2d 701 (Del. 1983) ............................................................38

*Weinman v. Fid. Capital Appreciation Fund (In re Integra Realty Res., Inc.)*,
    198 B.R. 352 (Bankr. D. Colo. 1996) ............................................................26, 31

*Westmoreland v. Powell*,
    59 Ga. 256 (1877) ............................................................23

*Yoh v. Daniel*,
    497 S.E.2d 392 (Ga. Ct. App. 1998) ............................................................45

*Zampatti v. Tradebank Int'l Franchising Corp.*,
    508 S.E.2d 750 (Ga. Ct. App. 1998) ............................................................47

## STATUTES

11 U.S.C. § 544(b) ............................................................23

11 U.S.C. § 550(b)(1) ............................................................6

DEL. CODE ANN. tit. 6, § 1302(a) ............................................................33

HOU:2861969.1

DEL. CODE ANN. tit. 8, § 154 (2003)....................................................................29

DEL. CODE ANN. tit. 8, § 160...........................................................................28

DEL. CODE ANN. tit. 8, § 170 (2003) ................................................................28

DEL. CODE ANN. tit. 8, § 172...........................................................................29

DEL. CODE ANN. tit. 8, § 173 ...........................................................................28

DEL. CODE ANN. tit. 8, § 174...........................................................................26, 28

DEL. CODE ANN. tit. 8, § 174(a) ..................................................................24, 27

DEL. CODE ANN. tit. 8, § 174(c) ..................................................................25, 26

O.C.G.A. § 18-2-22(2) ...........................................................................13, 20, 21

O.C.G.A. § 18-2-22(3) ...................................................................................2

## SECONDARY SOURCES

RESTATEMENT (SECOND) CONFLICTS OF LAWS § 6 ....................................................44

RESTATEMENT (SECOND) CONFLICTS OF LAWS § 142 (Supp. 1988) ........................44

## INTRODUCTION

At all times material to the claims asserted by MCAR in this proceeding, Southern Energy, Inc. ("SEI")[1] was a wholly owned subsidiary of the Southern Company ("Southern"). SSF3. Through complete domination of SEI's board MSF506-513, Southern caused SEI to transfer at least $1.9 billion in cash and other value to Southern from July 1999 to September 2000 (the "Transfers"). MSF194-204, 259-266, 302, 412, 439, 474-476, 561. The Transfers are detailed on pgs. 5-7 of Southern's brief. After these transfers were completed, Southern divested itself of SEI through a process by which SEI became Mirant Corporation ("Mirant"), a publicly held company. Less than three years later Mirant filed for bankruptcy. SSF6.

MCAR has sued on behalf of SEI's creditors to set aside all the Transfers under two different provisions of the Georgia fraudulent transfer statute. It has also sued on behalf of the creditors, as well as on behalf of SEI, to recover the proceeds of the Transfers from Southern because they were unlawful dividends under Delaware law. Additional claims are asserted on behalf of SEI to recover the value of the Transfers because they unjustly enriched Southern and because

---

[1] For ease of reference, "SEI" refers to Southern Energy, Inc., its predecessors and subsidiaries. "Mirant" includes its subsidiaries as well. "SSF" refers to Southern's Statement of Material Facts. "MSF" refers to Plaintiff's Statement of Additional Facts.

1

Southern aided and abetted breaches of fiduciary duty by the SEI board in authorizing the transfers to Southern. Material fact issues exist with respect to all these claims, and none are subject to summary judgment dismissal.[2]

## I.  The Fraudulent Transfers Under O.C.G.A. § 18-2-22(3)

With respect to MCAR's constructive fraudulent transfer claims, Southern does not assert that there is no evidence of SEI's insolvency under Georgia law, but argues it is entitled to summary judgment (except for the claim arising from the December 1999 cash dividend) because the transfers were supported by valuable consideration. Whether there was valuable consideration for any of the transfers, however, is a disputed fact, on which there is substantial evidence.

*The '99 Returns.* Citing *Brown v. Citizens & Southern Nat'l Bank*, 317 S.E.2d 180, 184 (Ga. 1984), Southern argues that since the first two transfers in 1999 about which MCAR complains ("'99 Returns"), totaling $1.03 billion, were treated on the books as repayment of loans under a promissory note, they were supported by valuable consideration. The *Brown* case, however, does not support that position. It actually stands for the proposition that satisfaction of an existing loan *may* satisfy the valuable consideration element in O.C.G.A. § 18-2-22(3), but that it should be left to the jury to determine. The court reversed a directed verdict

---

[2] MCAR is no longer pursuing the alter ego claim or the fraudulent transfer claim based on the Turbine Transfer asserted in its Fourth Amended Complaint.

entered for the Plaintiff and, noting that a "bona fide" indebtedness is sufficient to support a transfer, affirmed the lower court's refusal to grant directed verdict for the defendant on that basis. The case was returned for a jury resolution.

Georgia courts have recognized for well over a century that questions as to the bona fides of indebtedness are jury issues. *See Comer & Co. v. Allen*, 72 Ga. 1, 1883 WL 2813, at *8 (Ga. 1883); *Strickland v. Jones*, 62 S.E. 322, 324 (Ga. 1908); *State Housecraft v. Jones*, 99 S.E.2d 701, 703 (Ga. Ct. App. 1957) (quoting *Eberhardt v. Bennett,* 137 S.E. 64, 68 (Ga. 1927)); *Brown v. Cooper*, 514 S.E.2d 857, 862 (Ga. Ct. App. 1999). However, no Georgia court has specified a test for the fact-finder to apply in determining the bona fides of an alleged debt in a fraudulent transfer context.

On the other hand, numerous cases discuss standards to use in determining whether advances constitute bona fide "debt" or "equity" in other contexts. To assist in determining whether advances represent bona fide debt or equity in the tax context, the Eleventh Circuit adopted an analysis that considers 13 factors in *Stinnett's Pontiac Serv., Inc. v. Comm'r*, 730 F.2d 634, 638 (11th Cir. 1984), while noting that the factors are not of equal significance and no one factor is controlling. Shortly thereafter, in *Lane v. United States* (*In re Lane*), 742 F.2d 1311, 1314-15 (11th Cir. 1984), the court clarified that all thirteen factors need not be weighed,

HOU:2861969.1

only those that are relevant to the particular transaction, and held that "debt requires a reasonable expectation of repayment that does not depend solely on the success of the recipient's business." *Id.* at 1315.

The Eleventh Circuit has also noted that this analysis is not confined to tax cases, but has been applied in fraudulent conveyance cases as well. *See Ellinger v. United States*, 470 F.3d 1325, 1333 (11th Cir. 2006) (citing *In re Hillsborough Holdings Corp.*, 176 B.R. 223, 248 (Bankr. M.D. Fla. 1994)). Given the identical nature of the factual determination, it is not surprising that bankruptcy courts also frequently turn to this same analysis in making the factual determinations necessary to validate (or invalidate) a claim. *See, e.g.*, *In re Firstline Corp.*, No. 06-70145, 2007 WL 2460766, at *2-3 (Bankr. M.D. Ga., Aug. 23, 2007); *In re Biscayne Inv. Group, Ltd.*, 264 B.R. 765, 770 (Bankr. S.D. Fla. 2001).

Whether the transfer of funds extinguished a bona fide debt or was a return of equity in the instant case is an issue of material fact for the jury to resolve. While treatment of advances on the parties' books and existence of a note may be factors that weigh in favor of treating transfers as payments of a bona fide debt, they do not resolve the issue as a matter of law. *See Cohen v. KB Mezzanine Fund II, LP (In re SunMicron Sys. Corp.)*, 432 F.3d 448, 455-56 (3rd Cir. 2006). Using the factors that are outlined in the Eleventh Circuit cases discussed above, the jury

HOU:2861969.1

may rely on a wide range of evidence to determine that the debt in this case was not bona fide. MSF1-271. It may be particularly interested in the following facts included in that evidence.

The note on which Southern relies was unsecured, had no specific maturity date (being a demand note), no event(s) of default, no default interest rate, nor any financial covenants by the maker. MSF102-103; 124-126. It was back-dated, and initially provided no principal amount. MSF91-92. Rather, a grid was attached to the note on which advances were supposed to be entered, but the grid was never maintained. MSF93-95. And the note was not signed by either officer who was then authorized by the board to sign notes such as the one in issue. MSF96-101.

Southern's 1997 and 1998 financial planning documents show no expectations for repayments. MSF119-123. In fact, repayment to Southern of the advances was within SEI's discretion. MSF127-131. SEI *chose* to keep the advances in the form of demand notes, but could convert the notes to equity as needed. MSF127-129. Cash flow modeling by Southern's treasury department did not even anticipate receipt of interest on these advances. MSF120. Before 1999, SEI had never paid any interest on intercompany advances. MSF119, 123.

The advanced funds almost entirely were used to acquire capital assets, and one of the metrics on which Southern's board evaluated the acquisitions was a

HOU:2861969.1

return on Southern's *equity*—with the Southern advances to SEI being the *equity*. MSF1-57, 67-71, 85-90. Internal SEI projections and communications referred to or treated the purported loans as equity. MSF144, 151-156. And SEI frequently represented to lenders, analysts, and credit reporting agencies that the advances were equity or could be converted to equity at SEI's discretion. MSF145-150.

For summary judgment purposes all inferences from such evidence must be drawn in favor of MCAR. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 255 (1986). This is sufficient evidence to support a jury determination that the '99 Returns were not in payment of bona fide debt, and were therefore not supported by valuable consideration under Georgia law.[3]

*The 2000 Dividends.* A dividend is for no consideration, and is a "classic fraudulent conveyance" if the corporation is insolvent at the time of the transfer.

---

[3] Southern does not address SENAG's claim for avoidance of the October 1999 cash transfer. Even if it were determined that the payments were of bona fide debt, Southern is not entitled to summary judgment on that claim because the cash upstreamed by SENAG from its borrowing can be traced to Southern without valuable consideration in return to SENAG. *See IBT Int'l, Inc. v. Northern* (*In re Int'l Admin. Servs., Inc.*), 408 F.3d 689, 707-08 (11th Cir. 2005). If Southern asserts it is a mediate transferee, Southern has the burden of proving that it received the money in good faith, for value, and without knowledge of the voidability of the transfer. *See* 11 U.S.C. § 550(b)(1). Southern has not carried this burden. *See Jobin v. McKay* (*In re M & L Bus. Mach. Co.*), 84 F.3d 1330, 1338 (10th Cir. 1996); *Dev. Specialists, Inc. v. Hamilton Bank, N.A.* (*In re Model Imperial, Inc.*), 250 B.R. 776, 798 (Bankr. S.D. Fla. 2000).

HOU:2861969.1

*In re Adelphia Commc'ns Corp.*, 323 B.R. 345, 376 n.104 (Bankr. S.D.N.Y. 2005). To find consideration for the $503 million of cash dividends paid in 2000 ("2000 Dividends"), Southern argues they should be treated as an "integral" part of a single "IPO/Spin-off" transaction from which SEI received value, *i.e.*, the IPO proceeds.

Research has not located any federal court in the Eleventh Circuit or any Georgia court that has articulated a test for integrating transactions for fraudulent transfer purposes. However, other jurisdictions have considered the "integration" or "collapsing" doctrine in the context of fraudulent transfer, and generally three "tests" have evolved in determining its applicability: (1) end result, (2) interdependence, and (3) binding commitment. *Brown v. Gen. Elec. Capital Corp.* (*In re Foxmeyer Corp.*), 286 B.R. 546, 573-74 (Bankr. D. Del. 2002), summarizes these tests and concludes that whether they are met is "an ultimate question of fact — that is a mixed question of fact and law." *Id.* at 575.

The concept of collapsing separate events into a single integrated transaction originated with tax cases. *See, e.g., Associated Wholesale Grocers, Inc. v. United States*, 927 F.2d 1517, 1522-23 (10th Cir. 1991); *Redding v. Comm'r*, 630 F.2d 1169, 1175 (7th Cir. 1980). The fact is that Southern actually sought and obtained a ruling from the IRS that the 2000 Dividends at issue in this case **not** be integrated

7

with the IPO/Spin-off, but "be treated as a dividend under section 301" of the Internal Revenue Code. MSF452-471.

In the pre-submission filing with the IRS, made by Arthur Andersen in April 2000 on Southern's behalf, it was represented that SEI would have the capacity to fund the cash distribution to Southern <u>independent</u> of the sale of a portion of its stock in the IPO, and that the dividend was consistent with distributions by SEI to Southern in prior years. MSF458-459. It was further represented that <u>market conditions</u> dictated that the dividend be paid regardless of whether a favorable ruling letter was received from the IRS, but that the IPO <u>might</u> <u>not</u> go forward without a favorable ruling, and the IPO/Spin-off <u>would</u> <u>not</u> occur without a favorable ruling. MSF461. In short, Southern itself represented to the IRS, before the cash dividends were paid, that they were neither dependant upon nor an integral part of the IPO/Spin-off.

After SEI paid the $450 million cash dividend to Southern in May 2000, the formal Ruling Request was filed with the IRS, again urging that the dividends not be integrated into the IPO/Spin-off transaction. MSF462-469. The Ruling Request explicitly stated that the dividends should be respected as a "separate, independent distribution" subject to section 301 and not part of the distribution by Southern of SEI stock. MSF468. In August 2000, the Request was approved. MSF470-471.

Having successfully argued to the IRS that these dividends were independent of the IPO/Spin-off, and having received the tax benefits that flowed therefrom, Southern should be precluded as a matter of law from now arguing that the dividends should be integrated into the IPO/Spin-off as part of a single transaction. Nonetheless, if Southern is permitted to invoke the doctrine in this proceeding, the evidence respecting the Revenue Ruling may be sufficient alone to established a genuine issue of material fact. If there is any question, however, there is substantial additional evidence from which the jury could draw the inference that these dividends should not be integrated with the IPO/Spin-off.

The dividends were declared and paid months before the IPO. SSF3, 85-88. The SEI Board resolutions approving the dividends do not mention the IPO or Spin-off; MSF413, 440; do not condition the dividends on implementation of an IPO or Spin-off; do not obligate anyone to consummate an IPO or Spin-off; and do not require Southern to return the money if the IPO or Spin-off do not occur for any reason. MSF413-416, 440-441.

Neither the Master Separation and Distribution Agreement ("MSDA") nor any other Separation Agreement that effectuated the IPO/Spin-off makes *any mention whatsoever* of the 2000 Dividends. MSF472-473; SSF110. The MSDA required Southern to reimburse SEI for its IPO-related costs, yet Southern did not

9

reimburse SEI for the lending costs (fees and interest) incurred when it borrowed money to pay Southern the 2000 Dividends. MSF479, 445-451, 480-483. And SEI told its lenders that it planned to pay the 2000 Dividends regardless of whether the IPO later occurred. MSF382, 425-426, 428, 429-438, 442-444.

These facts demonstrate clearly why the two cases Southern cites in support of its argument do not support summary judgment in this case. In the case of *In re Nat'l Forge Co.*, 344 B.R. 340, 345 (W.D. Pa. 2006), the two transactions occurred on the *same day*, and the company's board approved them at the *same* board meeting in the *same* resolution. Furthermore, it was undisputed that each critical step of the stock redemption plan in that case would not have occurred on its own, but instead depended on the occurrence of the others. *Id*. at 350.

Similarly, in the case of *In re Phar-Mor Inc.*, 185 B.R. 497, 499-500 (W.D. Pa. 1995), the stock purchase agreement ("SPA") between Phar-Mor and an investor *obligated* Phar-Mor to use a portion of the investor's payments to repurchase shares owned by two other persons, and the SPA recited that the repurchase was a *material inducement* to the SPA. There are no such undisputed facts, inducements, or obligations in the instant case. Southern's motion for summary judgment on this basis must be denied.

HOU:2861969.1

*Transfers Integral to the IPO/Spin-off*.  Although the 2000 Dividends are not among them, there are a number of other transactions that are integral to the IPO/Spin-off when any of the three tests noted earlier is applied.  The Series B Dividend and the transfers and obligations contained in the Separation Agreements ("Separation Transfers") were undisputedly part of the IPO/Spin-off.  The evidence clearly indicates that the final acquisition that Southern orchestrated for SEI must be integrated as well.  When all these truly related and dependent components of the IPO are combined, the enormity of SEI's loss is such that a jury could conclude that the "consideration" SEI received from the "integrated" IPO/Spin-off was too grossly inadequate to be valuable consideration in support of the transfers.

Southern's investment bankers told Southern an aggressive growth rate was vital to achieving a successful IPO/Spin-off of SEI.  MSF322-332, 345-349.  To try to fulfill its aggressive growth mission, SEI agreed to buy power plants from Potomac Electric Power Company ("PEPCO") for $2.65 billion and to assume related obligations totaling an estimated $2.3 billion.  MSF311-375, 418, 485-493.  This acquisition should be "integrated" because it admittedly was "essential" to the IPO's success.  MSF362-372, 420.  SEI's plan was to use IPO proceeds to pay for liabilities associated with the PEPCO acquisition, MSF376, 423-424, and PEPCO assets were used to satisfy the tax-free spin-off requirement that SEI be engaged in

HOU:2861969.1

an active trade or business for five years before the Spin-off and immediately thereafter. MSF496-505.

There is evidence from which the jury may conclude that the value of the PEPCO acquisition to SEI shortly before the IPO date was negative by $1.8 billion. MSF495. In addition, Southern's Guarantees as of September 30, 2000 stood at $357.6 million, and SEI's obligation to replace those guarantees arose directly from the MSDA. MSF477-478. These two elements combined contributed a negative $2.1576 billion to an "integrated" transaction. Therefore, the "value" to SEI of the IPO/Spin-off was not "almost $1 billion" as netted by Southern on page 14 of its brief, but <u>negative</u> by over $1.1 billion.

That is not the end of deficits, however, because included among the Separation Transfers was a purported contractual release of Southern that Southern now argues releases it from SEI claims of unjust enrichment, receipt of illegal dividends, and aiding and abetting breaches of fiduciary duty. If that is truly the reach of that release, the cost to SEI of the "integrated" transaction becomes negative by approximately $3 billion.

From this evidence, the jury could easily infer that integrating the IPO/Spin-off with its truly dependant components generates inadequate consideration to satisfy the "valuable consideration" requirement of the Georgia statute. *See United*

12

*States v. Reid*, 127 F. Supp. 2d 1361, 1369 (S.D. Ga. 2000) (recognizing that plaintiff could attempt to prove that the alleged consideration was inadequate); *United States v. McMahan*, 392 F. Supp. 1159, 1166 (N.D. Ga. 1975), *aff'd*, 556 F.2d 362, 366 (5th Cir. 1977), *rev'd on other grounds*, 569 F.2d 889 (5th Cir. 1978) (confirming that transfer of property to satisfy a debt that was grossly less than property's value is constructively fraudulent). Southern's Motion for Summary Judgment must be denied as to the Separation Transfers, including the Series B Dividends, as well as to the 2000 Dividends, even if the latter are treated as integral to the IPO/Spin-off.

## II.    The Fraudulent Transfers Under O.C.G.A. § 18-2-22(2)

Southern's motion for summary judgment on MCAR's claims under O.C.G.A. § 18-2-22(2) begins with the mistaken premise that the statute requires proof of three elements, including harm. Not only do the cases cited by Southern on page sixteen of its brief fail to support that premise,[4] the plain wording of the statute itself makes clear that there are only two elements that must be established: (1) that the debtor made a transfer with the intent to delay or defraud creditors; and (2) that the defendant had knowledge of this intent.

---

[4] *Stokes v. McRae*, 278 S.E.2d 393, 395 (Ga. 1981), and *Lionheart Legend, Inc. v. Norwest Bank Minn. Nat'l Ass'n*, 560 S.E.2d 120, 124 (Ga. Ct. App. 2002) each explicitly enumerate two elements, not three.

HOU:2861969.1

*Evidence of SEI's Fraudulent Intent*.   As to the first element, Southern

asserts there is no evidence to support fraudulent intent because MCAR cannot

point to specific people who expressly stated, believed, or suggested that SEI was

insolvent at the time of any transfer.   However, such direct evidence is not

necessary to support a finding of fraudulent intent.   In *Eberhardt v. Bennett*, while

discussing the specific statutory provision at issue in the instant case, the Georgia

Supreme Court, stated:

> …[T]he rule of evidence is thus stated:  "Since proof of fraud is
> seldom if ever possible by direct evidence, recourse to circumstantial
> evidence is a necessity, and there is no kind of action wherein it can
> be held with greater reason that the fact in issue may be inferred from
> other facts proved than in cases of this character.   Circumstances
> apparently trivial or almost inconclusive, if separately considered,
> may by their number and joint operation, especially when
> corroborated by moral coincidences, be sufficient to constitute
> conclusive proof."

137 S.E. at 67 (quoting 27 C.J. 822, § 771).   In the instant case, SEI's fraudulent

intent is a fact issue, and there is evidence from which the jury may infer that

intent.[5]

---

[5] *First Nat'l Bank v. Bayliss*, 23 S.E. 851, 852-53 (Ga. 1895), cited by
Southern, confirms that the question of intent is an issue for the fact finder.   The
court simply held that there was evidence to support the factual determinations
made by the lower court, and affirmed.   *Id*. at 852-53.   *Bayliss* does not stand for
any other proposition of law applicable to the instant case.

HOU:2861969.1

Throughout the entire time of the Transfers, the SEI directors had a motive for Southern to receive as much cash as possible from SEI. MSF305-308. In April 1999, Southern announced its intention to repurchase 50 million shares of its own stock over a two year period. MSF194. The SEI directors collectively held over one million shares of Southern stock, as well as various Southern stock options. MSF306. To the extent that Southern could effect the repurchase, the value of the remaining shares (including those of the directors) would be enhanced.

However, Southern faced liquidity problems at the time. MSF197. Therefore, it looked to SEI and its subsidiaries as a source of funds for its repurchase program. MSF196-197. Operating through control of SEI's board, Southern caused SEI and its subsidiary, SENAG, to borrow over $1 billion to make the '99 Returns alone. MSF200-204, 258-266. There is evidence of substantial material information either intentionally or negligently withheld from the lenders in that process. MSF205-238, 272-301, 385-405.

Although SEI was aware of ongoing issues of significant weaknesses in its internal controls, including an inability to track or calculate the historical performance of its business units, manually intensive data entry requirements, and short staffing, the lenders were not advised of the issues, the problems they presented, or the ongoing inability to solve them. MSF205-225. The internal

HOU:2861969.1

control problems were a particular issue for SEI's energy trading subsidiary, SCEM. MSF213-221.

As early as 1998, the lack of controls had led to discrepancies in the reporting of trades by Chris McDonald, one of SEI's natural gas traders. MSF226-227. Mirant ultimately admitted that for almost the entire year of 2000, Chris McDonald and another of SCEM's natural gas traders had knowingly submitted inaccurate reports to the government concerning the trades of natural gas by SCEM. MSF228-234. Both traders pleaded guilty to federal felony charges related to their trading activities that occurred during the period of time SEI was borrowing hundreds of millions of dollars to upstream to Southern. MSF235-238.

In addition to failing to disclose internal control weaknesses, SEI deliberately hid agreements from lenders that they knew would be of concern to the lenders. SEI disclosed information regarding one set of agreements entered into in 1999 by certain SEI subsidiaries, referred to internally as "Below-the-Line" agreements. MSF272-276. However, certain SEI subsidiaries also entered into another agreement, a "Price Risk Management Agreement," that SEI referred to as the "Above-the-Line" agreement. MSF277-281. This "Above-the-Line" agreement reversed the effects of the agreements that were actually disclosed to the lenders. MSF278. SEI took great pains to ensure that the lenders did not discover

16

the "Above-the-Line" agreement. MSF277-299. It was "not to even be mentioned to the banks or their representatives." MSF283. The evidence reflects that SEI believed that the "banks [could] not cope with the replacement power risk" that actually existed as a result of the undisclosed agreements. MSF285-286.

There were discrepancies with financial projections as well. In conjunction with the SENAG financing that was ultimately used to fund the October portion of the '99 Returns, the financial projections provided the lenders were significantly different than internal projections for the same time frame. Five year projections of earnings for SENAG, both earnings before interest, taxes, depreciation and amortization (EBITDA) and cash available for debt service (CAFDS) that were presented to lenders in SENAG's September 1999 offering memorandum were 10 to 20% higher than SEI's internal projections. MSF300-301.

The May 2000 dividend was funded by borrowings from a bank loan syndicated by the Bank of America. MSF406, 411-412. The bank utilized five year financial projections for two SEI scenarios going forward. One set of projections assumed "No IPO" and the other assumed an "IPO with Significant Investment." MSF377-380. With respect to the business units referenced in <u>both</u> <u>scenarios</u>, the forecasted "cash flow by projects" was materially higher for each year than the internally forecasted "cash flow by project" numbers sent by SEI to

its auditors just two months earlier for the purpose of calculating of SEI management compensation.  MSF381-385.

There is evidence of additional problems with the "significant investment" scenario.  It is, if not explicit, easily inferred that the "significant investment" is the PEPCO acquisition, on which SEI was within a week of submitting its final bid when the loan closed.  MSF387-395.  Yet, the projections in that scenario did not include any reference to SEI's internal PEPCO acquisition projections, which were showing that the forecasted cash flow from that investment as a whole was *negative* by over $1.0 billion from 2000-2004 when costs associated with obligations that SEI would have to assume in conjunction with the acquisition were included.  MSF390-404.  And the projection failed to disclose that SEI planned to fund over $800 million into a "defeasance" account to assure at least partial payment of the $2.3 billion obligation assumed in conjunction with the PEPCO acquisition.  MSF405.

*Evidence of Southern's Knowledge of SEI's Intent*.  With respect to the second element of MCAR's claim of actual fraudulent transfer, Southern argues that summary judgment is appropriate because MCAR can point to no one who admits to knowing or believing or suggesting that SEI was insolvent or in the "zone of insolvency" during the relevant time frame.  However, the Georgia

18

Supreme Court has explicitly held that insolvency is not a requirement under O.C.G.A. 18-2-22(2). *Anderson Oil Co. v. Benton Oil Co.*, 271 S.E.2d 207, 208 (Ga. 1980); *Mercantile Nat'l Bank v. Aldridge*, 210 S.E.2d 791, 793 (Ga. 1974). The evidence Southern seeks is irrelevant to this statutory provision.

Southern's argument is particularly confusing since Southern acknowledges on page 16 of its brief that the provision requiring evidence of Southern's knowledge of SEI's intent to delay or defraud creditors doesn't require actual knowledge. It is satisfied by evidence of circumstances sufficient to put Southern on notice of SEI's intent. In any event, not only is there evidence of circumstances sufficient to put Southern on notice in this case, the evidence reflects facts that legally charge Southern with notice of SEI's intent.

Southern was SEI's sole and controlling shareholder. SSF3. The board of directors of SEI consisted of Southern's chairman and chief executive officer, Southern's president and chief operating officer, Southern's chief financial officer and treasurer, and two executive vice-presidents of Southern. MSF506-513. They represented essentially the entire top tier of senior management of Southern plus three members of its board, including the chairman. Their knowledge of each corporation is imputed to the other corporation. *Carlson v. Hallinan*, 925 A.2d 506, 542 (Del. Ch. 2006); *Nagy v. Bistricer*, 770 A.2d 43, 64 (Del. Ch. 2000); *see*

HOU:2861969.1

*also Brown,* 514 S.E.2d at 862-63 (imputing knowledge of an officer to the corporation in the context of § 18-2-22(2)).

They also had a corporate duty, as directors, to keep themselves fully informed of all material information readily available to them on any matter on which they acted. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). Knowledge of discrepancies between internal projections and projections being supplied to lenders would not be excepted from that duty. Furthermore, when the directors signed SEI's S-1, they attested to its accuracy, which included SEI's current and historical financial condition. MSF520. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061-62 (9th Cir. 2000).

*There Is No Element of Harm Required Under § 18-2-22(2)*. Despite the statute's explicit language, Southern argues that it also is entitled to summary judgment on MCAR's § 18-2-22(2) claims because there is no evidence that any transfer caused any creditor harm.[6] There is no such general requirement. The dictum quoted from *Wallace v. Wallace*, 5 S.E. 2d 580, 582 (Ga. 1939), doesn't supply contrary authority. *Wallace* involved a plaintiff seeking to avoid certain

---

[6] To the extent Southern may be trying implicitly to reargue its previously unsuccessful position that all creditors were satisfied in full, one need look no further than last Friday's closing price of Mirant's stock, which falls far below a level that would allow creditors to be paid in full.

HOU:2861969.1

conveyances by her former husband, who, subsequent to the conveyances, was divorced from the plaintiff and ordered to pay alimony. After the alimony order was entered, plaintiff filed suit. There was not even an allegation that the husband was in arrears in alimony payments when the suit was filed (or at any time). In essence, the court held that any claim was premature. That is markedly different from this case, where Mirant/SEI was in bankruptcy when this lawsuit was filed.

The Georgia Supreme Court itself has rejected an effort to use the *Wallace* case as authority for the proposition Southern asserts. In *Von Kamp v. Gary*, 52 S.E.2d 591, 595-96 (Ga. 1949), the court limited *Wallace* to its facts and held that it is <u>not</u> necessary under Georgia law to show that damage has actually accrued in a suit under the fraudulent conveyance statute. None of the remaining cases relied on by Southern hold otherwise.

Nor does Georgia law impose an additional hurdle of reliance or inducement to recover under 18-2-22(2). The cases relied on by Southern merely provide an additional avenue to recover transferred property: equitable estoppel. *See, e.g.*, *Brown*, 317 S.E.2d at 184. This estoppel precludes a transferee who gave value from claiming ownership of property if the transferee is aware of a creditor that, subsequent to the transfer, extended credit to the transferor based upon the mistaken belief that the transferor still owned the property. *See, e.g.*, *Ford v.*

21

*Blackshear Mfg. Co.*, 79 S.E. 576, 578 (Ga. 1913). MCAR has not sought to avoid the Transfers based on common law equitable estoppel, rather it has pled statutory actions under 18-22-2. *Cf. Dill v. Hamilton*, 44 S.E. 989, 990 (Ga. 1903) (estoppel unnecessary to creditor's right to recovery).

## III.  Unsecured Creditors Exist to Void the Transfers

Southern asserts that summary judgment is appropriate as to all MCAR's fraudulent transfer claims because there is no evidence of any unsecured creditor with an allowable claim in Mirant/SEI's bankruptcy who held avoidance rights under § 18-2-22.[7] The statute provides that certain conveyances are "fraudulent in law against creditors and others and as to them shall be null and void." A "creditor" is a person to whom the debtor "by contract or by law, is liable to pay . . . an amount of money, certain or uncertain." § 18-2-1. There is clear evidence in this case of both "creditors" and "others" against whom the transfers to Southern are fraudulent, and therefore null and void. MSF573-598.

At the time of the first transfer in July 1999 and on each transfer date thereafter SEI had numerous unsecured contractual creditors who remained unpaid as of Mirant/SEI's bankruptcy. They were listed as creditors and potential creditors on Mirant/SEI's official bankruptcy schedules. MSF576-587. The

---

[7] Southern cites four cases after this assertion. It is unclear why.

existence of a <u>single</u> such creditor confers standing to recover the entirety of the fraudulent transfer for the estate for the benefit of all creditors in a bankruptcy. *See* 11 U.S.C. § 544(b); *Moore v. Bay,* 284 U.S. 4, 5 (1931); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.),* 226 F.3d 237, 243 (3rd Cir. 2000), *cert. dismissed,* 124 S. Ct. 530 (2003).

In addition, at the time of each transfer an individual existed with a multi-million dollar personal injury claim against SEI and SEI had notice of such potential liability. MSF589-592. Post-petition the claim was settled by Mirant for $13,500,000. MSF592. The term "others" in the Georgia fraudulent transfer statute explicitly has been held to include, without limitation, plaintiffs with claims against debtors "'liable as tortfeasors, or otherwise…for an unascertained damage to person or property, so far as fraudulent conveyances are concerned.'" *Rolleston v. Cherry*, 521 S.E. 2d 1, 3 (Ga. Ct. App. 1999) (quoting *Westmoreland v. Powell*, 59 Ga. 256, 258 (1877)).

Almost a full page of argument by Southern, in this segment of its brief, concerns the legal consequences if a creditor is estopped from avoiding a transfer, which suggests that this point actually may be intended to argue that summary judgment should be granted on Southern's defensive claim of estoppel, even though Southern has not moved for summary judgment on that basis. Estoppel is

HOU:2861969.1

an affirmative defense as to which Southern bears the burden of proof, *Mahsa, Inc. v. Al-Madinah Petro. Inc.,* 625 S.E. 2d 37, 42 (Ga. Ct. App. 2005), and presents issues of fact to be decided by a jury, *Hunstein v. Fiksman,* 615 S.E.2d 526, 528 (Ga. 2005). This is not an element of MCAR's claim that it must prove.

In any event, the cases cited by Southern in its discussion of estoppel do not suggest any failure of the evidence on which MCAR relies to establish the existence of qualified creditors. In *Harris v. Huff (In re Huff),* 160 B.R. 256, 259 (Bankr. M.D. Ga. 1993), the unsecured creditor on which the bankruptcy trustee sought to rely for standing had *agreed in writing*, as part of a pre-petition workout that it would "not challenge, present or future" the conveyance at issue. Southern points to no evidence that any SEI creditor had knowledge of the existence of any fraudulent transfer claim against SEI and agreed not to pursue it.

## IV.  **Summary Judgment Is Not Appropriate on the Illegal Dividend Claims**

*Direct Right of Action*.  Southern first argues that MCAR's illegal dividend claims fail as a matter of law because §174(a) of the Delaware General Corporate Code holds directors, but not the shareholders, liable for willfully or negligently paying illegal dividends. First, MCAR is not suing Southern for paying the illegal dividends, MCAR is suing Southern for having knowingly received them. Second,

neither of the cases relied upon by Southern even address the issue of whether a corporation may sue a shareholder directly to recover an illegal dividend.

In fact, Delaware statutory law assumes the existence of a direct right of action by a corporation against a shareholder to recover an illegal dividend. Section 174(c) of its General Corporate Code provides that directors are personally liable for the payment of an illegal dividend, and are subrogated "*to the rights of the corporation against stockholders* who received dividends on…their stock with knowledge of the facts indicating that such dividend…was unlawful under this chapter…" DEL. CODE ANN. TIT. 8, § 174(c) (emphasis added). If a direct cause of action by a corporation against a shareholder to recover an illegal dividend were not allowed under Delaware law, then the subrogation provision in § 174(c) would be meaningless. The Delaware Supreme Court has cautioned against such constructions, noting that words in a statute should not be construed as surplusage, and courts must ascribe a purpose to the use of statutory language, if reasonably possible. *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 900 (Del. 1994).

Southern admits in a footnote that there is at least one case holding that Delaware law provides a corporate right of action against a shareholder who knowingly receives an unlawful dividend. There are in fact a number of cases in

HOU:2861969.1

addition to *Weinman v. Fidelity Cap. Appreciation Fund* (*In re Integra Realty Res., Inc.*), 198 B.R. 352, 365 (Bankr. D. Colo. 1996) that recognize a direct right of action by the corporation. *See Stanley v. Brock* (*In re Kettle Fried Chicken of Am., Inc.*), 513 F.2d 807, 814 (6th Cir. 1975); *AT&T Corp. v. Walker*, No. C04-5709FDB, 2006 WL 2927659, at *2 (W.D. Wash. Oct. 12, 2006); *Sheffield Steel Corp. v. HMK Enters., Inc.,* 320 B.R. 405, 414-15 (Bankr. N.D. Okla. 2004).[8]

At most, the authority cited by Southern questions whether <u>creditors</u> may maintain a direct right of action under § 174, or must assert a similar action under § 325 or Delaware common law. *See Protocomm Corp. v. Novell Advanced Servs., Inc.*, 171 F. Supp. 2d 319, 329 (E.D. Pa. 1999). In any event, the Delaware Supreme Court appears to have answered this question in *Johnston v. Wolf*, 487 A.2d 1132, 1136 (Del. 1985) when it emphasized that in the event of insolvency § 174 creates joint and several liability "*to the corporation and to its creditors.*" Consequently, based upon substantially the same reasoning that the corporation has a direct right of action, courts also have held that creditors possess a right of action against shareholders under § 174. *See, e.g.*, *Sheffield*, 320 B.R. at 448-49.

---

[8] *See also PHP Liquidating, LLC v. Robbins*, 291 B.R. 592, 598 (D. Del. 2003) (cited by Southern elsewhere in its brief), in which the court denied a claim under § 174 because it found good faith, but specifically acknowledged that § 174(c) suggests that a shareholder would be liable in a direct action for any amount received if it had notice the dividends were unlawful.

HOU:2861969.1

*The '99 Returns and Separation Transfers Were Illegal Dividends.*  Southern asserts that the '99 Returns and the Separation Transfers were not "dividends" as defined under Delaware law, and therefore cannot be illegal dividends.  Citing language from *Growe v. Bedard,*  No. 03-198-B-S, 2004 WL 2677216 , at *12 (D. Me. Nov. 23, 2004), Southern argues that the mere fact that a transfer conveys value from a corporation to its shareholder does not render the transfer a dividend, otherwise "virtually any transaction between a corporation and its shareholders [would be a dividend] so long as a plaintiff had a justifiable basis to maintain that the transaction was not at a fair price or value."  This argument ignores the very next sentence in *Growe*, which states that "[w]here to draw the line is not at all obvious in this context." *Id.*

The context in which the issue was posed in *Growe* was the claim that a transfer effectuated by payment from a corporation to its shareholder through an above-market executive services contract was actually a dividend.  The court ultimately <u>denied</u> the shareholder's motion for summary judgment in that case, and noted that "given the recurring nature of the payments…which <u>unquestionably had the ultimate effect of transferring corporate assets to GNP's shareholders, the payments</u>…<u>could</u> be characterized as dividends." *Id.* at 14 (emphasis added).

HOU:2861969.1

There are numerous cases holding that one must examine the substance of the transaction, not just its form, to determine the true nature of the payments in applying sections 173 and 174 of the Delaware General Corporate Code.[9] *See, e.g., Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Group, Inc.* (*In re Buckhead Am. Corp.*), 178 B.R. 956, 969-70 (D. Del. 1994); *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 1001 (S.D.N.Y. 1991). In the instant case, despite not being designated as dividends by the SEI board, the '99 Returns, as well as the Separation Transfers, all had the effect of transferring corporate assets to Southern and there is substantial evidence on which a jury could conclude that they were, in substance, dividends, because there was no real consideration to support the transfers. This evidence was summarized in detail in Section I above.

*The "Declared" Dividends Were Illegal.* Under Delaware law, a dividend is payable only out of a corporation's "surplus" or, if there is no surplus, out of net profits. DEL. CODE. ANN. tit. 8, § 170 (2003). "Surplus" is the amount by which a board determines the total assets of the corporation exceed the sum of the total

---

[9] This doctrine is equally applicable to Southern's assertion that the amount of the Series B Dividend was $.01. The true value of the dividend was the associated right to receive SEI's Finance Companies with a book value of no less than $193.9 million upon redemption. MSF561.

HOU:2861969.1

liabilities and capital.  DEL. CODE ANN. tit. 8, § 154 (2003).  Delaware courts require that prior to declaring a dividend, a corporate board use data reasonably reflecting the fair value of the assets, to make the determination of surplus.  *Morris v. Standard Gas & Elec. Co.*, 63 A.2d 577, 581-83 (Del. Ch. 1949).[10]

With respect to the transfers that were declared "dividends," Southern argues that summary judgment should be granted because its employee Laura Patterson (who was never an officer or director of SEI) determined three months ago that in 1999 and 2000 SEI's books showed other paid in capital and/or net profits exceeding the amount of the dividends it paid.  Therefore the dividends were "legal."

First, Southern ignores the requirement that the directors evaluate the assets of the company to determine the legality of the dividend <u>prior</u> to paying the dividend.  Their failure to do so renders the dividend illegal under Delaware law. *Morris,* 63 A.2d at 581-83; *Sheffield Steel*, 320 B.R. at 451 (upholding illegal dividend claim under Delaware law because there was no document in the record

---

[10] Section 172 of the Delaware General Corporate Code codifies the duty of care, diligence, good faith and reason declared in *Morris* and provides a safe harbor for the directors but it "is not available to the <u>recipients</u> of unlawful dividends."  *In re Sheffield Steel Corp.*, 320 B.R. at 452.

HOU:2861969.1

indicating that the Board made a calculation of surplus before declaring the dividend. *Id.* As the court stated in *Sheffield Steel*:

> [defendants] must show that the officer or expert upon whom they relied actually determined the existence of a surplus <u>prior</u> to the authorization of the dividend and that it was reasonable to rely on that officer or expert.

320 B.R. at 451 (emphasis added).

The SEI board did not meet at all when it approved and declared the $165 million '99 Dividend nor the $450 million May 2000 dividend. Both dividends were approved by adoption of a resolution in lieu of a meeting. MSF302-304, 413-414. Although there are minutes reflecting a board meeting and resolution approving the $53 million dividend in 2000, there is nothing attached to any of the resolutions evidencing that the board performed any calculation, or even reviewed any financial information.[11] MSF305, 414, 440.

Second, had the SEI directors relied solely on calculations of book surplus and net profits done at the time they declared the dividends they would not have fulfilled their duties under *Morris* to, *inter alia*, determine the value of SEI's net assets. They knew the financial records were inaccurate and unreliable. MSF205-

---

[11] Simiarly under § 160, a Delaware corporation may not redeem stock if its capital would be impaired. There was no calculation in connection with the Series B Redemption.

225.  There also is evidence that SEI's capital, retained earnings; and net income were all grossly overstated from 1997 forward, *i.e.*, if SEI's books had been properly stated it would not have had "net profit" and if its assets were properly valued it would not have had surplus, it would have been insolvent. MSF599-604; 534.  *See EBS Litig. LLC v. Barclays Global Investors, N.A.*, 304 F.3d 302, 305 (3d Cir. 2002) (holding if stock dividend occurred when corporation was insolvent, or corporation was rendered insolvent, "it was illegal under Delaware law.").

*Bad Faith*.  Southern also argues that summary judgment is appropriate on the  illegal dividend claims because there is no evidence that Southern accepted any of the transfers at issue in "bad faith."  Bad faith, in the context of recovering an illegal dividend from a shareholder, simply requires evidence that the shareholder accepted the transfers with knowledge of facts that would indicate that such transfers were unlawful. *See Sheffield Steel*, 320 B.R. at 415-16; *PHP Liquidating*, 291 B.R. at 598; *Integra Realty*, 198 B.R. at 365.

Extensive contemporaneous information concerning SEI's financial condition was provided directly to Southern.  MSF524-530.  But more importantly, as discussed earlier in Section II, the SEI directors' knowledge is imputed to Southern because of the composition of the board.  Those directors had actual knowledge that the $165 million dividend in 1999 and the $450 million dividend in

HOU:2861969.1

2000 were made through cursory resolutions in lieu of meetings, and lacked appropriate documentation, since they all signed the unanimous consents approving the dividends without a meeting. They also attended the meeting at which the $53 million dividend in 2000 was declared, for which there also is no documentation of appropriate calculations. MSF440. This is more than sufficient evidence from which the jury may infer that Southern accepted the dividends with knowledge of facts indicating that the dividends were unlawful.

## V. Summary Judgment Is Not Appropriate on the Aiding and Abetting Claims

In urging summary judgment against MCAR's aiding and abetting claims, Southern's initial premise is that because SEI was a wholly-owned subsidiary of Southern, SEI directors only owed fiduciary duties to Southern. While acknowledging that fiduciary duties extend to SEI's creditors if SEI is insolvent at the time of the transfers, it argues that "MCAR cannot possibly show insolvency under the Delaware fiduciary duty standard," and concludes therefore that there was no duty owing to SEI's creditors for the directors to breach. In reaching this conclusion, Southern improperly restricted the legal standard for "insolvency" under Delaware law, ignored fiduciary duties that arise when a Delaware corporation is operating in the zone of insolvency, and disregarded expert evidence regarding the insolvency of SEI at the time of the transfers. SEI's directors owed

HOU:2861969.1

fiduciary duties to SEI's creditors, and Southern aided and abetted their breaches.

*Insolvency and Zone of Insolvency Under Delaware Law.* Delaware's fraudulent transfer statute defines insolvency as the condition that exists when "the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation." DEL. CODE ANN. tit. 6, §1302(a). Insolvency based on liabilities exceeding fairly valued assets is called balance-sheet insolvency. *Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Co.*, 477 F.3d 583, 590 (8th Cir. 2007). On the other hand, Delaware's *receivership* statute allows a court to displace directors only when there is: "1) a deficiency of assets below liabilities with no reasonable prospect that the business can be continued in the face thereof, or 2) an inability to meet maturing obligations as they fall due in the ordinary course of business." *Id.* (internal quotations omitted). This is called equitable or cash-flow insolvency. *Id.*

Southern's motion mistakenly limits the triggering of a director's fiduciary duty to creditors to the equitable or cash flow insolvency. In Delaware, either equitable *or* balance-sheet insolvency triggers a fiduciary duty to creditors. *Id.* (*comparing U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Falls, L.L.C.*, 864 A.2d 930, 947-48 (Del. Ch. 2004), *rev'd on other grounds*, 875 A.2d 632 (Del. 2005) (equitable definition) with *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 788 (Del. Ch. 1992) (balance-sheet definition)).

33

Furthermore, whether a corporation is insolvent, and when it becomes so, are issues of fact. *Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 384 (3rd Cir. 2007). In this case, J. Michael Hill, Sr., an expert in business valuation, applied the balance-sheet insolvency standard as a part of his analysis in this case and concluded that SEI was insolvent at each Transfer Date. MSF534. This alone is sufficient evidence for a jury to find the requisite insolvency.

However, even if there were no evidence of insolvency under either of the tests discussed above, Delaware courts recognize that directors are also fiduciaries for the corporation and its creditors when their corporation is in the "zone of insolvency." *See, e.g., U.S. Bank Nat'l Ass'n*, 864 A.2d at 947-48; *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, Civ. A. No. 12150, 1991 WL 277613, at *34 (Del. Ch. Dec. 30, 1991); *Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group*, 327 B.R. 537, 548 (D. Del. 2005). This is true even if the corporation is a wholly-owned subsidiary. *Claybrook v. Morris (In re Scott Acquisition Corp.)*, 344 B.R. 283, 286-88 (Bankr. D. Del. 2006).

Courts uniformly describe the "zone of insolvency" as a vaguely broader, even more fact-intensive concept than mere insolvency. *Teleglobe*, 493 F.3d at 356 & n.9; *Credit Lyonnais Bank*, 1991 WL 277613, at *34 & n.55 (equating the

zone of insolvency with the "possibility of insolvency"); *U.S. Bank*, 864 A.2d at 948 ("[w]hether a company is within the zone can be a fact-intensive inquiry."). Southern's motion disregards the evidence on which the jury may rely to find that SEI was in the *zone* of insolvency at the time of the transfer. MSF535-551.

*The Business Judgment Rule Offers No Protection in This Case.* The parties agree that the fiduciary obligations owed by the directors in Delaware are: care, loyalty, and good faith. *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001). Southern argues, however, that even if these duties extended to SEI's creditors, the business judgment rule protects the directors in this case. At the same time, Southern acknowledges that the business judgment rule is rebutted upon a showing that any one of four elements was not present when the conduct complained of occurred: (i) a business decision; (ii) disinterestedness and independence; (iii) due care; or (iv) good faith. The SEI directors were neither disinterested nor independent. Proof of this fact alone rebuts the presumption in this case, and shifts the burden to Southern to prove that each transaction was "entirely fair." *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994); *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989); *Miller v. McCown de Leeuw & Co. (In re Brown Sch.)*, 386 B.R. 37, 47 (Bankr. D. Del. 2008).

35

The Delaware Supreme Court established the standard for disinterestedness, independence and due care in *Aronson v. Lewis*, 473 A.2d at 812. In order to be disinterested, "the directors can <u>neither</u> appear on both sides of a transaction <u>nor</u> expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Id.* (emphasis added). The Court does not suggest that there are two elements that must be established, but clearly states them in the disjunctive.

As discussed earlier, three of the five SEI directors were also on the Southern board, and all five were senior officers of Southern, at the time of each transfer. With each transfer Southern stood on both sides of the transaction. Southern attempts to preempt the obvious problem this presents in a footnote that completely ignores any reference to the *Aronson* standard. Citing *Roselink Investors, LLC v. Shenkman*, 386 F. Supp. 2d 209, 216-17 (S.D.N.Y. 2004), it argues that the dual roles of the directors does not rebut the business judgment rule in this case because there is no evidence that any of the SEI directors had a personal interest in any of the transfers.[12] While *Roselink* does make the statement that "presence on both sides of a transaction does not <u>automatically</u> rebut the

_____

[12] Southern cites two additional unpublished cases in its footnote neither of which is really on point, and both of which are factually distinguishable.

HOU:2861969.1

business judgment rule presumption," (*id.* at 218) one must read the case that the *Roselink* court cites for that proposition, *Orman v. Cullman*, 794 A.2d 5, 20 (Del. Ch. 2002), to fully understand how inapplicable *Roselink* is to the instant case.

The *Orman* court makes clear that "entire fairness review is not automatically triggered when a <u>non-controlling shareholder</u> appears on both sides of a challenged transaction." *Id.* at 20, n.36. (emphasis added). That distinction apparently made a difference in *Roselink*, since there were only two directors at issue and they did not control the board. Furthermore, the court found that the interests of the parent, subsidiary, and creditors, under the facts of that case, were all aligned. *Roselink*, 386 F. Supp. 2d at 222. In this case, however, Southern's total control of SEI's board put it entirely on both sides of every transfer. And Southern's interest in removing cash from SEI was not aligned with the interests of SEI's creditors. The Delaware Supreme Court reiterated in *Emerald Partners*, 787 A.2d at 90 that entire fairness review applies under these circumstances.

Unlike *Roselink*, the recent case of *ASARCO LLC v. Americas Mining Corp.*, No. 1:07-CV-0018, 2008 WL 4009927, at *93 (S.D. Tex. Aug. 30, 2008) is almost directly on point. In that case the trustee challenged the sale of an asset from a wholly owned subsidiary, ASARCO, to its parent AMC. Six of the nine ASARCO board members who approved the transaction also sat on the board of AMC. The

37

remaining three directors were "closely affiliated" with AMC and AMC's sole stockholder and parent company, Grupo. The court concluded that under Delaware law each of these directors stood on both sides of the transaction, which required AMC to establish the entire fairness of the transaction.[13]

As the Delaware Supreme Court stated in *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983):

> There is no "safe harbor" for such divided loyalties in Delaware. When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain.

It is not MCAR's burden to present evidence of the inherent unfairness of the Transfers; it is Southern's duty to present evidence of the cumulative manner by which the directors discharged all of their fiduciary duties, in the utmost good faith and the most scrupulous fairness. *Emerald Partners*, 787 A.2d at 97; *ASARCO*, 2008 WL 4009927, at *95. Based on the evidence in this case, a jury could well conclude that all the self-dealing by Southern, from causing SEI to borrow money in order to upstream cash, without receipt of any equivalent value, to causing SEI to release Southern from any claims, including self-dealing, were not transactions that were inherently fair to SEI or its creditors.

---

[13] *See also Tectonic Network Inc. v. Wolford*, 554 F. Supp. 2d 538, 588-59 (D. Del. 2008).

HOU:2861969.1

_The Exculpation Clause Is Irrelevant to the Aiding and Abetting Claims._
Southern also points to SEI's articles of incorporation, which purport to exculpate the directors for breach of fiduciary duty "to the fullest extent permitted by Delaware law," and argues that as a result of this clause, any breach of the duty of care by SEI's directors cannot be the basis for the aiding and abetting claims. That is inaccurate. This clause only protects the directors from "monetary" damages; it does not <u>change</u> their duty or alter what acts breach that duty. _In re The Walt Disney Company Derivative Litig._, 907 A.2d 693, 752 (Del. Ch. 2005). Furthermore, there is no case that suggests that the monetary protection provided by that clause extends to third parties that aid and abet the directors in their breach. And it is not necessary to sue the directors themselves for their breach in order to sustain a claim against the parent for aiding and abetting. _See Allied Capital Corp. v. GC-Sun Holdings, L.P._, 910 A.2d 1020, 1037-38 (Del. Ch. 2006) (dismissing claims against directors, but retaining claims against parent company for aiding and abetting breach of fiduciary duty).

_Knowing Participation._ Southern argues there is no proof of its knowing participation in the actions of the board. To satisfy the knowing participation element of the aiding and abetting claim, MCAR is not required to find Southern's confession; the evidence need merely allow the inference that Southern acted with

HOU:2861969.1

knowledge of the breach. *Gatz v. Ponsoldt*, 925 A.2d 1265, 1276 (Del. 2007); *Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.*, 829 A.2d 143, 157-58 (Del. Ch. 2003). The action of SEI's board was also the action of Southern because of the duality of the roles of the members of the board. SEI could not act through its board without the knowledge and participation of Southern's senior management, and principal board members. The jury can certainly infer the knowing participation of Southern in the breaches of fiduciary duty by its officers and directors while they were wearing their SEI directors' hats.

*Damages.* Damages include equitable relief, such as restitution. *Liquidation Trust*, 327 B.R. at 544-45. Southern received $1.7 billion in cash from SEI, which makes them recoverable as damages under Delaware law. Southern's assertion that MCAR is precluded from seeking these damages based on MCAR's interrogatory responses is false. MCAR's interrogatory response says, "To the extent the other causes of action (*e.g.*, breach of fiduciary duties …) are based on the above-mentioned transfers, Plaintiff's calculations of damages for such causes of action as they pertain to such transfers is the same as described above for the avoidance causes of action …." MSF560.

*No In Pari Delicto Defense for Southern.* MCAR's aiding and abetting claim is not barred by the doctrine of *in pari delicto*. Because a corporate insider is

responsible for the corporation's conduct, an insider cannot assert the defense against the corporation. *In re Healthsouth Corp. S'holders Litig.*, 845 A.2d 1096, 1107 (Del. Ch. 2003); *see also Floyd v. Hefner*, 556 F. Supp. 2d 617, 657-58 (S.D. Tex. 2008) (collecting cases). An "insider" includes, not only directors and officers, but also controlling persons and owners of at least 20% of the corporation. *Floyd*, 556 F.Supp. 2d at 658. Southern was in control of, and owned, 100% of SEI at all times relevant to the aiding and abetting claim. SSF3. It was clearly an insider. As such, it is not entitled to the benefit of the *in pari delicto* defense to MCAR's aiding and abetting claim.

*Limitations.* Finally, Southern argues that the aiding and abetting claims relating to SEI's *payments* in July and October 1999 are time barred under Texas' four year limitations period because they repaid loans that were incurred more than four years before Mirant's July 14, 2003 bankruptcy filing. This argument misconstrues when a cause of action accrues. Texas, as well as Delaware, follows the legal injury rule—that is, the cause accrues at the time the plaintiff sustains a legal injury for which the law affords a remedy. *Lowenberg v. City of Dallas*, 168 S.W.3d 800, 802 (Tex. 2005); *Celtic Life Ins. Co. v. Coats*, 885 S.W.2d 95, 100

HOU:2861969.1

(Tex. 1994); *7547 Partners v. Beck*, 682 A.2d 160, 162 (Del. 1996).[14]

The causes of action in question arise from the transfer of funds in July and October 1999—not entering into a supposed "loan" before that time. The legal injury was suffered when the money was transferred to the parent corporation. Texas and Delaware are consistent in applying the legal injury rule to facts such as these. *See Jones v. Blume*, 196 S.W.3d 440, 446 (Tex. App.—Dallas 2006, pet. denied) (claim based on improper payment under a contract accrues when the payment is made not when the contract is entered); *Glassberg v. Boyd*, 116 A.2d 711, 718-19 (Del. Ch. 1955) (when the complaint concerns the directors improperly making a payment, the cause of action accrues with the payment).

## VI.  Summary Judgment Is Not Appropriate on the Unjust Enrichment Claims.

*Limitations.*  While there is no conflict depending on which state's limitation period applies in the aiding and abetting analysis, there is a potential conflict

---

[14]  In addition, two tolling principles are applicable here.  First, Delaware applies the rule of equitable tolling (i.e. the discovery rule) to breaches of fiduciary duty for self dealing.  *See Laventhol, Krekstein, Horwath, & Horwath v. Tuckman*, 372 A.2d 168, 170-71 (Del. 1976).  Second, both Delaware and Texas law would toll during the period of Southern's domination of the SEI board.  *See Safecard Servs., Inc. v. Halmos*, 912 P.2d 1132, 1135-36 (Wyo. 1996) (applying Delaware law); *F.D.I.C. v. Dawson*, 4 F.3d 1303, 1312 (5th Cir. 1993) (applying Texas law).

HOU:2861969.1

regarding limitation relating to the unjust enrichment claims.[15]  Despite both parties being reminded in this Court's Order of April 1, 2008, that when jurisdiction is based on a federal question, as in this case, federal choice of law rules are applicable, Southern asserts that Texas choice-of-law rules govern the applicable limitations law for MCAR's unjust enrichment claim, and that under those rules Texas would apply its statute of limitations.

This Court has ruled on two separate occasions that the unjust enrichment claims in this case should be governed by Georgia law.  MSF552-554.  A federal choice of law analysis with respect to the applicable state limitations period compels the same result.  Courts undertaking a federal choice of law analysis have traditionally relied on the Restatement (Second) of Conflicts of Laws (hereafter "Restatement") for choice of law principles.  *See, e.g., Chuidian v. Philippine Nat'l Bank*, 976 F.2d 561, 564 (9th Cir. 1992); *Banyan Licensing, L.C. v. Orthosupport Int'l, Inc.*, 296 F. Supp. 2d 885, 888 (N.D. Ohio 2003); *Sec. & Exch. Comm'n v. Infinity Group Co.*, 27 F. Supp. 2d 559, 564 (E.D. Pa. 1998).

The principles enunciated in the Restatement do not differ depending on whether the conflict exists with respect to the elements of a tort claim or with

---

[15]  The applicable limitation period is four years under Georgia law, *Engram v. Engram*, 463 S.E.2d 12, 806 (Ga. 1995), but only two years under Texas law. *Elledge v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869, 871 (Tex. 2007).

HOU:2861969.1

respect to the limitations applicable to the claim. This fact is reflected in the Reporter's Note to § 142 of the Restatement, which explains that choice of law questions relating to limitations should **not** turn on whether limitations are considered "substantive" or "procedural," but instead "should be decided in much the same way as other questions of choice of law." Reporter's Note p. 130.

Section 142 of the Restatement specifically addresses the choice of law analysis when confronted with competing limitation periods. It provides in relevant part that "[w]hether a claim will be maintained against the statute of limitations is determined under the principles stated in § 6." RESTATEMENT (SECOND) CONFLICTS OF LAWS § 142 (Supp. 1988). Section 6 requires consideration of the relative interests of the respective states in having their laws applied in a specific case. This Court previously considered those interests in the context of this case, and determined that Georgia has the most significant relationship to the issues raised, and that Texas has essentially no interest in seeing its law applied. MSF553-554. The same analysis the court undertook to reach that conclusion compels the conclusion that Georgia limitations law should apply to MCAR's claim for unjust enrichment under Georgia law.[16]

---

[16] Southern's analysis of Texas choice of law principles on this point is outdated. The Texas Supreme Court has not addressed the limitations issue since it adopted the "most significant relationship test" found in the Restatement. A court

_Expectation of Compensation Is Not an Element of Unjust Enrichment._
Southern asserts it is entitled to summary judgment on MCAR's claim for unjust enrichment because there is "no evidence" that SEI expected to be compensated for the $1.949 billion in transfers identified in the Complaint. However, expectation of compensation is not an element of an unjust enrichment claim under Georgia law. _Yoh v. Daniel_, 497 S.E.2d 392, 394 (Ga. Ct. App. 1998), specifically holds that a claim for unjust enrichment does not require a showing of the anticipation of compensation. Southern's authority does not hold otherwise.

In _Engram v. Engram_, 463 S.E.2d 12, 14 (Ga. 1995), the court determined that there was no evidence of any value having been bestowed on the defendant, and explicit evidence that plaintiff had said she would not seek to recover anything from the defendant. In ruling against the plaintiff under these circumstances, the court did not create a new element of "expectation of compensation" that must be proved to establish an unjust enrichment claim. Similarly, _Stoker v. Bellemeade, LLC_, 615 S.E.2d 1, 5 (Ga. Ct. App. 2005), _rev'd on other grounds_, 631 S.E.2d 693

---

now analyzing the issue under Texas law should follow that test rather than adhere to the old procedural/substantive distinction. _See Jaurequi v. John Deere Co._, 986 F.2d 170, 173-74 (7th Cir. 1993) (analyzing Texas choice of law for statute of limitations under Restatement §§ 6 and 145, as adopted by Texas courts).

HOU:2861969.1

(Ga. 2006), merely recites *Engram* for the proposition that unjust enrichment is appropriate when the benefited party "equitably ought to return" the benefit.[17]

Expectation of repayment actually is an element required to establish a claim for *quantum meruit* under Georgia law, which, although similar, is a separate claim that has not been pled in this case. *See Brown v. Penland Construction Co.*, 641 S.E.2d 522, 523 (Ga. 2007) (holding that "quantum meruit, unlike unjust enrichment, relies on an implied promise of compensation") (quoting *Cochran v. Ogletree*, 536 S.E.2d 194, 197 (Ga. Ct. App. 2000)).

_The Existence of a Genuine Contractual Obligation Is a Material Fact Issue_. Southern again relies on its promissory note, and argues that because the '99 Returns were made pursuant to that contract the unjust enrichment claims related to those transfers must fail.[18] This argument ignores the substantial evidence,

---

[17] In support of its argument, Southern also quotes from *United States Virgin Islands v. Goldman, Sachs & Co.*, 937 A.2d 760, 796 n.161 (Del. Ch. 2007). According to Southern, the "holding" of that case was "that a 'stockholder who receives a dividend in good faith has not been unjustly enriched.'" Motion p. 40. This decision, under Delaware law, is of little relevance in applying Georgia law. Furthermore, the language quoted by Southern is *dicta*, and the quote itself is incomplete. The court actually stated "In my view, a passive stockholder who receives a dividend in good faith has not been unjustly enriched." (emphasis added). Southern is far from being a "passive" stockholder in the case at hand.

[18] Southern makes a similar argument with respect to alleged unjust enrichment claims related to "the Separation Agreement" and the Turbine

discussed in section I, *supra*, from which the jury might infer that there was no genuine contractual obligation represented by the note. In particular, the jury may consider the testimony of the former President of SEI affirming that SEI could <u>choose</u> to treat the monies it received from Southern in that time frame as debt or equity, whichever best met its needs, as dispositive. In any event, Southern is not entitled to a summary judgment on this disputed issue of fact.

*Damage.* Finally, Southern argues that the unjust enrichment claim must be denied because there is no evidence in the record to establish that MCAR is entitled to any damages on the claim. Under Georgia law, a claim for unjust enrichment is based on the premise that "the party sought to be charged has been conferred a benefit…which the benefited party equitably ought to return or compensate for." *St. Paul Mercury Ins. Co. v. Meeks*, 508 S.E.2d 646, 648 (Ga. 1988). As such, the measure of damages for an unjust enrichment claim is the dollar amount of the benefit that was unjustly conferred. *See, e.g.*, *Zampatti v. Tradebank Int'l Franchising Corp.*, 508 S.E.2d 750, 757 (Ga. Ct. App. 1998).

This is not a case like *Morrison v. Exxon Mobil Corp.*, No. 1:03-CV-140, 2007 WL 988862, at *9 (M.D. Ga. Mar. 29, 2007), where the Plaintiff sued to

---

Transfers. Motion pp. 42-43. Because MCAR's Fourth Amended Complaint does not raise such claims, MCAR will not respond to this argument.

recover the value of services rendered. MCAR has sued because Southern was unjustly enriched by the voluntary transfer to it of about $1.9 billion from SEI, comprising the $1.034 billion '99 Return, the $165 and $503 million dividends in 2000, and the transfer of the Finance Companies, which had a value of at least $193 million. MSF555-556, 561. The fact that SEI transferred approximately $1.7 billion in cash to Southern is not in dispute. MSF557. While Southern may dispute the value of the Finance Companies given in redemption of the Series B Dividend, that dispute at best creates another material fact issue for the jury to resolve. MSF561.

Furthermore, the argument that the claim must fail because "MCAR has not yet determined the precise calculation of its damages and has not identified a single document to support its damage calculation" ignores the detailed calculation of damages contained in MCAR's interrogatory responses. MSF560. Southern's motion for summary judgment on the unjust enrichment claim must be denied.

## VII.   The Self-Dealt Release Provides No Defense

Southern concludes by arguing that it is entitled to summary judgment on MCAR's non-avoidance claims because SEI released them in the Indemnification and Insurance Matters Agreement (the "IIMA") that was executed pursuant to the MSDA. The IIMA, including the release contained within, was authorized by

SEI's board, which, as discussed earlier, represented Southern on both sides of the transaction. Consequently, it is Southern's burden to prove that the release was entirely fair to SEI and its creditors. Southern cannot do so.

In addition, the release on its face does not clearly express that it released Southern from liability for claims "unknown" to the creditors at the time of the transaction. *See, e.g.*, *U.S. Anchor Mfg. v. Rule Indus.*, 443 S.E.2d 833, 835-36 (Ga. 1994). The extent to which Mirant's directors were aware of the claims is irrelevant. The directors' failure to disclose the company's claims to the creditors before executing the release is an independent breach of fiduciary duty that Southern aided and abetted. *See Village of Burnsville v. Westwood Co.*, 189 N.W.2d 392, 397 (Minn. 1971) (holding release avoidable because fiduciary did not disclose self-dealing); *cf. Wal-Mart Stores, Inc. v. Coughlin*, 235 S.W.3d 424, 429 (Ark. 2007) (collecting cases regarding fiduciary duty to disclose).

Finally, at the time the IIMA was executed SEI had valuable claims against Southern, including its claims for aiding and abetting breaches of fiduciary duty, receiving illegal dividends, and unjust enrichment. The generic release of these claims in the Separation Agreements is itself a transfer of property that is voidable

HOU:2861969.1

as part of the Separation Agreement Transfers. *See Metzger v. Farris (In re e2 Comm'ns, Inc.)*, 320 B.R. 849, 855 (Bankr. N.D. Tex 2004). The court in *Metzger* noted:

> Common sense suggests that a release of claims is a "transfer" of property—*i.e.*, a method of "disposing of or parting with" property, as the releasing party gives up the right to assert the claims in the future. Moreover, concluding that a release of claims qualifies as a "transfer" of property is consistent with the legislative history's guidance that "transfer" should be broadly construed.

*Id*. at 856.

Because Southern should not be able to benefit from its prior aiding and abetting of fiduciary duty breaches and fraudulent transfers by obtaining releases in the very same manner, the release cannot dispose of the claims asserted here.[19]

## CONCLUSION

For the foregoing reasons, MCAR respectfully requests the Court to deny in its entirety Southern's motion for summary judgment.

---

[19] Even if the release applied to SEI's claim to recover the illegal dividends received by Southern, it clearly does not purport to release the direct claims of the creditors to recover such payments that MCAR is also asserting.

HOU:2861969.1

Dated:  October 20, 2008

By: */s/ Nathan L. Garroway*
      Charles E. Campbell
      Georgia Bar No. 106100
      Nathan Lewis Garroway
      Georgia Bar No. 142194
      **MCKENNA LONG & ALDRIDGE LLP**
      303 Peachtree St., N.E., Suite 5300
      Atlanta, Georgia  30308
      Telephone:  (404) 527-4000
      Facsimile:  (404) 527-4198
      ccampbell@mckennalong.com
      ngarroway@mckennalong.com
      Richard H. Caldwell
      Texas Bar No. 03631000
      Robin Russell
      Texas Bar No. 17424001
      **ANDREWS KURTH LLP**
      600 Travis, Suite 4200
      JPMorgan Chase Tower
      Houston, Texas  77002
      Telephone:  (713) 220-4200
      Facsimile:  (713) 220-4285
      rcaldwell@andrewskurth.com
      rrussell@andrewskurth.com

      **Attorneys for MC Asset Recovery, LLC**

## <u>CERTIFICATE UNDER LOCAL RULE 7.1(D)</u>

Pursuant to Local Rule 7.1(D), I certify that the foregoing pleading is a computer-generated document, prepared in Times New Roman, 14-point font, in accordance with Local Rule 5.1(B).

Respectfully submitted, this 20th day of October, 2008.

By: */s/ Nathan L. Garroway*
Nathan Lewis Garroway
Georgia Bar No. 142194
**MᶜKENNA LONG & ALDRIDGE LLP**
303 Peachtree St., N.E., Suite 5300
Atlanta, Georgia  30308
Telephone:  (404) 527-4000
Facsimile:  (404) 527-4198
ngarroway@mckennalong.com

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that on October 20, 2008, I filed the within and foregoing

**BRIEF OF MC ASSET RECOVERY, LLC IN OPPOSITION TO**

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of

Court using the CM/ECF system, which will automatically send email notification of

such filing to the following attorneys of record:

Christopher S. Anulewicz      W. Scott Locher
Michael J. Bowers      Janine Cone Metcalf
Charles E. Campbell      Ryan Preston Reavis
Gordon Lee Garrett, Jr.      Robin Russell
Nathan L. Garroway
David Craig Kiernan

                             */s/ Nathan L. Garroway*

                             Nathan L. Garroway
McKenna Long & Aldridge LLP      Georgia Bar No. 142194
303 Peachtree Street, Suite 5300
Atlanta, Georgia 30308
(404) 527-4000                        *Attorney for Plaintiff*
(404) 527-4198 (facsimile)
ngarroway@mckennalong.com