IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MC ASSET RECOVERY, LLC,      :
      :
      Plaintiff,      :
      :      CIVIL ACTION FILE
v.      :      NO. 1:06-CV-417-BBM
      :
THE SOUTHERN COMPANY,      :
      :
      Defendant.      :

## O R D E R

This matter is before the court on the Motion for Summary Judgment [Doc.

No. 354], filed by Defendant The Southern Company ("Southern"), and the Motion

for Leave to File a Sur-Reply [Doc. No. 439], filed by Plaintiff MC Asset Recovery,

LLC ("MCAR").

## I.    Factual and Procedural Background[1]

This case arises from the insolvency of Mirant Corporation, a former wholly-

owned subsidiary of Southern. During the relevant time period, Southern was a

registered public utility holding company and the largest regulated producer of

electricity in the United States. Its assets consisted of power companies operating

in the southeastern United States, with income generated from rate-regulated sale

---

[1]    This account comes from the Fourth Amended Complaint and does not constitute findings of fact by the court.

of those companies' production of electricity.  In an effort to diversify its assets,

Southern also invested in companies that owned wholesale or merchant generating

facilities, as well as companies owning non-U.S. based energy assets.

In 1993, Southern incorporated SEI Holdings, Inc.[2] ("SEI" or "Mirant") as a

wholly-owned subsidiary to serve as a holding company for its merchant energy

business operations and to acquire and develop related businesses.  Mirant then

began to acquire interests in a number of international and domestic utility

companies.[3] To finance the acquisitions, Mirant borrowed significant amounts from

third-party financiers.

In addition to investing in international and domestic utility companies,

Mirant formed a number of trading and marketing entities.  Mirant also purchased

domestic generating assets and borrowed to do so.

In 1999, Southern initiated a buy-back program for $1.25 billion of its

outstanding stock. This program, coupled with the settlement of ratepayer litigation

---

[2]     SEI Holdings, Inc. was renamed Southern Energy, Inc. in 1997.

[3]     In order to fund a portion of these acquisitions, Southern generally advanced money to Mirant, which then found third-party lenders for additional project financing.  Mirant would repay Southern from the third-party funds, and any difference between the project financing and the power plant interest purchase price was treated as a Southern equity contribution to Mirant.  To the extent that any of the initial Southern advances were characterized as a "'loan'" rather than equity, the "'loan'" was re-characterized on the companies' books as equity at the end of each year.  (Fourth Am. Compl. ¶ 30.)

that lowered 1999 and 2000 utility revenues, created liquidity pressures for Southern, and Southern reacted by extracting cash from Mirant through the following upstream payments:

- in the second half of 1999, Mirant made three payments (the "Advance Return" or "1999 Loan Repayment") to Southern totaling $1.034 billion and characterized as loan repayments;

- in December 1999, Mirant paid a $165 million dividend (the "1999 Dividend") to Southern; and

- in the spring of 2000, Mirant paid two additional dividends (the "2000 Dividends") of $450 million and $53 million to Southern.

Late in 2000, Southern began the formal steps to sell to the public a minority interest in Mirant and to spin-off the remainder of Mirant stock to Southern shareholders. Contracts (the "Separation Agreements")[4] formalizing inter-company dealings on a variety of matters, including guaranties and releases, were signed by Mirant and Southern, and, on September 26, 2000, Mirant completed an initial public offering (the "IPO") for almost twenty percent of its shares.

---

[4] These contracts included the following: Master Separation and Distribution Agreement; Transitional Services Agreement; Indemnification and Insurance Matters Agreement; Technology and Intellectual Property Ownership and License Agreement; Confidential Disclosure Agreement; Employee Matters Agreement; Tax Indemnification Agreement; and Registration Rights Agreement. (Fourth Am. Compl. ¶ 88.)

The remaining eighty percent of Mirant stock was distributed to Southern shareholders in April 2001, creating a new stand-alone public company. At its inception as a public company, Mirant was highly-leveraged, with approximately $8 billion of short-term debt on its balance-sheet, and off-balance sheet leveraged lease obligations approximating $1.5 billion.

Two other transactions in favor of Southern, effected before and after the 2001 spin-off, reduced the value of the post-separation balance sheet available to support Mirant operations and creditors. In early 2001, through technical steps involving the issuance (the "Series B Dividend") and redemption (the "Series B Redemption") of a share of preferred stock, Mirant transferred to its parent two finance company subsidiaries (the "Finance Companies") valued by the Plaintiff at approximately $250 million.[5] And after the spin-off, Mirant, solely from its own assets, paid turbine generator cancellation fees (the "Turbine Transfers") on contracts that Plaintiff alleges were entered into by Mirant, not because *it* needed the turbine generators, but to afford Southern a better per unit price for its own purchases.

By the close of 2001, Mirant's critical cash flow and leverage issues were recognized both within and outside the company. Mirant consulted bankruptcy counsel in December 2001. That same month, Moody's was the first of several rating

---

[5]  These companies were Southern Energy Finance Capital Corp. and Southern Company Capital Funding, Inc.

agencies to downgrade Mirant below the investment grade rating that was so important for the company's trading operations.

In early 2002, Mirant hired bankruptcy counsel and on July 14, 2003, filed a voluntary petition for relief under Title 11 of the Bankruptcy Code in the Bankruptcy Court for the Northern District of Texas. Thereafter 82 of Mirant's affiliates likewise filed bankruptcy petitions.[6] In its bankruptcy schedules, Mirant listed $4.8 billion in unsecured claims as of the petition date.

Through the Chapter 11 filing, Mirant and its affiliated debtors were able to confirm a reorganization plan (the "Reorganization Plan") that distributed to unsecured creditors 96.25% of Mirant's common stock, with former equity holders receiving the remaining 3.75% of equity in the reorganized company. Unsecured creditors and former shareholders as classes each received a fifty-percent interest in avoidance and litigation recoveries, including the present action brought by MCAR, a litigation and collection vehicle created through the Reorganization Plan.

MCAR is a successor to the Debtors and the representative of their estates, "having all of the relevant rights and powers the Debtors had to avoid and recover the transfers at issue . . . during the bankruptcy as debtors-in-possession." (Fourth

---

[6]     For a list of the specific entities, <u>see</u> Fourth Amended Complaint ¶ 16.

Am. Compl. ¶ 19.) The Reorganization Plan was consummated on January 3, 2006, and on that date MCAR came into being when Mirant emerged from bankruptcy.

Pursuant to Bankruptcy Code §§ 544 and 550, as well as state and federal laws, this action was filed in the Bankruptcy Court where Mirant's bankruptcy action was pending. The U.S. District Court for the Northern District of Texas withdrew the reference to the Bankruptcy Court on January 10, 2006 and later transferred venue to this court pursuant to 28 U.S.C. § 1404(a). However before the venue transfer occurred, MCAR was substituted as the Plaintiff, representing Mirant Corporation, The Official Committee of Unsecured Creditors of Mirant Corporation, and 82 separate entities.

MCAR claims that Mirant's various actual or constructive transfers to Southern, as summarized above, (i) constituted fraudulent transfers because they were made during insolvency for inadequate or no consideration; *and/or* (ii) constituted fraudulent transfers because they were effected to hinder creditors; *and/or* (iii) constituted fraudulent transfers because they resulted in Mirant being unable to meet its obligations when due; *and/or* (iv) were made in violation of applicable state statutes limiting dividends and other distributions to shareholders. As such, MCAR alleges, the transfers were the result of a breach of duty by the

Mirant Board that Southern aided and abetted and led to the unjust and illegal enrichment of Southern.

The MCAR Complaint contains seven counts:[7]  (A) avoidance of the 1999 Advance Return; (B) avoidance of fraudulent conveyances, transfers, and/or illegal dividends; (C) breach of fiduciary duties; (D) restitution/unjust enrichment; (E) Mirant was the alter ego of Southern; (F) objections to Southern's proofs of claim; and (G) equitable subordination of Southern's claims.  Generally, MCAR seeks to recover for the damages it says Southern caused Mirant to incur on account of the transactions described above.[8]  On August 6, 2008, Southern filed this second Motion for Summary Judgment, relating solely to Counts A-E.   In response to information contained in Southern's Reply Brief, MCAR then filed a Motion for Leave to File a Sur-Reply on December 19, 2008.

## II.  <u>Legal Standard</u>

Summary judgment is appropriate only when the pleadings and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A

---

[7]     The court uses MCAR's styling of these counts from its Fourth Amended Complaint.

[8]      Collectively referred to as "Transfers" throughout this Order, the transactions at issue include:  (1) 1999 Loan Repayments/Advance Return; (2) 1999 Dividend; (3) 2000 Dividends; (4) Series B Dividend; (5) Series B Redemption; (6) Separation Agreements; and (7) Turbine Transfers.  (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 5-8.)

dispute over a fact will preclude summary judgment if the dispute "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A court must deny summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Although in considering a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," id. at 255, the nonmovant must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Indeed, the nonmovant must present affirmative evidence beyond mere allegations to show that a genuine issue of material fact does exist. Anderson, 477 U.S. at 256-57. Furthermore, the court must evaluate the evidence "through the prism of the substantive evidentiary burden" at trial. Anderson, 477 U.S. at 254.

III. **Analysis**

A. **Constructive and Actual Fraudulent Transfer Claims — Counts A and B**

Counts A and B of MCAR's Complaint seek in part to avoid a number of the earlier described transfers from Mirant to Southern pursuant to O.C.G.A. § 18-2-22,[9]

---

[9] "O.C.G.A. § 18-2-22 was repealed on July 1, 2002, when Georgia enacted the Uniform Fraudulent Transfers Act, O.C.G.A. § 18-2-70 et seq., but this repeal did not
(continued...)

which provides three instances in which acts by debtors are labeled fraudulent as against creditors and others — thereby rendering them "null and void." Section 18-2-22(3) relates to constructively fraudulent transfers, while section 18-2-22(2) pertains to actual fraudulent transfers. MCAR's claims made under these two code sections are discussed below.

### 1. Constructively Fraudulent Transfer Claims

O.C.G.A. § 18-2-22(3) defines a constructively fraudulent conveyance to be: "Every voluntary deed or conveyance, not for a valuable consideration, made by a debtor who is insolvent at the time of the conveyance." O.C.G.A. § 18-2-22(3). Southern argues that MCAR's constructively fraudulent transfer claims made pursuant to § 18-2-22(3) must fail because the transfers were either (1) supported by valuable consideration or (2) not made to Southern.

### a. 1999 Advance Return/Loan Repayment

Count A of MCAR's Complaint seeks to avoid the $1.034 billion transfer from Mirant to Southern that occurred in 1999. MCAR alleges in part that at the time of the transfer: Mirant was insolvent or rendered insolvent by the Advance Return;

---

[9](...continued)
extinguish causes of action that arose under O.C.G.A. § 18-2-22 before that date." Gerschick v. Pounds, 281 Ga. App. 531, 533 n.8, 636 S.E.2d 663, 665 n.8 (2006). The various transfers that are the subject of this action all occurred no later than the year 2001, so the cause of action under § 18-2-22 survives. (See id.; Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 1; Order on Def.'s Mot. to Establish Governing Law, Apr. 1, 2008, at 27.)

Southern was an insider of Mirant; and that the transaction was a fraudulent conveyance not for fair consideration, done with the intent to hinder, delay, and defraud creditors.

Southern argues that MCAR's constructive fraud claim fails because this transfer was supported by valuable consideration. In making this argument, Southern claims that the $1.034 billion transfer from Mirant to Southern was a loan repayment and, under the authority of Brown v. Citizens & S. Nat'l Bank, 253 Ga. 119, 317 S.E.2d 180 (1984), does not constitute a fraudulent transfer. Brown does stand for the proposition that "satisfaction of an existing loan may constitute valuable consideration." Id. at 123, 317 S.E.2d at 184.

The central issue in the present dispute, however, is the conclusory premise of Southern that the $1.034 billion transfer of funds in 1999 was a *loan repayment* entitled to the authority of Brown, as opposed to a *return of equity* that may constitute a fraudulent conveyance. To decide that issue, the Eleventh Circuit tells us, "A court must look not simply at self-serving declarations of the parties, but instead must examine those circumstances surrounding the transaction." In re Lane, 742 F.2d 1311, 1314 (11th Cir. 1984).

In conducting the examination mandated by Lane, 13 factors, such as adequate capitalization, should be considered, but "these guidelines are not rigid

rules mandating a particular conclusion when the court finds certain facts." Id. at 1315. In a jury trial, the facts and circumstances determination of debt versus equity are inherently factual issues left to the jury.

In making its argument for summary judgment, Southern offers conclusory statements that overlook the factual issue of bona fide indebtedness. Southern appears to believe that calling the 1999 transfer a "Loan Repayment" and referring to it repeatedly as debt, make it so. It also argues that since the transfer was treated on its own books as a repayment of loans under a promissory note, this is dispositive.

MCAR, however, points to evidence sufficient to demonstrate a factual dispute about whether or not the $1.034 billion transfer was in fact repayment of a loan. To start, the Promissory Note upon which Southern's argument relies was a "demand" note callable at the option of Southern and unsupported by typical financial and other covenants. (Def.'s App. 34.) MCAR points to testimony that normal project debt like the 1999 loan or advance at issue "has lots of covenants and provisions and . . . time requirements for payment." (Pl.'s Ex. 407 at 49:20-22.) The Promissory Note at issue had no such provisions.

Remarkably, the original note dated June 1, 1997, contained no principal amount and made reference to a blank grid with columns for settlement date,

amount of advance, rate, amount of principal paid, and principal outstanding. Discovery in this case indicates that the grid was never filled in or completed in any manner. (Pl.'s Ex. 405 at 57:1-5.)

Various financial schedules also indicate that for the period from 1993-1998, no interest was paid from Mirant to Southern for the purported loan. (Pl.'s Ex. 396 at 84:6-12.) Nor did Southern's cash flow projections for the relevant time period include any anticipated receipt of interest payments for the alleged loan.

There are numerous genuine issues of material fact in dispute regarding whether the $1.034 billion transfer was in fact a loan repayment. Summary judgment with respect to the 1999 Loan Repayment is inappropriate.

### b.     IPO and Spin-Off Transfers

Count B of MCAR's Complaint alleges in part that Southern caused Mirant to engage in other transfers which constituted constructive fraud and thus may be avoided pursuant to New York, Federal, and other applicable State laws. Southern argues in response that it is entitled to summary judgment on a number of different grounds, as analyzed below.

### (1)     2000 Dividends

Southern states that "the Series B Dividend, the Series B Redemption, the 2000 Dividends, the IPO, and the Spin-off were all part of a single, integrated

transaction," for which "Mirant *paid* Southern dividends of $503 million and *transferred* the Finance Companies," and in return "Mirant *received* $1.731 billion in IPO proceeds." (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 14.) Southern concludes that as such, the IPO and Spin-off Transfers were supported by valuable consideration, and that "the 2000 Dividends were integrated with the IPO/Spin Transaction as a matter of law." (Def.'s Reply Br. in Supp. of Mot. for Summ. J. 9.) MCAR argues that the 2000 Dividends were independent of the IPO/Spin-off, and were for no consideration, thus making them a fraudulent conveyance because Mirant was "insolvent at the time of the transfer." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 6.)

"It is now widely accepted that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for purposes of applying fraudulent conveyance principles." In re Nat'l Forge Co., 344 B.R. 340, 347 (W.D. Pa. 2006) (citations omitted). Under this doctrine, interrelated but formally distinct steps in an integrated transaction are considered part of the overall transaction. Id. Although the Eleventh Circuit has not articulated a test to be used in deciding when several transactions should be viewed as one integrated transaction in the fraudulent conveyance context, other circuits have spoken on the issue. "In determining whether a series of transactions should be

'collapsed' into a single integrated one, courts focus not on the form of the transaction but on its substance — especially the knowledge and intent of the parties involved in the transaction and whether there was an overall scheme to defraud creditors." Id. at 348 (citations omitted), see also United States v. Tabor Court Realty Corp., 803 F.2d 1288 (3d Cir. 1986) (sustaining collapse of various transactions where parties acted in bad faith); Voest-Alpine Trading USA Corp. v. Vantage Steel Corp., 919 F.2d 206 (3d Cir. 1990) (upholding finding that several transactions at the same time were a single integrated transaction that functioned as a subterfuge and damaged unsecured creditors); HBE Leasing Corp. v. Frank, 48 F.3d 623 (2d Cir. 1995) (consideration given to "collapsing the transaction" in an alleged fraudulent conveyance action). The examinations done by courts in this area include "whether all of the defendants were aware of the multiple steps of the transaction . . . [and] whether each step would have occurred on its own or, alternatively, whether each step depended upon the occurrence of the additional steps in order to fulfill the parties' intent." In re Nat'l Forge Co., 344 B.R. at 348.

   To support its argument that summary judgment is not appropriate, MCAR introduces ample evidence that the actual substance and intent behind the 2000 Dividends transaction preclude integration. MCAR points to communications that Southern had with the IRS, in which Southern sought and obtained a ruling that the

2000 Dividends *not* be integrated with the IPO/Spin-off. MCAR supplies evidence that Southern advocated that "[t]he distribution of $X by [Mirant] to Southern will be treated as a dividend under section 301 [of the IRS Code]." (Pl.'s Ex. 263 at '369.) While requesting such treatment, Southern asked for an IRS ruling that the dividend thus be treated as a "separate, independent distribution" and *not part of* the spin-off distribution by Southern of Mirant stock. (Pl.'s Ex. 268.01 at '672.)

In its Presubmission Memorandum to the IRS, Southern stated: "Before the IPO, [Mirant] will distribute cash to Southern as a dividend. [Mirant] will have the capacity to fund this distribution independent of the sale of a portion of its stock in the IPO. Furthermore, this dividend is consistent with distributions by [Mirant] to Southern in prior years." (Pl.'s Ex. 263 at '373.) In this same Memorandum, Southern advocated that the 2000 Dividends "be respected as a separate distribution and taxed as a dividend from [Mirant] to Southern." (Id.) Southern also stated that the payment of the 2000 Dividends were dependent on market conditions, *not* a favorable ruling from the IRS, while the IPO/Spin-off were contingent on such a ruling. (See id.) In addition, Mirant Board resolutions approving the 2000 Dividends made absolutely no mention of the IPO or Spin-off. (Def.'s App. 30.) And finally, MCAR submits evidence that though the Master Separation and Distribution Agreement ("MSDA") required Southern to reimburse Mirant for its

IPO-related costs, Southern was not required to make similar reimbursement payments to Mirant for the financing costs Mirant incurred while borrowing money to pay Southern the 2000 Dividends. MCAR has pointed to sufficient evidence to demonstrate a factual dispute regarding the integration of the 2000 Dividends transaction, and as such, the matter is appropriate for a jury.

### (2) Separation Agreement Transfers

Southern next argues that "[t]he Separation Agreement Transfers . . . were contractual obligations made in exchange for services and guaranties," and because they were supported by valuable consideration, were not constructively fraudulent transfers under § 18-2-22(3). (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 15.) MCAR responds that there is sufficient evidence such that a jury could conclude that both the Separation Agreement Transfers and an asset acquisition from the Potomac Electric Power Company ("PEPCO") were integral to the IPO/Spin-off, and that when viewed as a whole, the consideration Mirant received from the IPO/Spin-off "was too grossly inadequate to be valuable consideration in support of the transfers." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 11.)

At the outset, both sides agree that the Separation Agreements were an integral part of the IPO/Spin-off. (Def.'s Statement of Material Facts in Supp. of Its Mot. for Summ. J. ("SOMF") ¶ 112; Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 11.)

MCAR argues that the PEPCO acquisition should also be integrated with the IPO/Spin-off, and supplies evidence from which a jury could reasonably make such a finding. For example, a slide from the Mirant Interim Liquidity and Business Development Updated Presentation contains the heading "IPO Update" and then indicates that the IPO amount was "linked to the outcome of significant deals," one of which was the PEPCO acquisition. (Pl.'s Ex. 210 at '549.) In another presentation regarding the PEPCO asset acquisition, a summary slide calls PEPCO a "[t]ransforming [t]ransaction" and details how the purchase "[e]nhances IPO interest and price." (Pl.'s Ex. 170 at '930.) Because there is evidence that could support a finding that the PEPCO acquisition should be integrated with the IPO/Spin-off, the court will consider whether "valuable consideration" was given by Southern.

While discussing the requirements of § 18-2-22, courts have expressly stated that consideration can be "so inadequate as to render the conveyance fraudulent."[10]

---

[10]    The court finds no support for Southern's argument that the "valuable consideration" requirement of § 18-2-22(3) is satisfied as long as the consideration "has monetary value in any amount." (Def.'s Reply Br. in Supp. of Mot. for Summ. J. 10.) In support of its position, Southern advises that <u>Stokes v. McRae</u>, 247 Ga. 658, 278 S.E.2d 393 (1981) stands for this proposition. However, <u>Stokes</u> merely said that "[a] valuable consideration is founded on money, or something convertible into money, or having a value in money," and went on to find that there was valuable consideration because the undisputed evidence showed part of the consideration in the transaction was money or the value of money. <u>Id.</u> at 659, 278 S.E.2d at 395. Likewise, Southern's assertion that <u>In re Holmes</u>, 296 B.R. 567 (Bankr. M.D. Ga. 2003) states that "[t]he *adequacy* of consideration is (continued...)

United States v. Reid, 127 F. Supp. 2d 1361, 1369 (S.D. Ga. 2000); see also United

States v. McMahan, 392 F. Supp. 1159, 1166 (N.D. Ga. 1975) (Freeman, J.) ("Great

inadequacy of consideration in the transfer of property creates strong inferences that

the transfer was fraudulent."). Such a determination "depends on the intention of

the parties and on the facts and circumstances surrounding the conveyance." Reid,

127 F. Supp. 2d at 1369. MCAR points to an expert opinion that "the net value of the

PEPCO deal in 2000 was negative $1.8 billion." (Pl.'s Ex. 417 ¶ 4.) There is also

evidence that pursuant to the MSDA, Mirant was obligated to replace any guarantee

or letter of credit that Southern had issued for Mirant or any of its subsidiaries, and

that as of September 30, 2000, these obligations totaled approximately $357.65

million. (Pl.'s Ex. 9 at '562.) The combination of these two would reduce the value

to Mirant of the IPO/Spin-off transaction by $2.1576 billion. Southern asserts that

Mirant gained $978 million in the IPO and related transactions. Thus, even

accepting Southern's assertion of a gain, together with MCAR's proffered numbers,

the value of the IPO/Spin-off to Mirant was a loss of no less than $1.1 billion. (See

Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 14.) The court finds that MCAR

---

[10](...continued)
irrelevant," does not comport with the court's reading of the case. (Def.'s Reply Br. in
Supp. of Mot. for Summ. J. 10.) In re Holmes simply found that the "fact that [Plaintiff]
paid a high price [above fair market value] for the land does not mean that Plaintiff did not
receive something of value." In re Holmes, 296 B.R. at 573.

has proffered sufficient evidence from which a jury could find that the PEPCO acquisition was integral to the IPO/Spin-off and that as a result, the consideration received by Mirant in exchange for the conveyance did not constitute "a valuable consideration" under § 18-2-22(3).

### c.    Turbine Transfers

Southern also seeks summary judgment as to MCAR's claim that the Turbine Transfers constituted a fraudulent conveyance because the transfers were not made to Southern.  To the extent that a transfer may be avoided, the trustee may recover from "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."  11 U.S.C. § 550(a).

Southern first points out that MCAR concedes the Turbine Transfers were payments by Mirant to third-parties (not including Southern).  It next argues that there is no evidence that Southern was the entity for whose benefit the transfers were made (as required by § 550(a)(1)), and as such "MCAR cannot establish any constructive fraudulent conveyance claim based on the Turbine Transfers."  (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 16.)  MCAR does not dispute Southern's arguments, and instead concedes that it "is no longer pursuing . . . the fraudulent transfer claim based on the Turbine Transfer asserted in its Fourth Amended

Complaint." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 2 n.2.) Because no genuine issues of material fact exist, the court finds that Southern is entitled to judgment as a matter of law regarding the portion of Count B alleging that the Turbine Transfers constituted a fraudulent conveyance.

### 2. Actual Fraudulent Transfer Claims

Southern next argues that MCAR's actual fraudulent transfer claims made pursuant to § 18-2-22(2) fail because there is insufficient evidence as to each of the statute's requirements. O.C.G.A. § 18-2-22(2) defines actual fraudulent transfers as follows:

> Conveyances by debtors deemed fraudulent—
>
> The following acts by debtors shall be fraudulent in law against creditors and others and as to them shall be null and void:
>
>> (2) Every conveyance of real or personal estate, by writing or otherwise, and every bond, suit, judgment and execution, or contract of any description had or made with intention to delay or defraud creditors, where such intention is known to the taking party; a bona fide transaction on a valuable consideration, where the taking party is without notice or ground for reasonable suspicion of said intent of the debtor, shall be valid . . . .

O.C.G.A. § 18-2-22(2). "A party relying on this subsection must establish two elements: (1) the requisite intent of the grantor and (2) grantee's knowledge of grantor's intent. The second element may be established either by proof of actual

knowledge or by proof of circumstances sufficient to put grantee on inquiry."[11]

Stokes, 247 Ga. at 659, 278 S.E.2d at 395 (citations omitted). "As a general rule, it is

peculiarly the province of the jury to pass on these circumstances showing fraud."

Lionheart Legend, Inc. v. Norwest Bank Minn. Nat'l Ass'n, 253 Ga. App. 663, 665,

560 S.E.2d 120, 123 (2002) (citation and internal quotations omitted).

### a. Grantor's Intent

Southern states that as to the first element of § 18-2-22(2), "[t]here is no

evidence that Mirant made any of the Transfers with the actual intent to hinder,

delay, or defraud any creditor."[12] (Mem. of Law in Supp. of Def.'s Mot. for Summ.

---

[11] Although Southern asserts that MCAR must also establish that each "Transfer caused that creditor harm," neither § 18-2-22(2) nor any of the cases Southern cites supports its contention. (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 16, 18.) Indeed, a number of these cases explicitly say that the *only* elements required are grantor's intent and grantee's knowledge of intent. See e.g., Stokes, 247 Ga. at 659, 278 S.E.2d at 395; Lionheart Legend, Inc. v. Norwest Bank Minn. Nat'l Ass'n, 253 Ga. App. 663, 665, 560 S.E.2d 120, 123 (2002). This court particularly notes Southern's citation to Wallace v. Wallace, 189 Ga. 220, 5 S.E.2d 580 (1939). Southern tells the court that Wallace stands for the proposition that harm is a necessary element for a fraudulent transfer claim. However, Southern neglected to tell the court that Wallace was expressly distinguished by Von Kamp v. Gary, 204 Ga. 875, 882, 52 S.E.2d 591, 595-96 (1949) on precisely the same grounds at issue here. The Von Kamp court limited Wallace to its facts and said that under § 18-2-22(2), "[i]t is not necessary to show that damage has actually accrued." Von Kamp, 204 Ga. at 882, 52 S.E.2d at 596.

[12] In this section Southern also argues that "if a debtor believes himself solvent at the time of a transfer and does nothing to conceal the transfer from those that subsequently extend credit, the debtor lacks fraudulent intent under § 18-2-22(2)." (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 17.) It cites First Nat'l Bank of Cartersville v. Bayliss, 96 Ga. 684, 23 S.E. 851 (1895) for this proposition. However this case discusses only § 18-2-22(3), and in the particular context of fraudulent conveyances void as against creditors who
(continued...)

J. 17.) "Since proof of fraud is seldom if ever possible by direct evidence, recourse to circumstantial evidence is a necessity . . . . Circumstances apparently trivial or almost inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." Eberhardt v. Bennett, 163 Ga. 796, 137 S.E. 64, 67 (1927) (citation and internal quotations omitted). The court finds that MCAR has pointed to evidence sufficient to indicate a factual dispute as to whether, in connection with certain conveyances to Southern, Mirant had the intent to defraud its creditors.

MCAR first provides evidence that Mirant directors had a motive "for Southern to receive as much cash as possible from [Mirant]." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 15.) Collectively the directors owned over one million shares of Southern stock and stock options. (Def.'s App. 1 at '602-'06.) Additionally, in its Form 10-K for 1999, Southern disclosed that in "April 1999, Southern Company announced the repurchase of up to 50 million shares of its common stock over a two-year period through open market or privately negotiated transactions." (Pl.'s Ex. 447 at II-17.) There is evidence to suggest, however, that the funds Southern had

---

[12](...continued)
come to hold demands against the donor subsequent to the time of the debtor's conveyance. As this case involves creditors whose claims existed prior to any of the Transfers, see infra Part (A)(3), the court rejects Southern's argument for application of the articulated standard to claims arising under § 18-2-22(2), particularly as it relates to the requirement of a debtor's fraudulent intent.

anticipated using for this endeavor were not available, so Southern looked to Mirant for capital. (Pl.'s Ex. 448.)

MCAR next points to evidence that as part of the overall acquisition and separation process, Mirant obtained loans from various lenders, and that while securing such funds, Mirant "deliberately hid agreements from lenders that they knew would be of concern to the lenders." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 16.) For example, one of Mirant's subsidiaries, Southern Energy North America Generating, Inc. ("SENAG"), submitted a Confidential Information Memorandum ("SENAG CIM") to one of its lenders, Lehman Brothers, in September 1999. The SENAG CIM contained information about transactions between two of Mirant's other subsidiaries, Southern Company Energy Marketing, L.P. ("SCEM") and Southern Energy New England, L.L.C. ("SENE"), which were internally referred to as "Below-the-Line" agreements. (Pl.'s Ex. 453.) There is also evidence that Mirant subsidiaries entered into other agreements, internally referred to as "Above-the-Line" agreements, which had the effect of reversing the "Below-the-Line" agreements disclosed to the lenders. (Pl.'s Exs. 21, 453.) MCAR further proffers discussions that the "Above-the-Line" agreements and documents describing the transactions were referred to as "outside of the financing and as such . . . not to even be mentioned to the banks or their representatives." (Pl.'s Ex. 127 at

'930.)  This same document contains email conversations that caution employees to "never discuss" the documents describing such agreements, and that "the banks cannot cope with replacement power risk."  (Id.)  Finally, there is evidence of discrepancies in the financial projections given to lenders versus those prepared for internal use, with the external figures 10 to 20% higher than Mirant's internal projections.  (Pl.'s Ex. 427.00 at '5714; Pl.'s Ex. 80.)  Based on this evidence, the court finds that MCAR has shown there is a genuine issue of material fact regarding Mirant's fraudulent intent, and summary judgment on this element is unwarranted.

### b.    Grantee's Knowledge of Grantor's Intent

Southern next argues that pursuant to § 18-2-22(2)'s second requirement, "there is *no* evidence that Southern had actual or constructive knowledge of Mirant's alleged fraudulent intent with respect to any Transfer."  (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 19.)  To rebut this assertion, MCAR submits evidence that Mirant was the "wholly-owned subsidiary of Southern until the commencement of [the IPO] on September 26, 2000," and consequently Southern was Mirant's sole and controlling shareholder.  (Def.'s SOMF ¶ 3.)  Additionally, Mirant's Prospectus lists five individuals on its Board of Directors holding the following positions:[13]  (1) Director/Chairman of the Board; (2) President/CEO/Director; (3) Director; (4)

---

[13]    These individuals were A. William Dahlberg, S. Marce Fuller, H. Allen Franklin, Elmer B. Harris, and W.L. Westbrook. (Pl.'s Ex. 148 at '423.)

Director; and (5) Director. (Def.'s App. 1 at '602.) At the time of the transfers at issue, these individuals were also serving in leadership positions for Southern, and on its Board. Their positions with Southern included the following: (1) Chairman/CEO; (2) President/COO; (3) Executive VP/Director; and (4) Financial VP/CFO/Treasurer/Director. (Id.; Pl.'s Ex. 458 at I-23.) Furthermore, a number of these individuals also held leadership positions with various Southern subsidiaries. (Def.'s App. 1 at '602-'04.) MCAR points to evidence that Mirant's directors received detailed information about Mirant's financial condition, and each signed the company's September 26, 2000 Form S-1/A, which included and attested to the accuracy of Mirant's current and historical financial condition. (See Pl.'s Ex. 457 at II-6.) Because "knowledge of officers of a corporation is knowledge to that corporation and the corporation is bound thereby," the court finds that MCAR has put forward sufficient evidence from which a jury could reasonably find that Southern possessed the requisite knowledge of Mirant's fraudulent intent under § 18-2-22(2).[14] Brown v. Cooper, 237 Ga. App. 348, 353, 514 S.E.2d 857, 863 (1999). Summary judgment must therefore also be denied as to this portion of the claims.

---

[14] Contrary to Southern's argument, the allegation is not that simply because Mirant was a subsidiary of Southern, knowledge is imputed to the latter. (Def.'s Reply Br. in Supp. of Mot. for Summ. J. 12-13.)

### 3. Avoidance Rights Under O.C.G.A. § 18-2-22

Finally, in relation to Counts A and B, Southern argues that all of MCAR's actual and constructive fraudulent transfer claims fail as a matter of law, because "[t]here is no evidence . . . that any unsecured creditor with an allowable claim in Mirant's bankruptcy held avoidance rights under § 18-2-22."[15] (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 20.) Specifically, in its Reply Brief, Southern asserts a lack of evidence that for each Transfer, an actual creditor had (1) an allowable unsecured claim in Mirant's bankruptcy and (2) standing to bring an avoidance claim under § 18-2-22(2) or (3).[16] As previously stated, MCAR was substituted into the present action and represents various creditors holding claims

---

[15]   MCAR reads Southern's Brief as asserting the argument that creditors may be estopped from avoiding a transfer, and points out that this is an affirmative defense for which Southern bears the burden of proof. (See Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 23-24.) However the court reads Southern's Brief to use estoppel as an example of MCAR's relationship to the unsecured creditors in this suit, a concept about which there is no dispute. Thus, the court will not talk about the estoppel issue further.

[16]   The arguments that Southern makes in connection with this two-part assertion need not be considered by the court, as reply briefs are not the vehicles in which to introduce new arguments. See United States v. Ga. Dep't of Natural Res., 897 F. Supp. 1464, 1471 (N.D. Ga. 1995) (Forrester, J.) ("This court will not consider arguments raised for the first time in a reply brief."). However the court acknowledges that it finds the clarification provided by the Reply Brief helpful. The argument made in Southern's initial Brief left the court to wonder whether Southern complains about a lack of evidence of an unsecured creditor with an allowable claim, or a lack of evidence of a creditor having avoidance rights under the statute, or both. Having considered the arguments and the extra Brief, the court GRANTS MCAR's Motion for Leave to File a Sur-Reply and considers the arguments made both by Southern in this portion of its Reply as well as MCAR in its Sur-Reply Brief.

against the debtor Mirant. MCAR argues that there exists "clear evidence in this case of both 'creditors' and 'others' against whom the transfers to Southern are fraudulent, and therefore null and void." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 22.)

The term "claim" is defined, in part, as a "right to payment, whether or not such right is reduced to judgment." 11 U.S.C. § 101(5). MCAR first proffers evidence that as of the time of the first transfer at issue, July 1999, Mirant had a number of unsecured contractual creditors who had a right to payment but remained unpaid as of Mirant's bankruptcy. Thus, these individuals would have held an allowable unsecured claim in Mirant's bankruptcy as required by § 18-2-22. For example, Citibank was one of Mirant's creditors that filed a proof of claim in Mirant's Chapter 11 bankruptcy proceeding. This filing asserted an unsecured, unpaid claim for $448,248,681.69 plus interest, fees, costs and expenses, in connection with an agreement Citibank had made with Mirant on April 1, 1999. (Pl.'s Ex. 434 at 3.) Likewise, MCAR points to evidence that Deutsche Bank AG New York, as a successor-in-interest to Bankers Trust Company, also filed a proof of claim in Mirant's Chapter 11 proceeding. This was for the amount of "a[]t least $5,133.33." (Pl.'s Ex. 436 at 3.) The court finds that MCAR has identified sufficient evidence to indicate a factual dispute appropriate for a jury as to this first issue.

Regarding Southern's second argument, that MCAR has failed to present evidence showing that an actual creditor had standing to bring an avoidance claim under § 18-2-22, Southern claims that to have such standing under § 18-2-22(3), "a creditor must be a pre-transfer creditor who reduced his claim to judgment." (Def.'s Reply Br. in Supp. of Mot. for Summ. J. 14.) Southern likewise asserts that if a creditor has not reduced its claim to judgment, to avoid the transfer under § 18-2-22(2), the creditor "only has standing to avoid a transfer if it was made with the actual intent to defraud that particular creditor." (Id. at 16.) Southern argues that MCAR has not presented evidence sufficient to satisfy either of these requirements, and as such summary judgment should be granted.

A review of the precedent governing this statute does not support Southern's position. In interpreting the bankruptcy statute, Georgia courts have expressly said that "under O.C.G.A. § 18-2-22 all that is needed is a *claim*, not a judgment." <u>Cavin v. Brown</u>, 246 Ga. App. 40, 41, 538 S.E.2d 802, 805 (2000) (emphasis added). Likewise, O.C.G.A. § 9-11-18(b), which pertains to joinder of remedies as it relates to fraudulent conveyances, instructs that "a plaintiff may state a claim for money and a claim to have set aside a conveyance fraudulent as to him *without first having obtained a judgment* establishing the claim for money." O.C.G.A. § 9-11-18(b) (emphasis added). MCAR points to various unsecured creditors of Mirant who

could state a claim to avoid a transfer under the Georgia statute. Therefore, MCAR has satisfied its evidentiary burden regarding unsecured creditors having claims against Mirant at the time of its Chapter 11 bankruptcy filing. Accordingly, the court rejects Southern's assertion of a lack of evidence supporting the ability of any unsecured creditor to bring an avoidance claim under § 18-2-22, and Southern's Motion for Summary Judgment is denied as to the relevant claims.

### B.     Illegal Dividend Claims—Count B

MCAR's Count B also contains various claims of illegal dividends against Southern. As an initial matter, both parties agree that Delaware law governs these claims. Delaware Code § 170, generally summarized and without attention to par value, stated capital, and current earnings calculations that are not material here, prevents the payment of a dividend in excess of a corporation's "surplus," which equates to the dollar amount of its total assets less the dollar amount of its total liabilities.

Southern argues that as to MCAR's illegal dividend claims in Count B, summary judgment should be granted for four independent reasons. The court will address each argument in turn.

### 1. MCAR's Direct Right of Action Against Southern

Southern first argues that § 174 of the Delaware Code, which imposes liability for illegal dividends, permits a corporation such as Plaintiff to hold directors, but not shareholders, liable for paying illegal dividends. It argues that since MCAR brings this case against Southern as "a shareholder, not a director . . . MCAR's illegal dividend claim fails as a matter of law." (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 22.) MCAR responds by first pointing out that it is suing Southern not for *paying* illegal dividends, but "for having knowingly *received* them." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 24) (emphasis added). It then argues that summary judgment is inappropriate as Delaware statutory law assumes the existence of a corporation's right to bring a cause of action against a shareholder to recover an illegally distributed dividend.

Section 174 provides in relevant part as follows:

**Liability of directors for unlawful payment of dividend or unlawful stock purchase or redemption; exoneration from liability; contribution among directors; subrogation**

> (a) In case of any wilful or negligent violation of § 160 or 173 of this title, the directors under whose administration the same may happen shall be jointly and severally liable, at any time within 6 years after paying such unlawful dividend or after such unlawful stock purchase or redemption, to the corporation, and to its creditors in the event of its dissolution or insolvency, to the full amount of the dividend unlawfully paid, or to the full amount

unlawfully paid for the purchase or redemption of the corporation's stock, with interest from the time such liability accrued. . . .

(c) Any director against whom a claim is successfully asserted under this section shall be entitled, to the extent of the amount paid by such director as a result of such claim, to be subrogated to the rights of the corporation against stockholders who received the dividend on, or assets for the sale or redemption of, their stock with knowledge of facts indicating that such dividend, stock purchase or redemption was unlawful under this chapter, in proportion to the amounts received by such stockholders respectively.

Del. Code Ann. tit. 8, § 174.

At first glance, § 174's title, "Liability of directors for unlawful payment of dividend," appears to support Southern's argument that the statute does not provide for a right of action against a shareholder for receipt of an illegal dividend distribution. However the wording of subsection (c) implies the existence of a right of a corporation to bring such a suit: "Any director . . . shall be entitled . . . to be subrogated to *the rights of the corporation against stockholders who received the dividend on* . . . their stock with knowledge of facts indicating that such dividend . . . was unlawful . . . ." Id. (emphasis added).

Contrary to Southern's assertion that "[n]o Delaware court has interpreted § 174(a) to provide a corporation or its creditors a direct right of action against shareholders," Delaware courts have in fact done just so. (Mem. of Law in Supp. of

-31-

Def.'s Mot. for Summ. J. 21.)  In <u>PHP Liquidating, LLC v. Robbins</u>, after recognizing

that the overall purpose of the statute is to "provide[] a remedy against directors,

not stockholders, for violations of Section 160," the court stated that subsection (c)

"suggests that the shareholder will be liable for any amount received by him but

only if he had notice that the dividend was unlawful.  Stated another way,

shareholder liability requires bad faith.  Thus, shareholders who redeem their stock

in good faith are not liable to the corporation."  291 B.R. 592, 597-98 (D. Del. 2003)

(citations and internal  quotations omitted).  Likewise, a Delaware Court of

Chancery recently affirmed recognition of such a right when it said that "§ 174's

terms suggest . . . a legislative disinclination to hold stockholders liable in situations

when they received a dividend or other distribution in the good faith belief that the

corporation was making a lawful return to its equity holders."  <u>Territory of U.S.</u>

<u>Virgin Islands v. Goldman, Sachs & Co.</u>, 937 A.2d 760, 794-95 (Del. Ch. 2007).

Because Delaware courts have interpreted § 174 to provide for a corporation's right

to bring a cause of action against a shareholder for receipt of an illegal dividend, the

court finds that summary judgment is inappropriate on this ground.[17]

_____

[17]     The court recognizes a split of authority among various district courts throughout
the country, but ultimately defers to Delaware precedent in interpreting the Delaware
statute.  <u>Compare</u> <u>Weinman v. Fid. Capital Appreciation Fund (In re Integra Realty Res.,</u>
<u>Inc.</u>), 198 B.R. 352, 365 (Bankr. D. Colo. 1996) <u>and</u> <u>Sheffield Steel Corp. v. HMK Enters. Inc.</u>
<u>(In re Sheffield Steel Corp.</u>), 320 B.R. 405, 414-15 (Bankr. N.D. Okla. 2004) <u>with</u> <u>Pinellas</u>
(continued...)

## 2.     Dividend Versus Non-Dividend Status of the Transfers

Southern next argues that § 174 is inapplicable to the "1999 Loan Repayments, the Separation Agreement Transfers, and the Turbine Transfers" because these were "non-dividend transfers" and therefore fall outside the reach of the Delaware illegal dividend statute.  (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 22-23.)  It claims that each of these transfers was made in exchange for valuable consideration and do not constitute "dividends" under Delaware law.  Additionally, Southern states that "Delaware dividend law does not apply to stock redemptions, including the Series B Redemption," further necessitating summary judgment relating to Count B and this particular Transfer.  (Id. at 23.)  MCAR argues that "despite not being designated as dividends by [Mirant's] board, the '99 Returns, as well as the Separation Transfers, all had the effect of transferring corporate assets to Southern and there is substantial evidence . . . that they were, in substance, dividends, because there was no real consideration to support the transfers."  (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 28.)

Delaware law provides that a "dividend" is a "payment to the stockholders as a return upon their investment . . . to be distributed according to some fixed

---

[17](...continued)
County v. Great Am. Indus. Group, Inc., No. 90 C 5254, 1991 WL 259020, at *3 (N.D. Ill. Dec. 2, 1991) and Protocomm Corp. v. Novell Advanced Servs., Inc., 171 F. Supp. 2d 459, 469 (E.D. Pa. 2001).

scheme." Penington v. Commonwealth Hotel Constr. Corp., 155 A. 514, 517 (Del. 1931). Southern says that the 1999 Loan Repayments, the Separation Agreement Transfers, and the Turbine Transfers were neither (1) payments to Southern as a return upon its investment nor (2) distributed according to a fixed scheme—instead they were "made in exchange for consideration or . . . not made to Southern." (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 23.) In determining whether a particular transaction constitutes a "dividend" to shareholders, Delaware courts have placed an emphasis on substance over form, and focused on the "economic reality of the transactions." Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Group, Inc. (In re Buckhead Am. Corp.), 178 B.R. 956, 969-70 (D. Del. 1994).

Even though, as MCAR concedes, the Transfers were not "designated as dividends by the [Mirant] board," there is sufficient evidence to indicate the presence of a factual dispute regarding whether the Transfers at issue were illegal dividends. (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 28.) It is not disputed that Southern was a shareholder of Mirant at the time of the transfers. MCAR has provided evidence that Southern made substantial investments in Mirant and its subsidiaries, which as of June 30, 1999 totaled approximately $3.75 billion. (Pl.'s Ex. 260 at '698.) As previously discussed, MCAR has introduced evidence supporting

its claim that the 1999 Advance Return/Loan Repayment was a payment from Mirant to Southern of funds not for valuable consideration. <u>See</u> <u>supra</u> Part (A)(1)(a). Likewise, as also discussed above, MCAR has provided sufficient evidence to indicate a factual dispute regarding the sufficiency of the consideration received by Mirant in exchange for its payments to Southern made in connection with the Separation Transfer Agreements. <u>See</u> <u>supra</u> Part (A)(1)(b)(2). Because MCAR has pointed to evidence sufficient to indicate a material factual dispute regarding these two Transfers to Southern, and whether they were in fact dividend payments, summary judgment is inappropriate for this portion of Count B.

MCAR has not pointed to any evidence supporting its claim that the Turbine Transfers were dividends to Southern. The court accepts this as a concession that MCAR is no longer asserting an illegal dividend claim against Southern in relation to such Transfers. Therefore summary judgment is GRANTED on the illegal dividend claim in Count B as it relates to the Turbine Transfers allegation.

Finally, regarding the Series B Dividend and Redemption, the court finds that MCAR has put forth evidence indicating the presence of a material factual dispute appropriate for a jury. Although Southern argues that "Delaware dividend law does not apply to stock redemptions, including the Series B Redemption," there is

no support for such an assertion.[18]  To the contrary, the title of Delaware Code § 174 expressly provides for liability relating to "unlawful payment of dividend or unlawful stock purchase or *redemption*."  Del. Code Ann. tit. 8, § 174 (emphasis added).  It is irrelevant whether the transfers are evaluated under Delaware Code § 160,[19] which limits stock redemptions, or Delaware Code § 170, which limits dividends:  their tests are the same, and would prevent a transfer if it exceeded the amount of corporate surplus.

---

[18]    Southern cites to <u>Baron v. Wolf</u>, C.A. No. 4972, 1976 Del. Ch. LEXIS 180, at *7 (Del. Ch. Jan. 15, 1976) for  this argument. However <u>Baron</u> merely found that the plaintiffs had not met the standard for a temporary restraining order relating to the planned redemption of preferred stock of a corporation, and made no holding about the inapplicability of Delaware dividend law to stock redemption.  <u>See</u> <u>id.</u>

[19]    § 160 provides, in part:

**Corporation's powers respecting ownership, voting, etc., of its own stock; rights of stock called for redemption**

(a) Every corporation may purchase, redeem, receive, take or otherwise acquire, own and hold, sell, lend, exchange, transfer or otherwise dispose of, pledge, use and otherwise deal in and with its own shares; provided, however, that no corporation shall:

(1) Purchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation . . . .

Del. Code Ann. tit. 8, § 160.

MCAR has argued that despite Southern's assertion that the value of the Series B Dividend was $.01, the actual value must be calculated taking into account Southern's "associated right to receive [Mirant's] Finance Companies." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 28 n.9.) There is evidence that as of September 21, 2000, the Finance Companies had a combined fair market value of at least $193.9 million. (Pl.'s Ex. 417.02 at T8-2.) From this a jury could reasonably conclude that there was insufficient consideration to support the transfer. The court thus finds that a material factual dispute exists regarding whether this transaction constituted an illegal stock redemption, and DENIES Southern's Motion for Summary Judgment as to this issue.

### 3. Legality of the Dividend Transfers

Under Delaware law, a dividend may be paid out of either a corporation's "surplus" or its "net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year."[20] Del. Code Ann. tit. 8, § 170(a). "The reason dividends are payable only out of surplus or net profits is to prevent boards from draining corporations of assets to the detriment of creditors and the long-term health of the corporation." Sheffield Steel Corp. v. HMK Enters., Inc. (In re Sheffield

---

[20] Surplus is defined as the total value of a corporation's assets minus its liabilities and capital. Capital is the total par value of the corporation's issued stock. See Del. Code Ann. tit. 8, § 154.

Steel Corp.), 320 B.R. 423, 448 (Bankr. N.D. Okla. 2004) (citation and internal quotations omitted).

Southern argues that the 1999 Dividend, the 2000 Dividends, and the Series B Dividend were all "legal under Delaware law" because at the time they were paid, "Mirant had surplus and/or net profits exceeding the amount of the dividend." (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 24.) In support of this argument Southern submits that "from December of 1999 through July 2000, Mirant's surplus was never less than $2,799,998,000 ($2.8 billion net assets minus $2,000 capital)." (Id.) MCAR argues that there is evidence suggesting (a) Mirant's directors ignored their responsibility to evaluate the company's assets prior to issuing the dividends and (b) the financial records upon which they relied were inaccurate and known to be so by the directors. MCAR concludes that as such, summary judgment is inappropriate regarding the legality of the 1999 Dividend, the 2000 Dividends, and the Series B Dividend.

### a. Evaluation of Assets Prior to Issuance

MCAR's first argument is that Mirant's directors failed to take the necessary steps to evaluate Mirant's assets before making the dividend distribution, and that this rendered the dividend illegal. In support, MCAR points to evidence that the Mirant Board did not assemble at a meeting to approve the 1999 Dividend or the

$450 million May 2000 dividend. Instead, both of these dividends were approved by adoption of a resolution of unanimous written consent. (Def.'s Apps. 29, 30.) Relating to the $53 million 2000 dividend, MCAR states that although minutes reflect a Board meeting and resolution approving the payment, "there is nothing attached to any of the resolutions evidencing that the board performed any calculation, or even reviewed any financial information." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 30.) Finally, MCAR argues that it has provided sufficient evidence of an illegal redemption for the Series B Redemption because "there was no calculation in connection with" this redemption. (Id. at n.11.)

> Unless otherwise restricted by the certificate of incorporation or bylaws, any action required or permitted to be taken at any meeting of the board of directors . . . may be taken without a meeting if all members of the board . . . consent thereto in writing . . . and the writing or writings . . . are filed with the minutes of proceedings of the board, or committee. . . .

Del. Code Ann. tit. 8, § 141(f). Thus, MCAR's argument that the approval and declaration of the 1999 and May 2000 Dividends was illegal because no meeting was conducted, and instead a resolution was adopted, must fail as a matter of law. It is true that in keeping with Delaware law's provisions regarding corporate issuance of dividends, Delaware courts have required that the company's directors "assess[] the health of a corporation prior to declaring dividends." In re Sheffield Steel Corp., 320 B.R. at 449. However, such an assessment "does not mean . . . that formal

appraisals must be obtained from professional appraisers or even made by the directors themselves." Morris v. Standard Gas & Elec. Co., 63 A.2d 577, 582 (Del. Ch. 1949) (citations and internal quotations omitted). Likewise, the court can find no requirement under Delaware law that the directors memorialize their assessment of the company's financial situation in either the meeting minutes or a resolution. In interpreting § 160, which specifically relates to a corporation's redemption of stock, Delaware courts have required "only that there exist a surplus after a repurchase, not that the board memorialize the surplus in a resolution."[21] Klang v. Smith Food & Drug Ctrs., Inc., 702 A.2d 150, 156 (Del. 1997).

Ultimately, a lack of evidence suggesting that the Board reviewed any financial information prior to approving and declaring the dividend is not sufficient to create a fact question as to whether the assessment took place. For these reasons,

---

[21]    MCAR relies on In re Sheffield Steel Corp. in support of its argument that defendants "must show that the officer or expert upon whom they relied actually determined the existence of a surplus prior to the authorization of the dividend and that it was reasonable to rely on that officer or expert." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 30.) MCAR also makes arguments consistent with the following language from In re Sheffield Steel Corp. which reads, "there is no corporate resolution, minute or other document in the record indicating that the Board made a calculation of surplus before declaring dividends." 320 B.R. at 451. However both of these statements concern the court's interpretation of § 172's safe harbor affirmative defense which "immunizes directors from liability for declaring an otherwise illegal dividend under certain circumstances." Id. The provision codifies the duty of care, diligence, good faith, and reason. The Sheffield Steel Corp. court was called upon to evaluate the strength of defendants' summary judgment arguments under the affirmative defense. Thus the standards articulated in its discussion are not applicable to the current case.

the court finds that MCAR's first argument, relating to an improper evaluation of assets prior to paying the dividend, is not sufficient to overcome Southern's Motion for Summary Judgment on the issue of the illegality of the dividends.

### b. Accuracy of Financial Status Prior to Issuance

In making the required assessment of a corporation's financial health prior to approving a dividend, Delaware law requires that the directors "evaluate the assets on the basis of acceptable data and by standards which they are entitled to believe reasonably reflect present 'values.'" Morris, 63 A.2d at 582. MCAR's second argument is that the financial records upon which Mirant's directors relied, while contemplating the dividends, were inaccurate and known to be so by these individuals.[22] It first introduces evidence to suggest as of July 1999, Mirant lacked systems that were able to track or calculate the historical financial results of its business units. (Pl.'s Ex. 407 at 82:5-25.) This same evidence also indicates that the lack of such a system made work difficult for Mirant's Corporate Finance Manager. In Mirant's 1999 Internal Audit Progress to Plan Report, a medium overall risk rating was given to the company's Accounting Finance and Treasury Department, and discussion comments noted "[p]oor controls could provide bad financial

---

[22]    MCAR asserts that Southern's assessment of Mirant's financial situation, when it approved and declared the dividends in 1999 and 2000, is inaccurate, as it was made by an employee who (1) "was never an officer or director of [Mirant]" and (2) made the determination three months prior. (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 29.)

information for reporting and business decisions." (Pl.'s Ex. 313 at '808.) The Report also noted Mirant's high risk of "false data for business decisions," and a similarly high "risk that the Company will engage in accounting transactions that create inappropriate subsidies between business units." (Id.)

MCAR provides further evidence of the inaccuracies of Mirant's financial statements and the directors' knowledge of those inaccuracies, by pointing to documentation that in 2000, Mirant's directors received a memo describing what was deemed a "central issue" in Mirant's Financial Reporting—the lack of "a sophisticated transaction system and related manual processes that can effectively convert operational results into a format consistent with GAAP and SEC financial reporting requirements in a timely manner." (Pl.'s Ex. 275 at '541.) MCAR also points to evidence that following an independent audit during 2002, Mirant's Audit Committee was advised that certain accounting deficiencies in the review collectively constituted a material control weakness. (Pl.'s Ex. 433 at 70.) As a result of this audit, Mirant was required to restate its earnings for 2000 and 2001. (Id. at F-17—F-25.) Finally, as additional evidence of problems with Mirant's financial records, MCAR provides an email from Ron Lepionka, who had become Vice President and Controller of the Americas Group at Mirant in the fall of 2000:

> I have been shocked at the condition of what I am now responsible. There is no consistency between regions. Account reconciliations at

> many of the companies are not and have not been routinely completed
> each month (so I do not not [sic] our exposure to balance sheet items).
> For example, in NY cash has not been properly reconciled and is off by
> $20 million. . . . In general, controls do not meet the standards.  I (We)
> have been handed a bag of crap . . . .

(Pl.'s Ex. 255 (format modified).)  The court thus finds that there are genuine issues

of material fact in dispute regarding whether Mirant's directors, in issuing the 1999

Dividend, 2000 Dividends, and Series B Dividend, evaluated the assets on the basis

of acceptable data which they were reasonably entitled to believe was accurate.

Summary judgment is therefore inappropriate regarding the illegality of these

dividends as alleged in Count B.

### 4.    Acceptance of Dividends in Bad Faith

Finally, in relation to the illegal dividend claims, Southern argues that

summary judgment is appropriate because "there is no evidence that Southern

accepted any unlawful distribution in 'bad faith.'"  (Mem. of Law in Supp. of Def.'s

Mot. for Summ. J. 24.)  It states that because MCAR cannot identify anyone who

stated, suggested, or believed that Mirant was insolvent at the time any transfer was

made, MCAR lacks evidence to support its illegal dividend claims.

To state a claim under Delaware law against a shareholder for receipt of an

unlawful dividend, the bad faith element requires that the shareholder have "some

element of knowledge of [the company's] financial condition, actual or imputed."

In re Sheffield Steel Corp., 320 B.R. at 415. In Sheffield, the court found that a complaint survived the motion to dismiss stage because it was reasonable to infer from it that the defendants knew or should have known that the company's negative financial position (defined as "no surplus or net profits") precluded the lawful payment of dividends. Id. at 416. Likewise, the court in PHP Liquidating indicated that in order to allege bad faith in connection with such a transaction, the defendants must have been "aware that [the company's] capital was impaired." PHP Liquidating, 291 B.R. at 598.

As previously discussed, there is evidence to suggest that Southern, as a shareholder of Mirant, had knowledge of Mirant's financial condition at the time of the various Transfers. See supra Part (A)(2)(b). A reasonable jury could make such a finding given the evidence MCAR provides that a number of Southern's Board members served concurrently as directors on Mirant's Board. Id. Additionally, MCAR has introduced evidence that indicates that these individuals were aware that Mirant's financial reporting was suspect and may have reflected the existence of inflated figures reported to various external entities. See supra Part (B)(3)(b). From this evidence a jury could reasonably conclude that Southern, as a shareholder, knew or should have known that Mirant faced such a weak financial position, so as to prevent the lawful payment of dividends. The court therefore

finds that summary judgment as to the issue of bad faith, in connection with the issuance of illegal dividends as alleged in Count B, is inappropriate.

## C.    Aiding and Abetting Fiduciary Duty Breach Claims—Count C

As part of MCAR's Count C, which generally alleges a breach of fiduciary duties, MCAR claims that "Southern induced and aided and abetted fiduciary duty breaches by Mirant's directors and officers."  (Fourth Am. Compl. ¶ 162.)  The alleged underlying breaches involved Mirant's directors and officers "approving and implementing the Advance Return, illegal dividends, and other Transfers to Southern."  (Id. ¶ 161.)  MCAR must establish three elements in connection with such an allegation:  (1) existence and breach of a fiduciary duty owed by Mirant's directors to Mirant; (2) Southern knowingly participated in the breach; and (3) damages resulted from the concerted action of Mirant's directors and Southern.  See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P., 817 A.2d 160, 172 (Del. 2002).  Southern makes a number of arguments that MCAR's aiding and abetting claims fail at the summary judgment stage, each of which is considered in turn.

### 1.    Mirant's Directors' Liability

First, Southern argues that the court must grant summary judgment on the aiding and abetting allegation because MCAR cannot state a claim for the existence and breach of fiduciary duty on the part of Mirant's directors.  Where a plaintiff

"fails to state a claim for breach of fiduciary duty against the [parent company] or [subsidiary's] directors," the plaintiff's claim that a third party "aided and abetted any underlying breach of fiduciary duty fails." Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 215 (Del. Ch. 2006). Southern relies on three grounds in making its argument—(a) Mirant's directors owed no fiduciary duty to Mirant; (b) Mirant's directors are protected from liability by the business judgment rule; and (c) Mirant's directors are exculpated from liability for a breach of the duty of care by the company's articles of incorporation.

### a.   Fiduciary Duty Owed by Mirant's Directors to Mirant

Southern first claims that MCAR's aiding and abetting claims must fail as a matter of law because Mirant's directors owed no fiduciary duties to Mirant, and thus the first element of the aiding and abetting claims cannot be satisfied. Initially, both sides agree that under Delaware law, only "the directors and officers of an *insolvent* wholly-owned subsidiary owe fiduciary duties to the subsidiary and its creditors." Claybrook v. Morris (In re Scott Acquisition Corp.), 344 B.R. 283, 286 (Bankr. D. Del. 2006) (emphasis added) (distinguishing this situation from the norm—where "when a subsidiary is wholly owned, its officers and directors owe their fiduciary duties solely to the single shareholder, and not to the subsidiary corporation itself."). However the parties disagree as to whether or not MCAR has

supplied evidence sufficient to establish that Mirant was insolvent under the applicable law, thereby triggering the duties owed to the subsidiary entity (and likewise its creditors).

Southern argues that under Delaware fiduciary duty law, a corporation is insolvent only if it has:  "(1) a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof, or (2) an inability to meet maturing obligations as they fall due in the ordinary course of business."  Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.), 493 F.3d 345, 384 (3d Cir. 2007) (citation and internal quotations omitted).  MCAR labels this "equitable or cash-flow insolvency," and distinguishes it from "balance sheet insolvency," which it maintains is also a test for insolvency under Delaware law.  (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 33.)  Under this latter test, insolvency is established when an entity's liabilities exceed its fairly valued assets. See Matrix Group Ltd. v. Rawlings Sporting Goods Co., 477 F.3d 583, 590 (8th Cir. 2007).  Southern argues that "MCAR's cited 'balance sheet' test . . . does not apply in the fiduciary duty context," and also that since there is no evidence that Mirant was insolvent under either of the equitable insolvency tests, MCAR's claims must fail for lack of a fiduciary duty owed by Mirant's directors to Mirant.  (Def.'s Reply Br. in Supp. of Mot. for Summ. J. 20.)

In discussing when a director's fiduciary duties to creditors arise on account of insolvency, a number of Delaware courts have held that "an entity is insolvent when it has liabilities in excess of a reasonable market value of assets held."[23] Geyer v. Ingersoll Publ'ns Co., 621 A.2d 784, 789 (Del. Ch. 1992). Subsequent cases analyzing the insolvency issue have stopped short of using this description as "a precise definition . . . in determining whether, in fact, an entity is insolvent." Francotyp-Postalia AG & Co. v. On Target Tech., Inc., No. 16330, 1998 WL 928382, at *5 n.8 (Del. Ch. Dec. 24, 1998) (noting that in Geyer, the court was discussing the precise point in time at which a director becomes a fiduciary of a creditor because of insolvency); see also Blackmore Partners, L.P. v. Link Energy LLC, No. Civ.A. 454-N, 2005 WL 2709639, at *6 (Del. Ch. Oct. 14, 2005) (in determining, under Delaware law, whether directors owe fiduciary duties to creditors, the court described insolvency as occurring "at the moment when the entity has liabilities in excess of a reasonable market value of assets held") (citation and internal quotations omitted). Id. Although these cases discuss the triggering of fiduciary duties owed by directors to creditors, application of the principle is warranted in the present

---

[23] Language from the Geyer court's opinion indicates that the reasonable market value definition is a mere elaboration of the equitable insolvency test language, which specifies that "[a]n entity is insolvent when it is unable to pay its debts as they fall due in the usual course of business." See Geyer v. Ingersoll Publ'ns Co., 621 A.2d 784, 789 (Del. Ch. 1992).

situation where duties to both creditors and the subsidiary are determined by the company's insolvency status. Thus, in the present context of determining whether Mirant's directors owed a fiduciary duty to the subsidiary and its creditors because of insolvency per <u>In re Scott Acquisition Corp.</u>, use of the balance sheet insolvency test is likewise appropriate.

"Whether a corporation is insolvent, and when it becomes so, are issues of fact." <u>In re Teleglobe Commc'ns Corp.</u>, 493 F.3d at 384. In support of its claim that Mirant was insolvent, and thus that its directors owed fiduciary duties to the entity and its creditors, MCAR introduces evidence in the form of expert financial analysis and testimony. Such evidence consists of a financial appraisal, performed by James M. Hill ("Mr. Hill"), an expert in business valuation, estimating Mirant's fair market value at certain points throughout 1999 and 2000. These calculations were done in accordance with MCAR's advocated "balance-sheet insolvency standard," and reflect a negative net worth for Mirant at six different dates. In Mr. Hill's opinion, "Mirant was insolvent and undercapitalized as of each of the Valuation Dates." (Pl.'s Ex. 417 ¶ 3.) The court finds that there exist genuine issues of material fact in dispute regarding whether Mirant was in fact insolvent at the time of its Transfers to

Southern, and thus summary judgment is not appropriate on the issue of whether Mirant's directors owed a fiduciary duty to Mirant.[24]

### b.    The Business Judgment Rule

Southern next argues that the business judgment rule protects Mirant's directors from liability, and consequently because MCAR cannot state a claim for breach of fiduciary duty against Mirant's directors, MCAR's aiding and abetting claims must fail as a matter of law.  The business judgment rule affords a protective presumption "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  Orman v. Cullman, 794 A.2d 5, 19-20 (Del. Ch. 2002) (citation and internal quotations omitted).  When the rule applies, "the judgment of a properly functioning board will not be second-guessed and absent an abuse of discretion, that judgment will be respected by the courts."  Id. at 20 (citation and internal quotations omitted).  The presumption embodies the general rule that in making decisions on behalf of a corporation, "a board is presumed to have acted properly, [and] the burden is on the party challenging the decision to

---

[24]    In its Reply Brief, Southern argues that the claims must likewise fail because creditors of an insolvent corporation have no right as a matter of law to assert direct claims for breaches of fiduciary duty.  (Def.'s Reply Br. in Supp. of Mot. for Summ. J. 19.) However this argument does not carry the day, because in the present action MCAR represents Mirant as well as its creditors.  See supra, at 6.

establish facts rebutting the presumption." <u>Id.</u> (citation and internal quotations omitted). "If the plaintiff fails to meet this burden, the business judgment rule insulates the directors from liability." <u>Nebenzahl v. Miller</u>, No. CIV. A. 13206, 1996 WL 494913, at *2 (Del. Ch. Aug. 29, 1996). In the present context, summary judgment must be denied if MCAR is able to "allude to facts in the record which are undisputed or which are disputed but, if true, are sufficient to rebut the presumption afforded by the business judgment rule." <u>Weinberger v. United Fin. Corp. of Cal.</u>, CIV. A. No. 5915 (1979), 1983 WL 20290, at *6 (Del. Ch. Oct. 13, 1983).

Four distinct elements are required in order for the business judgment rule to apply: (1) a business decision; (2) disinterestedness and independence; (3) due care; and (4) good faith. <u>Roselink Investors, L.L.C. v. Shenkman</u>, 386 F. Supp. 2d 209, 216 (S.D.N.Y. 2004). Where a plaintiff establishes facts that show any of the above four elements were not present, the presumption of the business judgment rule is rebutted. <u>Id.</u> at 216-17. Southern argues that "MCAR has *no* evidence to establish that one of these elements was absent as to any of the Transfers," and says that instead MCAR "offers only unsupported, conclusory allegations that Mirant's directors made risky or foolish business decisions, which are categorically insufficient to defeat the business judgment rule." (Mem. of Law in Supp. of Def.'s

Mot. for Summ. J. 30.)  Southern states that because of this summary judgment is appropriate as to the claims for aiding and abetting a breach of fiduciary duty.

MCAR argues that Mirant's directors failed to meet the "disinterestedness and independence" requirement of the business judgment rule, and thus the protective presumption does not apply.  (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 35.)  The disinterestedness and independence requirement "means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing."  Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000).  "When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain."  Weinberger v. UOP, Inc., 457 A.2d 701, 710 (Del. 1983).

In ASARCO LLC v. Ams. Mining Corp., 396 B.R. 278, 405 (S.D. Tex. 2008), the court confronted the issue of disinterestedness and independence on facts similar to the present case.  In that case, ASARCO was a wholly-owned subsidiary of the parent company AMC.  Id. at 302.  ASARCO alleged that AMC had aided and abetted ASARCO's directors' breach of fiduciary duty to ASARCO and ASARCO's creditors in connection with the sale of certain stock.  Id. at 394.  In analyzing the

independence and disinterestedness of the directors, the court found that the business judgment rule presumption did not apply because "[s]ix of the nine ASARCO directors who approved the transaction also served on AMC's . . . boards of directors." Id. at 405. Additionally, these men signed the consents for both companies approving of the transaction, and the remaining directors of ASARCO were also closely affiliated with AMC. Id. The court concluded that each of the directors stood on both sides of the transfer, and that the business judgment rule's protective presumption did not apply.[25] Id.

The court finds that MCAR has introduced evidence from which a jury could determine that Mirant's directors were neither disinterested nor independent. It

---

[25]    Southern cites to Roselink Investors, 386 F. Supp. 2d at 223, for support that MCAR cannot meet the standard for creating a material factual dispute as to the disinterestedness and independence of Mirant's directors. In Roselink Investors, the court said the following: "[T]his is not a case where directors transferred company funds into their personal bank accounts; rather, defendants transferred funds to the parent corporation with the purpose of assisting the parent, which was entirely in keeping with their fiduciary duty to consider the best interests of [the parent]." Id. Southern argues that because "[t]here is no evidence that any Mirant director had a personal interest in any Transfer separate and apart from his interest as a corporate fiduciary," MCAR cannot satisfactorily establish disinterestedness and lack of independence sufficient to rebut the business judgment rule's presumption. (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 30-31 n.13.) However Roselink Investors is distinguishable on its facts. First, that case involved only two directors, and they did not control the company's board. Roselink Investors, 386 F. Supp. 2d at 213. Likewise, the court found it significant that in making the transfer, the directors specifically believed the transaction would further the interests of the creditors. The court similarly noted that the creditors had failed to establish "any significant financial adverse interest on the part of defendants." Id. at 222. When the quoted language from Roselink Investors is read in light of the facts of this case, it becomes clear that it does not apply to the current dispute.

points to evidence that prior to the date of the IPO, Mirant had five directors on its Board.  (Def.'s App. 1 at '602.)  Three of these Mirant directors were also directors of Southern, and the two remaining Mirant directors served in various executive officer and leadership positions for Southern.  (Id.; Pl.'s Ex. 458 at I-23; see also supra, at 24-25.)  Based on the ASARCO court's rationale, this evidence is sufficient to indicate a factual dispute appropriate for a jury as to whether, at the time of each Transfer, these individuals stood on both sides of the transaction and could not be said to have been "independent" or "disinterested."  The court therefore finds that MCAR has satisfied its burden, having alluded to facts in the record which, if true, are sufficient to rebut the presumption afforded by the business judgment rule, and as such, summary judgment is inappropriate.[26]

---

[26]     In its Reply Brief, Southern argues that the dual status of Mirant's directors did not cause them to have divided loyalties or conflicting interests, and thus the business judgment rule presumption has not been rebutted.  (Def.'s Reply Br. in Supp. of Mot. for Summ. J. 21.)  To support this argument Southern cites Trenwick, 906 A.2d at 201.  In that case, one director of the wholly-owned subsidiary was also a director of the parent company.  The remaining members of the subsidiary's board were employees of the parent and the subsidiary.  The plaintiff attempted to argue that because the subsidiary's directors were all officers of the subsidiary and owed their livelihood to the parent, they did not exercise their independent business judgment as to the transactions at issue.  The court stated:  "Insofar as this statement is intended to suggest a motive on the part of the [subsidiary's] directors to injure the long-term health of that entity, it fails entirely of its purpose."  Id.  An inquiry into the disinterestedness and independence requirements of a company's directors for the purposes of rebutting the business judgment rule's presumption is entirely separate from one exploring the actual motives of particular directors, rendering Trenwick inapplicable.  On a separate note, in response to Southern's attempts to reargue the duty issue in footnote 40 of its Reply, the court directs the
(continued...)

### c. Express Exculpation of Directors From Liability

Southern next argues that "Mirant's articles of incorporation exculpated its directors from liability for breach of fiduciary duty to the fullest extent permitted by Delaware law." (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 31.) It claims that because of this exculpation provision, "Mirant's directors cannot be held liable for a breach of the duty of care." (Id.) Southern says that consequently, because there is no evidence that Mirant's directors can be held liable for a breach of their duty of good loyalty or for acting in bad faith, "Count C fails as a matter of law." (Id. at 31-33.) MCAR argues that despite the exculpation clause, Mirant's directors still owed a duty of care to Mirant that was capable of being breached. It further states that the clause does not provide protection "to third parties that aid and abet the directors in their breach," and that it is unnecessary to sue the directors for such a breach in order to sustain aiding and abetting claims against the parent company. (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 39.)

Delaware statutory law expressly provides for the inclusion of exculpation provisions in a corporation's certificate of incorporation:

---

[26](...continued)
defendant to its discussion at <u>supra</u>, Part (C)(1)(a).

**Contents of certificate of incorporation**

(b) In addition to the matters required to be set forth in the certificate of incorporation by subsection (a) of this section, the certificate of incorporation may also contain any or all of the following matters:

. . . .

(7) A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit. . . .

Del. Code Ann. tit. 8, § 102(b)(7).

The statutory language expressly limits the application of the exculpatory provision to "personal liability . . . for *monetary damages* for breach of fiduciary duty as a director." (Id.) (emphasis added). This is confirmed by the stated purpose of § 102(b)(7), which is to "permit shareholders . . . to exculpate directors from any personal liability for the *payment of monetary damages* for breaches of their duty of care." In re Walt Disney Co. Derivative Litig., 907 A.2d 693, 752 (Del. Ch. 2005) (emphasis added). "The existence of an exculpation provision authorized by § 102(b)(7) does not, however, eliminate a director's fiduciary duty of care, because

a court may still grant injunctive relief for violations of that duty." Id.; see also

Malpiede v. Townson, 780 A.2d 1075, 1095 n.68 (Del. 2001) ("Section 102(b)(7) is not,

and was not intended to be, a panacea for directors . . . section 102(b)(7) does not

eliminate the duty of care that is properly imposed upon directors."). Because the

exculpation clause simply limits the financial recovery available from directors,

"[d]irectors continue to be charged under Delaware law with a duty of care in the

decisionmaking [sic] process and in their oversight responsibilities." In re Walt

Disney Co., 907 A.2d at 752 n.444 (citation and internal quotations omitted). The

court finds that despite the presence of exculpatory language in the articles of

incorporation, Mirant's directors continued to owe a duty of care to Mirant that was

capable of being breached, and MCAR is consequently capable of establishing the

first requirement as dictated by Gotham Partners.[27] Summary judgment as to the

---

[27]     In Official Committee of Unsecured Creditors of Radnor Holdings Corp. v.
Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.), 353 B.R. 820, 842-43
(Bankr. D. Del. 2006), the court discussed various claims that were either "not pled or
dropped after trial." As part of this analysis it said that much of the plaintiff's "case at trial
at best would have implicated the duty of care." Id. at 842. The court continued by
theorizing that an exculpatory provision in the company's certificate of incorporation,
included pursuant to § 102(b)(7), "would have barred any such claims against the board,
and [defendants] therefore could not have possibly been held liable for aiding and abetting
such claims." Id. at 843. The court does not accept this case as binding because the court
was hypothesizing facts not present in the case, thus rendering this discussion to be dicta.

aiding and abetting claims for breach of fiduciary duties based on the exculpatory clause provision is therefore inappropriate.

### 2. Southern's Knowing Participation in Mirant's Breach of Fiduciary Duty

Southern next argues that it is entitled to summary judgment on MCAR's aiding and abetting a breach of fiduciary duty claims because there is no evidence that Southern was aware of any breach of a fiduciary duty by Mirant. "Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach." Malpiede, 780 A.2d at 1097. Simply demonstrating that the defendant "was a participant in the complained-of transactions" does not alone subject it to liability for aiding and abetting breaches of fiduciary duty. Official Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.), 353 B.R. 820 844 (Bankr. D. Del. 2006). "Rather a plaintiff must prove that the defendant knowingly participated not just in the transactions but in the breach of fiduciary duties." Id. "In some circumstances, the terms of the negotiated transaction themselves may be so suspect as to permit, if proven, an inference of knowledge of an intended breach of trust." Gatz v. Ponsoldt, 925 A.2d 1265, 1276 (Del. 2007) (citation and internal quotations omitted).

As previously discussed, Mirant's directors owed fiduciary duties to Mirant as well as its creditors only if Mirant was insolvent. <u>See</u> <u>supra</u> Part (C)(1)(a). Where a defendant has no knowledge that a company is insolvent, and thus does not know that fiduciary duties are even owed to creditors, let alone that they were breached, the "knowing participation" element of an aiding and abetting claims is not satisfied. <u>In re Radnor Holdings Corp.</u>, 353 B.R. at 844. Southern argues that it "could not have 'knowingly participated' in any breach unless it knew that Mirant was insolvent at the time of the directorial acts or omissions MCAR alleges." (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 34.) It states that MCAR has failed to provide evidence that Mirant was insolvent, and that "MCAR has not identified *anyone*—from Southern, Mirant, or anywhere else—who stated or suggested that Mirant was insolvent at the time of the Transfers, or at any time before the Spin-Off." (<u>Id.</u>) Southern concludes by arguing that the "knowing participation" element required to state a claim for aiding and abetting a breach of fiduciary duties has not been satisfied, and summary judgment is appropriate. (<u>Id.</u> at 34-35.)

MCAR responds that a "knowing participation" confession from Southern is unnecessary, and that "the evidence need merely allow the inference that Southern acted with knowledge of the breach." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 39-40.) It does not contest Southern's argument regarding the requirement that

Southern have knowledge of the existence of Mirant's directors' fiduciary duties owed to Mirant and its creditors by way of the company's insolvency. Instead, MCAR argues that because the "action of [Mirant's] board was also the action of Southern . . . [t]he jury can certainly infer the knowing participation of Southern in the breaches of fiduciary duty by its officers and directors while they were wearing their [Mirant] directors' hats." (Id. at 40.)

As previously discussed, MCAR has come forward with sufficient evidence to indicate a factual dispute regarding Mirant's insolvency. See supra Part (C)(1)(a). However, MCAR has not supplied any evidence that suggests Southern knew of Mirant's insolvency and thus that Mirant's directors owed fiduciary duties to Mirant and its creditors. Even taking into account MCAR's argument that Southern essentially was Mirant's Board, no evidence has been supplied that shows Mirant's Board itself had knowledge of the company's insolvency. At most, the evidence introduced simply provides a factual dispute as to Mirant's inherent state of insolvency. See supra Part (C)(1)(a). However this evidence is limited in its usefulness to the present inquiry, as it consists solely of expert financial analysis by an outsider to the company. Calculations regarding Mirant's insolvency were performed by Mr. Hill, who has had no prior affiliation with Mirant or Southern. Mr. Hill's knowledge cannot be imputed to either Mirant or Southern, so his

testimony is insufficient to satisfy the "knowing participation" requirement. MCAR

has likewise provided no additional evidence that anyone at either of the companies

knew or had reason to believe Mirant was insolvent at the time of the Transfers.[28]

Without such evidence, this court may not properly conclude that Southern could

have known that Mirant's directors owed fiduciary duties to the subsidiary. In the

absence of knowledge of the existence of such duties, Southern's participation in the

transactions could not have been a "knowing participation" in a breach of any

fiduciary duties. See In re Radnor Holdings Corp., 353 B.R. at 844. Furthermore,

MCAR has failed to identify evidence suggesting that "the terms of the negotiated

transaction themselves [were] so suspect as to permit . . . an inference of knowledge

of an intended breach of trust." Gatz, 925 A.2d at 1276 (citation and internal

quotations omitted). Its conclusory statement that the jury can infer Southern's

knowing participation in the breach of fiduciary duties, because of "the duality of

the roles of the members of the board," does nothing to satisfy its baseline

evidentiary burden. (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 40.) The court

thus concludes that MCAR has failed to demonstrate the presence of a material

factual dispute regarding Southern's "knowing participation" in Mirant's directors'

---

[28]     At most the evidence suggests that Southern knew Mirant's financial figures were
unreliable and the company faced a weak financial position. See supra Part (B)(4).

breach of fiduciary duties, and thus summary judgment is appropriate regarding the aiding and abetting claims against Southern.[29]

### D.    Unjust Enrichment Claim—Count D

MCAR alleges in Count D of the Complaint that it is entitled to restitution from Southern for the various Transfers under the doctrine of unjust enrichment. Prior to addressing the elements of the claim, Southern argues that MCAR's unjust enrichment claim is time-barred under the applicable statute of limitations. Southern says that Texas choice-of-law rules govern the analysis, and under such rules, "Texas' statutes of limitation apply even when the law of another state governs the substantive right."  (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 37.)  Southern states that under the Texas statute of limitations, the two-year time period for bringing an unjust enrichment claim has expired and therefore the cause of action is time-barred.[30]

---

[29]    The court notes that in its Motion for Summary Judgment, Southern also argues that (1) MCAR has failed to introduce evidence of damage to Mirant related to this claim; (2) MCAR's claim is barred by in pari delicto; and (3) MCAR's claim based on the 1999 Loan Repayment is time-barred.  (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 35-37.) However because the court is granting summary judgment on the aiding and abetting claim pursuant to the "knowing participation" requirement, it will not address these three remaining issues raised by Southern.

[30]    Both parties agree that Texas Civil Practice and Remedies Code Annotated § 16.003 (2007) is applicable if the Texas statute of limitations period applies.

MCAR argues that because jurisdiction in this case "is based on a federal question . . . federal choice of law rules are applicable, . . . [and] the unjust enrichment claims in this case should be governed by Georgia law." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 43.) MCAR notes that Georgia law has a four-year statute of limitations period for the same claim, which would render the unjust enrichment allegation timely. In support of its argument for the Georgia statute of limitations, MCAR cites this court's December 11, 2006 and April 1, 2008 Orders, as well as provisions of the Restatement (Second) of Conflict of Laws, which it alleges yield a "federal choice of law analysis . . . [that] compels the same result." (<u>Id.</u>)

In beginning its analysis, the court notes that the reference of this action originally pending in the Bankruptcy Court was withdrawn pursuant to 28 U.S.C. § 157(d) and the case was subsequently transferred to the Northern District of Georgia, Atlanta Division, pursuant to 28 U.S.C. § 1404(a). (Order on Def.'s Mot. for Withdrawal, Jan. 10, 2006, at 34-37; Order on Def.'s Mot. to Transfer, Feb. 15, 2006, at 9-10.) As justification for the transfer, the Texas District Court found that "the convenience of the parties and witnesses, and the interest of justice w[ould] best be served by a transfer of this action." (Order on Def.'s Mot. to Transfer, Feb. 15, 2006, at 9.)

Although MCAR maintains that federal jurisdiction in this matter exists because of federal question jurisdiction, it is necessary to address its pendent state law claims according to the principles established for diversity cases in <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487 (1941). <u>See</u> <u>Thomason v. Mitsubishi Elec. Sales Am., Inc.</u>, 701 F. Supp. 1563, 1565 (N.D. Ga. 1988) (Shoob, J.).

> Under <u>Klaxon</u> a federal court applies the state law of the courts in the state where it is located. Where a case is transferred to a more convenient forum based on 28 U.S.C. § 1404(a), however, the court is obligated to apply the state law that would have applied absent the change in venue.

<u>Id.</u> (citing <u>Van Dusen v. Barrack</u>, 376 U.S. 612, 639 (1964)); <u>see also</u> 17A James Wm. Moore et al., <u>Moore's Federal Practice</u> § 124.30[4] (3d ed. 2008). "A change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms." <u>Van Dusen</u>, 376 U.S. at 639. This court previously found that Georgia law applies to the substantive unjust enrichment claim in the case. (Order on Def.'s Mot. for Summ. J., Dec. 11, 2006, at 26; Order on Def.'s Mot. to Establish Governing Law, Apr. 1, 2008, at 28.) However this finding does not end the inquiry here:

> If the transferor state categorizes a rule as procedural for choice of law purposes, the transferee court must apply the transferor state's procedural rule, even if under the transferor state's choice of law rules, the transferee court must apply its own substantive law or the substantive law of another state.

Moore's, § 124.30[4].  Texas, as the transferor state, deems statutes of limitation as procedural for choice of law purposes.  Armstrong v. Am. Home Shield Corp., No. Civ.A.4:99-CV-169-Y, 2001 WL 34119165, at *10 (N.D. Tex. Sept. 19, 2001) (while engaging in a choice-of-law discussion, the court stated "[u]nder . . . Texas law, statutes of limitations are procedural."); see also Vega v. United States, 512 F. Supp. 2d 853, 860 (W.D. Tex. 2007) ("A statute of limitations is a procedural device which operates as a defense to limit the remedy available from an existing cause of action . . . .").  Because of this procedural classification, the court finds that Texas's two-year statute of limitations for the unjust enrichment claim is applicable, despite the continuing relevance of Georgia law to the substantive claim.

Pursuant to the Reorganization Plan, MCAR is authorized to pursue only those causes of action against Southern "arising from or relating to any transaction . . . that occurred on or before April 2, 2001."  (Def.'s App. 8 at 20, Ex. A ¶ 206.) MCAR concedes that it "is not asserting any claim based on a transaction between Mirant and Southern that occurred after April 2, 2001."  (Pl.'s Resp. to Def.'s SOMF ¶ 10.)  Under the Bankruptcy Code, the statute of limitations period for bringing such a claim may be extended only if "such period has not expired before the date of the filing of the petition."  11 U.S.C. § 108(a).  Here, Mirant did not file for bankruptcy until July 14, 2003.  (Def.'s SOMF ¶ 6.)  As such, the two-year period for

filing an unjust enrichment claim had expired prior to the petition date, and an extension of the applicable statute of limitations was foreclosed.[31] The court thus finds that MCAR's unjust enrichment claim found in Count D is barred by Texas's two-year statute of limitations.[32]

### E.     Alter Ego Claim—Count E

Count E of MCAR's Fourth Amended Complaint alleges that Southern was the alter ego of Mirant, and requests "contribution from Southern for payment of debts imposed on Mirant because of its actions." (Fourth Am. Compl. ¶ 178.) Southern argues that it is entitled to summary judgment because MCAR has failed to identify evidence sufficient to create a material factual dispute regarding the appropriateness of piercing the corporate veil under Delaware law. Specifically, it argues that (1) Southern and Mirant did not operate as a single economic entity; (2)

---

[31]     MCAR does not dispute that if applicable, Texas's two-year statute of limitations for unjust enrichment actions would bar its claim. Additionally, as MCAR gives no binding legal authority for its advocated "federal choice of law analysis," the court refrains from relying on the Restatement (Second) of Conflict of Laws, as suggested by MCAR. (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 43.)

[32]     In its Motion for Summary Judgment, Southern also argues that (1) MCAR has failed to introduce evidence that Mirant reasonably expected any or additional compensation for the Transfers to Southern; (2) the 1999 Loan Repayment and the Separation Agreement Transfers were made pursuant to contracts; (3) Southern did not receive a benefit in connection with the Turbine Transfers; and (4) MCAR has not introduced evidence of damages relating to the unjust enrichment claim. (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 39-43.) However because the court finds that the unjust enrichment claim is barred by the applicable statute of limitations, it will not address these remaining issues.

Southern's alleged use of Mirant's corporate form did not work as a fraud on creditors; and (3) MCAR has failed to provide a calculation of damages under an alter ego theory. (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 44-49.) MCAR does not argue to the contrary or put forth evidence to support its claim—instead it concedes that it is "no longer pursuing the alter ego claim." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 2.) Because no genuine issue of material fact exists, the court finds that Southern is entitled to judgment as a matter of law for Count E which alleges Mirant was the alter ego of Southern.

### F. Release Agreement--Counts C, D, and E

Finally, Southern argues that summary judgment is appropriate on all of MCAR's claims in Counts C, D, and E because Mirant released all of its non-avoidance claims against Southern in the Indemnification and Insurance Matters Agreement ("Agreement"). (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 49.) Southern also says that in conjunction with this Agreement, Mirant agreed not to sue on any released claims. (Id.) It argues that "because . . . the business judgment rule applies," summary judgment on Counts C, D, and E is appropriate. (Def.'s Reply Br. in Supp. of Mot. for Summ. J. 27.) MCAR argues that "[t]he [Agreement], including the release contained within, was authorized by [Mirant's] board, which, as discussed earlier, represented Southern on both sides of the transaction," and

because Southern cannot prove that the release was entirely fair to Mirant and its creditors, this issue survives the Motion for Summary Judgment. (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 48-49.)

"Under Georgia law, a release or settlement agreement is a contract subject to construction by the court." Kobatake v. E.I. DuPont De Nemours & Co., 162 F.3d 619, 624 (11th Cir. 1998) (citation and internal quotations omitted). As the entering into of such a contract required a "business decision" on the part of Mirant's directors, an analysis is necessary as to whether the business judgment rule applies. See Orman, 794 A.2d at 19-20. The court's previous discussion regarding the disinterestedness and independence of Mirant's Board is relevant here, and the court again finds that MCAR has satisfied its burden, having pointed to facts in the record which, if true, are sufficient to rebut the presumption afforded by the business judgment rule, making summary judgment inappropriate as to Counts C, D, and E based on the release of claims in the Agreement.[33] See supra Part (C)(1)(b).[34]

---

[33] The court will not further address MCAR's remaining arguments as to why summary judgment is inappropriate, insofar as it has already found material factual disputes regarding the disinterestedness and independence of Mirant's Board.

[34] Southern also seeks to argue in its Reply Brief that summary judgment is warranted as to all of MCAR's claims on the independent basis that "MCAR has not provided a sufficient computation of damages." (Def.'s Reply Br. in Supp. of Mot. for Summ. J. 29.) The court takes this opportunity to point out that Southern has made this argument as to

(continued...)

### III.    **Summary**

For the foregoing reasons, Southern's Motion for Summary Judgment [Doc. No. 354] is GRANTED IN PART and DENIED IN PART.  Summary judgment is GRANTED in favor of Defendant Southern as to (1) MCAR's alter ego claim (Count E); (2) the fraudulent transfer claim based on the Turbine Transfers (Count B); (3) the illegal dividend claim based on the Turbine Transfers (Count B); (4) the aiding and abetting a breach of fiduciary duty claims (Count C); and (5) the unjust enrichment claim (Count D).  Summary judgment is DENIED with respect to (1) the constructively fraudulent transfers claims relating to (a) the 1999 Advance Return/Loan Repayment (Count A), (b) the 2000 Dividends (Count B), and (c) the Separation Agreement Transfers (Count B); (2) the actual fraudulent transfer claims (Count B); and (3) the illegal dividend claims (Count B).  MCAR's Motion for Leave to File a Sur-Reply [Doc. No. 439] is GRANTED.  The Parties are DIRECTED to file their Consolidated Pretrial Order within 45 days, in conformance with the Rules of this court, on or before March 23, 2009.

---

[34](...continued)
a number of MCAR's claims throughout its summary judgment motion, which have been addressed when appropriate.  To the extent that this section of Southern's Reply Brief makes new arguments relating to damages, the court refrains from considering such assertions, because reply briefs are not the vehicles in which to introduce new arguments.  See Ga. Dep't of Natural Res., 897 F. Supp. at 1471 ("This court will not consider arguments raised for the first time in a reply brief.").

IT IS SO ORDERED, this 5th day of February, 2009.

s/Beverly B. Martin
BEVERLY B. MARTIN
UNITED STATES DISTRICT JUDGE